IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

DENISE SHIPMAN,

Plaintiff,

v. No: 5:12-cv-00589

UNITED PARCEL SERVICE, INC.,

Defendant.

DEPOSITION OF

# MICHAEL WARREN SMITH

WEDNESDAY, MAY 8, 2013

9:00 A.M.

ALSTON & BIRD LLP

4721 EMPEROR BOULEVARD

DURHAM, NORTH CAROLINA

Garrett Reporting Services, Inc.
Professional Stenomask for the Record

Post Office Box 98475, Raleigh, North Carolina 27624-8475
Telephone (919) 676-1502 – Fax (919) 676-2277

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

SANDRA J. POLIN, ESQ.
LAW OFFICE OF SANDRA J. POLIN
514 DANIELS STREET
PRIVATE MAIL BOX 330
RALEIGH, NORTH CAROLINA 27605

ON BEHALF OF THE DEFENDANT:

CHARLES A. GARTLAND, II, ESQ.
ALSTON & BIRD LLP
950 F STREET, NORTHWEST
WASHINGTON, D.C. 20004-1404

ALSO PRESENT:

DENISE SHIPMAN

TABLE OF CONTENTS


| WITNESS | EXAMINATION |
|---|---|
| Michael Warren Smith | |
| By Ms. Polin | 4 |
| By Mr. Gartland | 77 |

| EXHIBIT | DESCRIPTION | MARKED |
|---|---|---|
| (NO EXHIBITS MARKED) | | |

P R O C E E D I N G S

(WHEREUPON,

Michael Warren Smith

was called as a witness, duly sworn, and testified as follows:)

E X A M I N A T I O N

BY MS. POLIN: 9:00 A.M.

Q Good morning.

A Good morning.

Q My name is Sandra Polin. I'm the attorney for Denise Shipman. As you may know, Ms. Shipman has brought a lawsuit against UPS, and this morning I'm going to be asking you some questions relating to that lawsuit.

If you don't understand my questions, just please tell me; I will repeat the question. And in answering the question, if you can say either "yes" or "no," if it calls for that, so -- and not nod your head so that the court reporter can -- the reporter can record your responses.

Also, if I'm asking a question, if you could allow me to finish the question so that you can respond, and I will try to do the same thing so that we're not talking over another so, again, she can get your response.

If you need to take a break, please let me know. All I ask is that I allow you to finish the

question that I have asked and then we'll take a break after that.

Can you state your name for the record, please?

A Michael Warren Smith.

Q And your date of birth?

A 7/18/82.

Q And your place of birth?

A Charlotte, North Carolina.

Q Are you married?

A No.

Q Where did you attend high school?

A I went to two different high schools. I started off at Independence High School, and I graduated from Butler High School.

Q All right. And the year of graduation?

A 2000.

Q And did you attend college?

A Yes, ma'am.

Q Where did you attend?

A North Carolina State.

Q And did you graduate?

A Yes, ma'am.

Q What year?

A 2004.

Q And what was your major?
A Business management.
Q When did you start working at UPS?
A 2004.
Q Had you applied prior to 2004?
A No.
Q And what position did you hire in at?
A I started off as a loader.
Q And did you know anybody at UPS prior to applying?
A I met the recruiter.
Q The recruiter came out to State?
A Uh-huh.
Q And since your position at -- was the position as a loader full time?
A No.
Q Okay. And so how long did you have that part-time position?
A 28 days.
Q Okay. What happened within that time frame?
A That's too broad of a question. I don't -- I mean, what do you mean, "what happened?"
Q What happened within the 28 days so that you only had your first position for 28 days?
A I transferred to the sort.

Q And what's the sort?
A This is where we sort the packages to the different belts that they go on throughout the building.
Q Okay. How did you -- why did you transfer to the sort?
A Because it paid a dollar more an hour.
Q So did you apply for that position?
A Yes.
Q And how did you know about the position?
A I asked a guy I met in the building how he got to do the job he was doing.
Q You asked who?
A A guy named Chris Johnson.
Q And where did you see him at?
A I knew him from school.
Q And at that time did you know that the position paid a dollar more?
A He told me that.
Q Okay. And so he told you how to apply for that sort position?
A Exactly.
Q And how long did you have the sort position?
A For -- it was -- I want to say five months, maybe.
Q Okay. And then what position did you have

after that?

A Part-time supervisor for revenue recovery.

Q And how did you get that position?

A I applied for it.

Q How did you find out about it?

A Somebody -- well --

Q Who was --

A -- actually, Chris --

Q Who was that?

A -- referred me to somebody in the finance department who was looking for a part-time supe.

Q Okay. I know that UPS has its own terminology, just like any other employer, but when you're able, if you can not use lingo or --

A See, it's -- it's second nature to me, so if you --

Q I know. I know it --

A If you don't understand what I'm saying, I can clarify it for you.

Q No. I know it's second nature to you, and that's why I'm giving you sort of a broad reminder now that if you can remember to, you know, not use the lingo.

A I honestly don't even know which part of it you didn't understand.

Q The "supe."

A Supervisor.
Q And so did you make an application for that --
A Not on paper.
Q -- supervisor's position?
COURT REPORTER: If you'll try --
BY MS. POLIN:
Q I'm sorry. You cut me off.
COURT REPORTER: Yeah. If you'll try not to talk over --
THE WITNESS: Okay.
COURT REPORTER: Thanks.
BY MS. POLIN:
Q What was the response?
A You finish your question.
Q What was the response?
A To what?
MS. POLIN: Okay. Let's take a break. I think we've got off to a bad start.
(A brief recess was taken.)
BY MS. POLIN:
Q What is your current position, Mr. Smith?
A I'm a full-time supervisor on-road.
Q And what are your duties in that position?
A Supervise package car drivers.

Q And how long have you had that position?
A Since 2006.
Q And what's your salary?
A I'm not exactly sure. We have a total compensation package that entails a bunch of different things.
Q Okay. So what's the total compensation package?
A It's how they determine how much --
Q The dollar amount, sir.
A It's 92,000.
Q Do you have any children?
A No.
Q Ever been arrested?
A Yes.
Q Okay. Could you tell us details of that?
A I got arrested for disorderly conduct when I was in college.
Q For what?
A Mouthing off to a police officer.
Q What was the disposition of that?
A There was none. I paid a fine, and it was over with.
Q Ever been convicted of any offense?
A Nope.

Q Any driving offenses?
A Plenty.
Q Okay. Can you name them, please?
A Speeding.
Q How many times?
A I don't know.
Q More than six?
A I'm not sure.
Q What years?
A I'm not sure.
Q When's the last time you were convicted of speeding?
A I'm not sure.
Q Any documents that would help you?
A Do you have any documents that would help me?
Q That's not my question. Are there any documents that would list your several speeding tickets and convictions?
A I'm sure there's a driving record somewhere.
Q Okay. And on that driving record, how many times would it list that you were convicted of speeding?
MR. GARTLAND: Objection. Asked and answered.
MS. POLIN: No. I've never asked that

question.

MR. GARTLAND: You asked him how many times he's been cited for speeding. "Conviction" is not the right term. You asked him how many times he's been cited. He told you he's not sure.

MS. POLIN: Right now I'm asking him: On the driving record, how many times would that be listed? I didn't ask that question, so you cannot use objection for that.

MR. GARTLAND: You can change one word in the question; it doesn't change the question. My objection remains.

BY MS. POLIN:

Q Answer it, please, Mr. Smith.

A I'm not sure.

Q What year were you arrested for mouthing off at the police officer?

A I'm not sure.

Q What year did you attend college?

A From 2000 to 2004.

Q Did this happen on campus?

A No.

Q Where did it happen?

A South Carolina.

Q Did you list the -- that offense on your

application to UPS?
A No.
Q Why not?
A Because I wasn't convicted of anything.
Q After your sort position, what position did you have?
A I was a part-time supe of revenue recovery.
Q And what did you do there?
A I supervised the people responsible for auditing packages.
Q Were you trained on how to do a -- the various audits?
A Yes.
Q How is a package car audit conducted?
MR. GARTLAND: Object to the form.
A There are different kind of package car audits.
BY MS. POLIN:
Q Okay. What kinds are there?
A We can audit anybody for anything from methods to pre-trip to post-trip to recording procedures that -- I mean, it's a multitude of things.
Q Do you use forms?
A Yes.
Q Okay. What forms do you use?

A Whatever specific audit form is required for the one you're conducting.

Q Okay. And so let's say for a check-in audit. What is a check-in audit?

A A check-in audit is when you audit the package to make sure they were recorded properly, everything that is on the car belongs on the car, whether or not they used a service cross, whether or not the package had been recorded. It's basically to make sure they're doing everything they're supposed to do on the road.

Q Okay. And is there a particular time that those check-in audits can be done?

A It depends on what time the driver gets back.

Q So are the audits done when the driver pulls the vehicle into the facility?

A Yes.

Q Are the audits done before or after the driver's shift is over?

A The driver's shift would be coming to an end. Sometimes they're done before the driver punches out; sometimes they're not. But it's always after they finish their day and they're returning to the building.

Q Okay. So when a person would go in to

conduct the audit, the check-in audit of a package car, what would happen?

A Can you repeat that again?

Q Uh-huh. When the supervisor would go in to conduct the check-in audit, when they would walk into the package car, the vehicle, how would they begin the audit?

A I'm not sure, exactly, how somebody else would do it; but me, personally, when I get on the car, the first thing I'm doing is checking to make sure that the packages are in the right place. We have one area required for send-agains. I go in and I check send-agains to make sure that they all have a service cross on them. If anything doesn't have a service cross on it, I take it off the car to make sure it was actually attempted.

We also check for smallest containerization, which is we require them to put anything smaller than a shoebox and less than 5 pounds either in a tote box or a forever bag, which is a nylon bag that we use to send them to our small sort.

I make sure they don't have any Group 2s, which is anything that requires to be processed by a clerk.

And basically, that they have everything in the car where it should be, organized and not just thrown in there any kind of way.

Q Okay. And so after that examination is done by the person conducting the audit, then is the person noting this down on the audit form?

A Correct.

Q Okay. And then after they have made their observations, do they sign off on the audit form?

A They're supposed to.

Q Okay. And then do they present that audit form to the driver?

A They do not present it to the driver.

Q Okay. So why don't they present it to the driver?

A They present it to either myself or a manager for review, and then myself or a manager will present it to the driver if there was an issue. They're not -- generally speaking -- me, myself, if the person was still around, I would speak with them. If someone else, a third party, is conducting the audit, they don't necessarily know who this person is; and then even so, if they know who the person is, we don't suggest that they approach that person because that person is not supposed to be on the clock. That person is supposed to be on the way home.

Q That person is supposed to be on the way home when the audit's done?

A Uh-huh. I mean, this is at the end of their day. This is when they're turning in at the end of the day. We don't want them hanging around on the clock after they're supposed to be leaving.
Q So is that audit form numbered or named a particular form?
A It's a Check-In Audit Form.
Q It's called "Check-In Audit Form" at the top?
A Yes.
Q Is it used for any other audits, besides the check-in audit?
A Not -- there's not a use that I'm familiar with if there's another one.
Q Okay. You had mentioned a service cross. What is that?
A The driver is required to put the date, the disposition, the time, and their initials to let us know that the package has been processed by them.
Q So they actually write on the package?
A Correct.
Q UPS is known for innovative technology. There has not been anything to be used in place of the driver actually putting that cross on and writing it?
A That's more for them than it is for us.

It's their way of taking notation of the disposition that they put on the package. We can track the package and find out whatever they did.

Q And so when is that service cross supposed to be applied to that package?

A According to the methods, they're supposed to do it at the time they record the package. You're not going to remember what you did with it at the end of the day.

Q In your supervisory experience, do you find that the package car drivers that you supervise comply with putting the service cross on at the time that they handle the package or attempt to deliver it?

A If they don't, they risk discipline, you know. Any methods infraction can result in discipline, and it wouldn't be smart to not do that. Like I said, it's there for their notation. If you don't remember the disposition when you put it on the package, how are you going to remember what you're supposed to do with it?

Q So when you say "disposition," how many dispositions could there be?

A Too many.

Q Is this -- does the disposition go to whether it was delivered or whether it was attempted to be delivered?

A That's one of them. You can also have no-money, which is for CODs. You can have anything that's Group 2, which is something that needs to be processed by the clerk, which is not-in 3, no-money 3, not-ready 3, needs address correction, no apartment, no suite, something like that. Something that requires us to go back to the customer to find more information.

Q Are there drivers who, because of their work performance, they are identified to have audits done on a regular basis?

A There is not a list, but there -- generally, what happens is we either get everybody or we have a third party do it. That way it's a random selection what's going on. And I'd say once or twice, maybe three or four times sometimes, depending on what's going on in a month, we'll all get everybody who comes in the building at a certain time.

Q How many package car drivers do you supervise currently?

A 20-something. I'm not sure the exact number that are in my group.

Q So you report to Lindy Hill currently?

A No.

Q Who do you report to currently?

A Dwight King.

Q And so Mr. King has how many package car drivers that he manages?

A I think it's 63 full time.

Q Okay. And so you have -- what? -- a third of those?

A A little bit more than a third.

Q So are there two other supervisors that are on the same level as you?

A Correct.

Q And who are those?

A Fred Fuller and Peter Broadribb.

Q And so do you supervise any other employee, besides package car drivers?

A Part-time dispatch supervisors or package center supervisors. They're basically -- what we used to call OMS; it's basically a secretary.

Q Okay. When did you start supervising Ms. Shipman?

A 2006.

Q So was that when you -- at the same time that you moved into your current position?

A Uh-huh.

Q And what position did you have prior to that?

A I was a preload supervisor in Durham.

Q And how long had you had that position?
A Three months.
Q And how is it that you moved from preload supervisor in Durham to your current position?
A That was the assignment they gave me.
Q And how did you find out about the new assignment?
A They called me into the office and told me to report on -- I think it was October 1st, 2006.
Q Okay. What -- when was the first time you had an opportunity to evaluate Ms. Shipman's job performance after you became her supervisor in 2006?
A I don't know the answer to that.
Q Do you have a regular time that you evaluate your employees?
A No.
Q So there's no yearly evaluation?
A No.
Q What was your impression of Ms. Shipman's job performance when you began to supervise her in 2006?
A Needs improvement.
Q And how would you base -- how would you come to that conclusion?
A We have a certain standard that is expected of the company, and you either meet that standard, you

exceed that standard, or you fall short of it.

Q So how did you come to the conclusion -- if you can't remember when you evaluated her, how would you come to the conclusion that she would need improvement?

A By riding with her.

Q So when did you ride with her?

A I don't -- you know, I mean, you're asking me to remember something that happened six, seven years ago.

Q Well, you remembered very clearly, with no hesitation, that she needed improvement, so I'm asking for support for that answer.

A I mean, you're -- you're talking about methods -- the methods were -- were not where they need to be. The amount of time it took was not --

Q Okay. So number one --

A Okay. You can interrupt me, but I can't interrupt you?

Q Well, you're giving factors -- okay? -- and so yes, I can say, "Okay, let's take the first factor first." Okay? Elaborate on that.

A Elaborate on what?

Q What you just said.

A What did I just say?

Q Okay. I'm -- listen --

A You made me lose my train of thought when you interrupted me. I'm asking you to ask -- to clarify what question you're asking me.

MR. GARTLAND: Why don't we have the court reporter read back the first part of his answer. We can resolve it that way.

MS. POLIN: It's -- this is not going to happen all day. Let's go off the record.

MR. GARTLAND: No. Let's stay --

THE WITNESS: That's up to you.

MR. GARTLAND: No. I'm sorry. Let's stay on the record --

MS. POLIN: No, no. Listen --

MR. GARTLAND: -- because I would like this discussion on the record.

MS. POLIN: Okay.

MR. GARTLAND: For the record, you interrupted the witness in the middle of attempting to answer your question. I think it's fair for the witness to be concerned and upset about that. And now he's asking you to reset the clock.

MS. POLIN: He's not asking me to reset the clock, Attorney Gartland. That didn't come out of his mouth.

MR. GARTLAND: I'm using a metaphor for

what --

MS. POLIN: Well, don't --

MR. GARTLAND: -- he asked you to do.

MS. POLIN: Well, no.

MR. GARTLAND: He asked you -- now you're interrupting me.

MS. POLIN: That's right. I am interrupting you. That's correct.

MR. GARTLAND: And you're raising your voice --

MS. POLIN: I'm not --

MR. GARTLAND: -- and that's unnecessary.

MS. POLIN: No. You don't --

MR. GARTLAND: Let the --

MS. POLIN: You don't tell me what's necessary and what's unnecessary.

MR. GARTLAND: I can offer an opinion as to what's necessary and unnecessary. I'm a participant in this deposition, just as you are --

MS. POLIN: An opinion is different than stating --

MR. GARTLAND: -- and I do not think it's --

MS. POLIN: -- what is the facts.

MR. GARTLAND: I do not think it's necessary to raise your voice in this context, as you are doing,

and I want the record to reflect that.

Why -- my suggestion remains: Why don't we have the court reporter read back --

MS. POLIN: No.

MR. GARTLAND: -- the first --

MS. POLIN: This is my deposition, and I get to tell the court reporter whether she can read back the question or not.

MR. GARTLAND: I didn't --

MS. POLIN: Thank you very much for your suggestion. Let's move on.

MR. GARTLAND: I want to move on. I just made a suggestion. You're --

MS. POLIN: And I --

MR. GARTLAND: -- free to reject it.

MS. POLIN: I rejected it, Mr. Gartland.

MR. GARTLAND: Fair enough.

BY MS. POLIN:

Q You had mentioned that your impression of Ms. Shipman's job performance, when you began to supervise her, was that she needed improvement. Did this impression ever change?

A No.

Q Did you have conversations with Ms. Hill, prior to Ms. Hill managing Ms. Shipman, that Ms. Shipman

could not do her route?
A No.
Q Did you have opportunity to talk with Ms. Hill, when she became manager, about package car drivers?
A What about them? That's a broad question.
Q The question before you is did you have an opportunity to talk with Ms. Hill, as she became manager in Cary, about package car drivers' performance?
A No.
Q You never talked with her?
A Not before she became manager.
Q When did you talk with her about it?
A When she asked questions.
Q Okay. And so did she ever ask questions about Ms. Shipman's performance?
A Yes.
Q When?
A I don't remember.
Q Okay. And was this a face-to-face meeting?
A Yes. We meet every morning.
Q Okay. What time do you meet -- did you meet every morning?
A I don't remember.
Q Was it before 9:00?

A It was before 9:00.
Q What time do you normally get to work?
A Are you talking about now, or are you talking about back then, or --
Q I'm talking about now.
A 7:30.
Q And what time do you usually leave?
A It varies.
Q From what to what?
A I could leave at 4 one day. I could leave at 9:00 at night. I could leave later than that.
Q What circumstances would allow you to leave at 4:00?
A Perfect day.
Q And what circumstances would allow you to leave at 9:00?
A Any kind of issue that might arise.
Q And so what kind of questions would Ms. Hill ask you in regards to Ms. Shipman's performance?
A Why is she two hours over allowed?
Q I'm sorry. Why is she two hours over what?
A Over allowed.
Q What does that mean?
A Every route is assigned a specific amount of time it's supposed to take to do what we're asking them to

do; and if you take more time than that, it calculates how far you were over the amount of time that we allotted for the job.

Q So was Ms. Shipman two hours over on a daily basis?

A I wouldn't say every day.

Q Once a week?

A No. Definitely more often than not.

Q And is that documented anywhere?

A Not that I know of.

Q You don't keep daily reports?

A Not from six years ago.

Q So the reports are made contemporaneous with the particular work day?

A Yes.

Q And how are those kept?

A I think it's called the GTS system, global timecard system.

Q And so how would Ms. Hill know that Ms. Shipman was two hours over?

A It's on a report she receives every morning.

Q So is that report for that current day or for the previous day?

A It's for the previous day. You can't calculate it before they've done it.

Q You can't calculate what before they've done what?

A You can't calculate whether or not she's over allowed before she's performed the work. You don't know how long it takes her to do it before she's actually performed it.

Q So if you could give an example in terms of the number of hours and then how someone would be two hours over that?

A We generally try to dispatch the drivers in between eight and a half and nine and a half hours. If it takes her ten and a half, eleven and a half hours to do eight and a half hours' worth of work, you do the math in between, and that's how you know how far they're over allowed.

Q So what does the collective bargaining agreement say for drivers who work over nine and a half hours?

A I'm not sure.

Q If you had a question about a driver working nine and a half hours and whether that was in violation of their collective bargaining agreement, who would you call within the organization?

A If I had a question, I'd call Lester Grant.

Q Are the drivers' routes designed so that the

drivers would finish their routes before nine and a half hours?
A For the most part.
Q And the route that Ms. Shipman was on in 2006, do you recall that route?
A Yes.
Q What route was that?
A 24B.
Q And can you tell us the details of that route?
A Depends on what you mean by "the details."
Q "Details," meaning the name for the route in terms of street names and the number of stops for the route.
A I don't remember.
Q So you don't have an independent recollection or knowledge now what Route 24B is?
A Once again, I don't understand your question.
Q Did you say that the route that she was on in 2006 was Route 24B?
A Uh-huh.
Q Okay. And I'm asking now -- you're still in that -- your same current position. Right?
A I'm actually over a different driver group

now.

Q Okay. So does anyone in your group have Route 24B?

A No.

Q Okay. Did someone in your group within the last couple of years have Route 24B?

A No.

Q All right. Do you know what Route 24B is?

A Yes.

Q What is it in terms of the name?

A It's called 24B.

Q Where is it? Is it in Cary?

A It's in Raleigh.

Q Okay. And what are the parameters of the route?

A It changes from time to time.

Q The route changes?

A It's not exactly the way it is -- was when she ran it.

Q How do you know?

A Because it's got a different area on it because at one point in time we completely disbanded it.

Q Why was that?

A Because there wasn't enough work for it.

Q So who evaluates routes to determine whether

there's enough work for it or not?

A The center team.

Q The what kind of team?

A The center team. That's me and two other supervisors and the manager and our dispatch supervisor.

Q So what is that process for going in and looking at the route and making a determination whether there is sufficient work for a driver to do?

A We sit down and look at it.

Q Okay. And so you look at the number of stops?

A Number of stops, number of pickups, how easily it is to disband. Because there's certain times of year where there -- we're in a seasonal area. When school lets out, there's not enough work for a lot of the stuff, so we usually try to break one down or combine two.

Q And that was done to this route?

A Yes.

Q Do you remember if it was done -- if anything was modified on this route when Ms. Shipman was driving it?

A I do not remember, but it definitely was not disbanded while she was there.

Q Okay. Well, if you've had an opportunity, both as a supervisor and also as a member of this center

team, to look at the route sufficient to determine whether there's enough work on it, then you know where the route is in Raleigh?

A I know where it is.

Q So where is it?

A It's on -- right now it's on Avent Ferry Road for the most part.

Q Okay. And do you recall how many stops were on it? And I know you may not know how many stops were on it at a particular year; but just roughly, do you remember how many stops were on it?

A When?

Q At any time that you can remember.

A I mean, right now it's in between 160 and 180.

Q And how many -- do you know how many drivers covers -- cover that route?

A One.

Q How many stops can a driver do in one day?

A It depends on what route they're on.

Q So do you have routes that are in the 200 stops?

A Yes.

Q Do you have routes that have 300 stops?

A Not currently, but we will later in the

year. We have routes that approach 4-, 450.

Q And how many hours are -- how many hours are that -- those kind of routes supposed to take?

A All of them have different time allowances.

Q And who sets the time allowances?

A The IE Department.

Q What does that mean?

A Industrial engineering.

Q All right. Do you recall when -- well, did you have an opportunity to ride with Ms. Shipman when she was doing that Route 24?

A 24B?

Q 24B.

A Yes.

Q And do you recall how she performed on that route?

A It was still below standard.

Q And would there be documents showing that particular ride?

A I'm not sure if those documents are available or not.

Q Did you -- after you rode with Ms. Shipman, did you have a meeting with her to communicate her performance?

A Yes.

Q Okay. And did you articulate what she needed to do in terms of improvement?

A Yes.

Q Can you remember the areas that you discussed with her that she needed to improve?

A I can't remember everything, but I remember we discussed workplace, using the selection areas. There -- there was a lot of stuff. I don't remember everything.

Q What's using the selection area?

A We have a 30-inch selection area on the -- on the shelf, where you're supposed to pull your packages from so you don't have to walk all the way to the back of the truck every time you need to select a package.

Q Did you ever put Ms. Shipman on -- did you ever administer discipline to her?

A I'm sure I did at some point.

Q Why are you sure you did at some point?

A 90 percent of the employees have received discipline at some point.

Q Where are you getting that number from?

A Just a rough estimate.

Q 90 percent of the employees that you supervise have received discipline for you or --

A Yes.

Q -- 90 percent of UPS employees worldwide?
A I don't know what they do worldwide. I can only speak to what I do.
Q So you're saying that you have disciplined 90 percent of the employees?
A Correct.
Q Since you started as a supervisor in 2006?
A Yes.
Q And why is that?
A Like I said, any method infraction usually results in discipline.
Q And so what has been your main discipline that you've used?
A Warning letters.
Q In the last year how many warning letters have you issued?
A I'm not sure.
Q More than 12?
A Definitely.
Q Do you have a file with all of your warning letters in it?
A I do not, but labor does.
Q How many discharges have you administered?
A I don't discipline -- I mean, I don't administer discharges.

Q Why is that?
A Because the manager usually takes care of that.
Q So do you talk with the manager and recommend that a driver has been discharged?
A No.
Q You just never think about that?
A You asked me was it my recommendation.
Q Was it your -- is it within your job duty to recommend discharge?
A No.
Q Is it within your job duties to recommend suspensions?
A Yes.
Q And so how many suspensions have you administered within the last year?
A I'm not sure.
Q Are suspensions issued in written form?
A Yes. All discipline is in written form, other than verbal.
Q Verbal warnings?
A Uh-huh.
Q So in terms of the progressive discipline -- do you use progressive discipline?
A Yes.

Q So when you use progressive discipline, is a verbal warning part of what you use?
A Correct.
Q And then are there -- do you skip the verbal warning and go straight to written warnings sometimes?
A It depends.
Q It depends on what?
A If it's something that was covered in the Driver Responsibilities packet, we don't do verbal warning.
Q The Driver's Responsibility packet, is that something that the driver signs every year?
A I'm not sure if they sign it every year, but they've all seen it at one point in time.
Q So if it's something that's covered in the Driver Responsibility packet, then you go immediately to the written warnings?
A To the warning letter.
Q All right. And do you draft the warning letter yourself?
A Yes.
Q Is there a particular template that you follow?
A Yes.
Q Do you submit the warning letter to your

manager to review before you send it out?

A Yes.

Q Does the warning letter -- I'm going to use the word "drop off" because I don't know exactly what UPS's terminology is, but is there a certain time after which the warning letter is taken out of the employ-- or the driver's file or drops off the driver's discipline record?

A There is a certain time period that it's valid for progressive discipline; and yes, it does drop off at some point.

Q Do you know when it drops off?

A I'm not exactly sure, but I want to say it's nine months.

Q Okay. So when -- clarify for me when you say that after a certain time -- did you say it was -- does not go towards progressive discipline?

A After a certain time it drops off when you're talking about progressive discipline.

Q Okay. So --

A In other words, you start the process over.

Q So how does that -- how does the process work at UPS in regards to progressive discipline? You get a verbal if that incident is not covered in Driver's Responsibility; then you get a written; and then, if you

get another incident, it goes to a suspension?

A Correct.

Q And then, if you get another incident, you go to termination?

A Correct.

Q There are certain incidents that UPS considers so severe that an employee can be terminated for that severe incident. Is that correct?

A Correct.

Q And can you list those incidents for me?

A I'm not going to tell you that I know all of them, but I know unauthorized passenger, dishonesty, workplace violence. All that's covered.

Q Okay. And what is the honesty in employment policy for UPS?

A I'm not sure what that question means.

Q You had mentioned dishonesty. And so for dishonesty you can get immediately terminated. Correct?

A Correct.

Q So what is the honesty policy so that if you violate that, you're classified as dishonest and you can get immediately terminated?

A I can give an example, but I can't define it for you. Cheating, giving yourself more credit than you deserve for what you do.

Q Giving yourself, as an employee, more credit for what you do. So how does that manifest?

A You could be padding stops. You could be driving too many miles. You could enter too many special counts, which is an additional allowance they give you for basic delivery as opposed to delivering 70-pound packages or something like that.

Q Can you explain to me the 70-pound package example?

A What kind of explanation --

Q How is that cheating? I didn't -- I followed the beginning of that example, where you were talking about padding stops and things like that, but I did not get the 70-pound.

A I give you credit for delivering any package over 70 pounds. So if you have five of them and you put "50," it'll give you more credit than you earned.

Q So when you say "credit earned," what do you mean by that?

A Time allowance. Like I said, there's special things that give you special time allowances that -- which it adds time to your day.

Q So what do you mean when you say "it adds time to the day"?

A It adds allowance. Like I told you in the

beginning, they allow you a certain number of hours to do a certain job, and a way to increase that is to add over-70s packages. And that would be dishonest.

Q So if a route has been designed by the industrial engineering department to have 200 stops and nine hours for the driver to complete it, and on a particular day the driver gets ten 70-pound packages, the system recognizes that it's going to take more time for the driver to deliver all of those 70-pound packages. So in order to increase that time allowance given to that particular driver, they will input in the DIAD how many 70-pound packages they have and each 70-pound package will increase the time allowed for that particular route completion by whatever the credit is for that 70-pound package. Is that correct?

A Correct.

Q And what you're saying is that particular circumstances increase an allowance on a particular route. Is that correct?

A Yes. Anything out of the normal increases the time allowance.

Q So the driver, depending on those particular situations on that day, can increase his or her time allowance for that route?

A Did you say "can" or "can't"?

Q Can.
A Yes.
Q And so when the supervisor monitors the driver and finds that the driver has put in an incorrect amount or incorrect situation to increase that allowance, that is considered cheating and violates the honesty in employment policy. Is that correct?
A If they did it intentionally, that's correct.
Q So how is that shown, if you know, whether they -- how does a supervisor go about trying to demonstrate that the driver has done it intentionally?
A We go in and look at their records. And when you go in and look at the records, it's easy to see what's going on.
Q Okay. So can you give me an example --
A Like --
Q -- of something?
A -- the example I gave you, if you had five and you put "50," you know, that could be -- it's -- by the definition, is dishonest. But if your finger slipped and you hit "50," it's not reasonable for me to think you had 50, so I would ask you first. And if you told me you only had five, that's the end of it right there.
Q There would also be ways to check, from

whoever is loading the truck, how many actual 70-pound packages there were. Correct?

A I wouldn't ask anybody to remember that, but that's correct.

Q Well, wouldn't there be some kind of documentation that you could track to see how many packages were loaded on that particular vehicle in that morning?

A Yes.

Q At some point Ms. Shipman was given or bid on another route, and that was Route 31A, near or on the campus of North Carolina State. Correct?

A Correct.

Q You trained her for that route?

A Correct.

Q Did she ask for the training?

A No.

Q So is it just a normal part of the procedure that when a driver gets a new route, they're trained?

A Correct.

Q And so what did the training consist of?

A I show her what the stops were, how to deliver them, where to deliver them, and who to get to sign for the -- for the packages.

Q So how many days of training did you

provide?

A At a time, five.

Q What do you mean, "at a time"?

A Well, the first time I trained her, I gave her five days; and the second time I trained her, I gave her five more days.

Q So when you say "the first time," you're saying prior to her officially taking that route, you gave her five days?

A She had already officially taken the route, and I was training on her for the first five days that she ran the route.

Q She had already taken the North Carolina State route; and for those first five days, you had trained her?

A Correct.

Q And then -- so the second five days, are you talking about when she came back after the first termination or are you talking about prior to her first termination?

A I don't know when her first termination was, but she was terminated after taking that route, so yes, the five days after she returned from that termination.

Q Okay. Well, throughout my questioning I will be referring to three terminations for Ms. Shipman.

The first termination was in March 2011; the second termination was in August 2011; and then the third termination was in January 2012.

All right. So the five days that you trained her when she initially started running the route, were those five consecutive days?

A As far as I remember.

Q Okay. And do you recall how many stops were on that route?

A No.

Q So in order to show Ms. Pittman the stops, did you have, like, a printout?

A Who is Ms. Pittman?

Q Ms. Shipman.

A I had a printout for myself. She has a DIAD board with all the stops in it.

Q Have you ever had a position as a package car driver?

A I worked temp driving for a few months from 2004 to 2006.

Q So after the five days of training, was there a form that you signed to indicate that she had received training?

A No.

Q Did you evaluate her in terms of how she

could run the route after you provided the training?
A As far as written, no.
Q So did you do a verbal kind of evaluation that you --
A Well, we -- we talked every day about what she needed to do, what she needed to improve on, and how she was basically going to run the route.
Q Okay. And so on February the 21st -- in Ms. Shipman's complaint, she alleges that that was the first day that she ran the route by herself, and she's alleged that very early in the morning she recognized that she needed assistance and started contacting her manager and you that she needed assistance. Do you recall her reaching out to you saying that she needed help on this route?
A At no point did that happen that day.
Q At no point did what happen?
A She didn't call me.
Q She didn't call you at all?
A No. The first phone call I got was from Lindy at 4:30.
Q Okay. And what did Ms. Hill say?
A She told me I needed to get over there right now and help Denise or she was going to miss packages. And I told her that at the time I was more than 30 minutes

away and at 5:00 the University shuts down, there will be nobody there to sign for anything.

Q So in terms of delivering the packages in that narrow time frame, you're saying that in your experience, it was late in terms of the request for help?

A It was too late for me to do anything.

Q Okay. So what did you do after that?

A I ended up finishing up the route that I was on; I went back to the building; I got my car; and I came out there.

Q So you were actually delivering packages yourself?

A It was a strange circumstance. We had a driver whose license had got suspended, so I was required to drive the car while he made the deliveries.

Q Okay. So did you eventually come out to assist Ms. Shipman?

A I didn't come out to assist her. I basically came out for damage control.

Q What does that mean?

A To try to minimize the impact and get rid of what I could.

Q In terms of the packages?

A Correct.

Q Okay. Did you come by yourself?

A Yes.
Q Did you all send out other drivers to assist Ms. Shipman?
A I called other drivers to assist.
Q And did the route get finished?
A What was salvageable was finished. The University was closed.
Q So as a supervisor, on a scale from 1 to 10, 10 being the worst, what kind of a scenario was this in terms of you, in your experience, and in terms of how you would like to see things go for your -- for the drivers that you supervise?
A That specific instance was Level 10. I've never had that happen with anybody at any point in time before or after that event. I've never had anybody miss that many packages.
Q And when you say "miss" -- when you say "miss the packages," you mean fail to deliver the packages?
A Correct.
Q And were you able to assess, at some point, why there were so many service failures?
A I don't really understand that question.
Q Were you able to find out, either from interviewing or meeting with Ms. Shipman or looking at the

status of the package, why the packages were not delivered?

A She had to have a meltdown. That's the only explanation I can think of.

Q You mean just in terms of, like, panicking and not being able to deliver the packages?

A Correct.

Q Okay. So what was done -- scratch that.

Did you ever talk with Ms. Shipman to find out what her point of view or what her reasons were for not being able to deliver the packages?

A Yes.

Q And what did she say?

A I don't remember exactly what she said.

Q But from that, you concluded that she may have had a meltdown or panicked?

A I assumed that was the only way that could have happened.

Q Okay. And so after that, how did you and your manager go about making sure that the packages were delivered?

A They were missed. They didn't get delivered till the next day.

Q But when you say "they were missed," you're saying that in terms of what UPS's standards are --

A No. When we put the packages on the car, they're to -- to be delivered that day, 100 percent, no exceptions. The -- well, I take that back. The only exceptions are send-agains, and that's stuff that you attempted that didn't get delivered, but you have to attempt 100 percent of the packages on the car.
Q That's what I was going to say if you had allowed me to finish. You interrupted me.
A I'm sorry.
Q Okay. So after that particular day, what was done to make sure that the packages were going to be delivered after that by Ms. Shipman?
A I don't remember her working the day after that.
Q Is it your recollection that after that incident she was terminated?
A As far as I remember.
Q So did you have an opportunity to meet with Lindy Hill to discuss what should happen to Ms. Shipman at that point?
A We didn't discuss what should happen.
Q What did you discuss?
A What actually did happen.
Q And at that meeting did Ms. Hill tell you that Ms. Shipman was going to be terminated?

A I don't remember.
Q Okay. Can a driver be terminated for that particular kind of an incident?
A I'm not sure.
Q At some point did you gain additional knowledge that would support your understanding of why Ms. Shipman was terminated?
A Yes.
Q And what additional knowledge did you gain?
A She requested next-day air and next-day saver packages as customer-requested-late, and nobody gave her permission to do that.
Q Okay. Explain that to me.
A Okay. We have service levels. Next-day air is supposed to be delivered by 10:00 -- well, 10:30 every morning; and next-day saver is supposed to be delivered by 3:00. Correctly, when you record a package, if you deliver it after that time, it's late. Instead of recording it as late, she recorded it as customer-requested-late, meaning they gave you permission to deliver it after that time.
Q And was that on a number of packages that that was done for?
A What do you mean?
Q Was that just one package where it was a

customer-requested and you found out that not to be the case, or was it on a series of packages?

A It was on a series of packages.

Q And was there any other actions that Ms. Shipman took that you found out that that would support your understanding of her termination?

A I don't remember any others. I do remember that one.

Q So would that fall into the category of dishonesty?

A Yes.

Q And if you can recall, was it determined that that was done intentionally, to gain credit?

A There is no way it wasn't done intentionally.

Q So you're saying no mistake could be made --

A No.

Q -- no -- okay.

All right. So did you have knowledge at some point that Ms. Shipman was brought back after her first termination -- brought back to work?

A Of course.

Q Okay. And did you have knowledge of how many days out -- how many days that she was away from the job before she was brought back?

A If you're asking me do I remember how many days it was, the answer to that is no.

Q Okay. At some point did you gain knowledge as to how many days she was out before she returned back to work?

A I still don't know exactly how many days it was.

Q Okay. Did you have any participation in writing the discipline for Ms. Shipman for her first termination?

A No, I did not do that.

Q Did -- were you interviewed by Mrs. Hill or did you participate in any meetings to provide information to Mrs. Hill to support her initiating the termination against Ms. Shipman?

A In -- specifically, was that the purpose of the meeting? No.

Q So you had a meeting with her where that came up in discussion?

A What came up in discussion?

Q What -- all of the things that Ms. Shipman did to support her termination.

A Yes.

Q Did you participate in any audits of delivery records to investigate exactly what Ms. Shipman

did, including that customer-requested air freight?
A Air late.
Q Air late.
A Yes.
Q What did that consist of? Looking at all of Ms. Shipman's delivery records for that particular day?
A Correct.
Q And did you write a report or anything to Ms. Hill?
A I don't remember writing a report about that.
Q Do you remember reviewing Ms. Shipman's records and saying, "Okay, this is the situation that happened here," in terms of the discrepancies?
A I don't understand that question.
Q Let me rephrase it. Are -- you had mentioned that there are audit -- written audit forms that you can complete when you do audits. Are there audit forms for delivery records?
A No, there's not an audit form for delivery records.
Q Are there discrepancy forms for delivery records?
A There's no form for delivery records.
Q Okay. Are there discrepancy forms, just in

general?

A It depends on what you define as "discrepancy."

Q Well, discrepancy forms, meaning that at the top of the form it's called a "Discrepancy Form."

A No.

Q So what form or what documentation would you use when there is a situation where the delivery records indicate that there is an issue here?

A I would use the actual delivery records.

Q And circle them and point --

A Highlighted.

Q And the delivery records are compared to the information stored that particular day in the DIAD?

A The delivery records come from the information stored in the DIAD. It's just a printout of what was recorded in the DIAD.

Q Okay. So in looking at Ms. Shipman's documentation, that included the delivery forms for that particular day. Is that correct?

A I don't know anything about documentation Ms. Shipman has.

Q No. The documentation on that particular day that led you all to believe that Ms. Shipman requested the customer-air-late form as opposed to what she actually

did, was that information from the DIAD?
A Yes.
Q So after Ms. Shipman came back to work after her first termination, she came back to be supervised by you. Is that correct?
A I do not think I was the supervisor over that group anymore when she came back. I'm pretty sure I was not.
Q Okay. At that time were you assigned to retrain her for the particular North Carolina State route?
A Yes.
Q Okay. And so what did the training consist of this time?
A It was the same thing we went over the first time.
Q Is that the training you think that -- scratch that.
Do you think that Ms. Shipman needed training -- retraining?
A In my opinion, she needed retraining or else what happened that day would not have ever happened.
Q Can you elaborate on your response?
A In my opinion, she had some issue that day; because, looking at the records, she had packages on the car for stops that she had already attempted. And when I

trained her the first time, I made everything very clear. We went over everything. I even took the time to make a printout of every stop and what gets delivered where for her to take home and study in between the days that I was training her the first time.

In order for what happened to have happened, either she didn't retain it or she panicked. So in my mind, the appropriate thing to do was to take her out there again and give her a chance; because, after however many days she had been off, if she did that bad the first day, she wasn't going to do any better if I sent her back out there without training her again.

Q When you began to train her the second time around, do you recall her telling you that she had gone out to the route on her own while she had been away from the job, in her own private vehicle, to try to learn the route?

A Yes.

Q Okay. And at this time that -- her running the route, did she use a gate key to get into the -- some of the areas at State?

A Yes.

Q Okay. So when you retrained her after she returned to work after her first termination, did you focus on any particular areas in terms of the training?

A No.

Q So it was basically just the -- retraining what you did the first time?

A Correct.

Q And so did you do -- did you give her, like, a test or some kind of evaluation at the end of the second five days?

A No.

Q Did you train her on the policy where you can leave packages at one location and get credit for the delivery of those packages throughout, like a complex?

A No. I don't really understand that, though. Are you saying did I give her permission to leave packages one place and take credit for multiple places?

Q No. I guess -- and I'll break the question down into two questions. I guess my first question is: Are you familiar with a policy called a "left-at" policy?

A Yes.

Q Okay. Can you explain to me what your understanding of that left-at policy is?

A I can tell you what the left-at policy is. You use the left-at whenever you deliver to multiple places and nobody's available to get a signature. After you've made your attempts, you take it to one place and get a signature for it, and then you're allowed to record

it as left-at.

Q So does that scenario only apply in certain circumstances?

A Yes.

Q Okay. Do you -- can you tell me what circumstances that left-at policy would apply at?

A Like I -- like I said, it's anything -- once you've made attempts on the packages and you cannot get a signature, you're allowed to take them to a central location and get a signature. But you have to attempt them first.

Q So is it fair to say that UPS requires -- whether you're in an apartment complex or whether you're at a college campus -- that if you have a -- that every package has an address and then you are to attempt to deliver that package to that particular address first, before going to a central location? Is that correct?

A That is not a policy.

Q What part of that was not a policy?

A There are certain circumstances where you would take all the packages to one place and not make an attempt on them.

Q Okay. What are those circumstances?

A Any place where security doesn't allow you to walk throughout a building.

Q Okay. So if you -- if the driver knows up front that there is not going to be an opportunity for them to try to individually deliver that package, then they have the authority to go to a central location and give all of those packages to that individual, and then that individual be responsible for having people come pick up the package?

A That's the requirement, not an authority.

Q That's a requirement for the driver to do?

A Yes; if you're not allowed to attempt the individual packages, you're required to take them to a central location to be delivered by somebody else.

Q So if a driver takes all of the packages to a central location, not because they cannot individually attempt them but because they want to move more quickly through their route, and they characterize the situation as a situation where they're required to go to a central location, could that be considered cheating?

A If you characterize it all as one stop and one signature, it's not considered cheating.

Q Okay. Explain that.

A If I was to record the packages left-at that I did not attempt, that's cheating.

Q Okay. But it's not cheating if the driver handles it what way?

A It's going to be smart for me to take them all one place and have them delivered by one person and get one signature to save time.

Q And that's within the -- that's what a driver can do?

A They are allowed to do that.

Q Okay. So is that -- what is that considered? Is that considered using the left-at policy or --

A That's not the left-at policy.

Q That's not the left-at policy?

A No.

Q Is that called a certain thing in UPS?

A It doesn't have a name.

Q All right. Are you familiar with the circumstances of Ms. Shipman's second termination?

A No.

Q Because you weren't supervising her at that point. Correct?

A I'm just not sure exactly what you're talking about.

Q At some point in August of 2011, Ms. Shipman was terminated for a second time. Do you have any knowledge as to the grounds for that second termination?

A No.

Q Okay. And then, in January of 2012, Ms. Shipman was terminated for a third time. Do you have any knowledge about the grounds of that termination?

A No. I wasn't involved in that, either.

Q Okay. How are package car drivers compensated? Are they paid by delivery or by the hour?

A That's a complicated question because they have an hourly wage rate but they are also paid based on their plan day, which I was talking about, the amount of time that we allot for them to do the job.

Q So how are they paid on their plan day?

A If you exceed the expectation, you get it done quicker than you're supposed to, you get paid what's called bonus, which is time and a half. If you get paid -- if you're over allowed, you get paid by the hour.

Q When does the time and a half kick in for a driver?

A It depends whether you're over allowed or under allowed.

Q But let's say if you're under allowed.

A If you're under allowed, it kicks in for anything that you exceed your plan day by. So if I have ten and a half hours' worth of work and I finish in eight, the -- the difference, the two and a half hours, is paid in bonus, which is time and a half.

Q So when you say that a driver has engaged in a particular conduct where they're trying to earn credit for something they have not done, which changes or manipulates that time allowance, that's how it directly affects their compensation. Is that correct?

A Correct.

Q And that's -- okay. Scratch that.

Ms. Shipman has alleged in her complaint that when she returned to work after her second termination, after the Christmas break, in January of 2012, to begin that route after Christmas, she did not have the proper gate key. Based on your testimony just a couple of minutes ago, at that point you did not supervise Ms. Shipman. Is that correct?

A That's correct.

Q Would you -- even though you did not supervise her, would you have any involvement in her having the proper gate key?

A I don't understand the question. Are you saying is it my responsibility, or are you saying --

Q Did you --

A -- could I have done anything to help?

Q No. I'm just saying did -- would you -- even though you did not supervise her, would you have had any involvement in making sure she had the proper gate

key?

A Only if she decided to involve me in it.

Q Did she -- do you recall if, at any time prior to January of 2012, that you were told by her that she needed a new gate key for that route?

A I don't remember, but I think that she might have contacted me or somehow I was involved in obtaining the new gate key. But it's -- it's not a situation that I had any knowledge of or anything I would have been able to do about it, other than her letting me know that.

Q Do you recall her letting you know that, like, in December 2011?

A I don't remember.

Q Were you the one that actually, physically got the new gate key from State?

A I think I did.

Q Okay. Do you remember when you got that?

A No.

Q Okay. Did you have any conversations with Lindy Hill, either in December of 2011 or January 2012, about Ms. Shipman doing the route without a gate key?

A Are you -- I mean, I don't understand what -- what you're asking me.

Q Whether you and Ms. Hill at any time talked, in either December of 2011 or January 2012, about

Ms. Shipman doing that route without having a gate key.

A Are you asking did -- did we discuss sending her out there intentionally with no gate key or -- I mean --

Q No. No. That's not my question.

A Did we talk about it?

Q Yes.

A No.

Q Would you make remarks to individuals that you supervised, and also coworkers, about how Ms. Shipman made more money than them?

A No.

Q You never made any remarks about that?

A Not that I remember.

Q Did you ever say anything negative about Ms. Shipman's appearance to your coworkers or management?

A Not that I remember.

Q Did you ever say anything negative about Ms. Shipman being a female to coworkers -- your coworkers or management?

A No.

Q Did you ever say anything negative about Ms. Shipman's race to your coworkers or management?

A No.

Q Did you ever say anything to coworkers or

management about how Ms. Shipman would not be driving for you when you supervised her?

A No.

Q Did you ever talk to coworkers about Ms. Shipman's -- not -- scratch that.

Did you ever talk to other drivers that you supervised about Ms. Shipman's performance on her route?

A Not that I remember.

MS. POLIN: Can we take a short break?

MR. GARTLAND: Sure.

(A brief recess was taken.)

BY MS. POLIN:

Q Just a couple more questions, Mr. Smith. I appreciate your time today.

I know that you had testified earlier that in regards to your time supervising Ms. Shipman, you would say that her performance needed improvement. Could you say that she was teachable?

A Yes.

Q Could you say that she had a good work ethic?

A I'm not sure about that.

Q Okay. What do you mean?

A At times she displayed a good work ethic, and I can remember specifically her telling me she can't

do this every day.

Q Because she thought it was too much? Too much work?

A I don't know if she thought it was too much work or it was too hard or what.

Q Okay. You've been at the company, you said, since 2004?

A Correct.

Q And you've been in supervisory positions since 2004, 2005?

A All but six months of my career.

Q Okay. Would -- based on your experience, can you say that the policies for the drivers have changed during the time period 2004 to present?

A That's a broad question. But, I mean, I don't think the policies have changed. I think everything is the same for the most part.

Q Okay. Would you agree that at some points there have been some policies that have been, for lack of a better word, spotlighted by management to -- for management to emphasize to drivers to either get them to fully comply with or to modify?

A We've had -- yeah, we've had several different areas of focus from time to time.

Q Okay. Since you were there in the 2008,

2009 time frame, do you have knowledge about drivers recording properly their lunch, and can you explain to me your knowledge of what drivers were doing prior to that time and then what management's emphasis was to drivers about properly recording their lunch?

MR. GARTLAND: Object to the form.

But go ahead and answer.

A I don't know what they were doing before, but I know that we were required to monitor and make sure that everybody had their hour lunch.

BY MS. POLIN:

Q Okay. And when you say "had their hour lunch," you mean properly recorded in that handheld device. Right?

A Correct.

Q And if drivers did not properly record their lunch, they would be disciplined. Correct?

A I'm not going to say that that was something we disciplined people for because I'm not sure about what happened with other people; but I, personally, only disciplined people if it became an ongoing issue. We talked about it several times before I would discipline anybody for a lunch.

Q And the -- is the reason why you talked about it several times prior to disciplining is because of

your understanding that drivers got into a habit and they just forgot to record and it took some time for them to get into that habit of recording?

A Correct.

Q Okay. Now, going back to Ms. Shipman, is it possible that the way she was doing things on her route were of such a habit that in order to change -- it was just that she was -- had a difficult time changing and doing things that the policies called for?

MR. GARTLAND: Object to the form.

A Which route and what specific things are you talking about?

BY MS. POLIN:

Q Well, I guess you supervised her under two routes. The first route, do you recall any particular activity that she was doing that formed your basis for you saying she needed improvement?

A On the 24B route?

Q Yes.

A Yes.

Q Okay. What activity was that?

A She's just too slow.

Q Okay. And so on the 31A route, was she also just too slow?

A It was a multitude of things on the 31A

route, but I can say Denise gave me a lot more effort on the 31A than she did on 24B.

Q Okay. What does a -- in general, what does a supervisor do when the driver is just slow?

A Work with them on things they can do to increase their work pace and try to identify any issues with the methods that are causing them to take too much time.

Q Is there, like, a class that they can be put through to do that very training?

A Who is "they"?

Q Those -- the slow drivers.

A No.

Q So is that -- was that opportunity, in terms of training and identifying the methods and all of that -- was that opportunity given to Ms. Shipman?

A Yes. The second five days that I gave her I wasn't required to give her. I did that as a favor to Denise.

Q So was that second five-day training the type of training that would try to improve the time and the methods of performing the route?

A It was all-inclusive. Correct.

Q Okay. And so what methods, specifically, of trying to improve the time of the route were reviewed

during that second training?

A Selection. I would -- I don't know how to say it in a way you would understand, but basically work pace, customer contact time, how to load a handcart for multiple stops, not moving the truck multiple times when you can deliver several buildings. It's a lot of stuff.

Q So when you say "selection," is that selection of the box?

A Correct.

Q So in those elements that you just named, did you find that there were -- there was an area or multiple areas that Ms. Shipman was needing improvement in?

A Yes; that's -- all the things we worked on were things she needed improvement in.

Q So your belief was that she spent, possibly, too much time talking to customers?

A Too much time talking, too much time selecting packages, not properly loading the handcart; all of that.

Q In your supervisory meetings or meetings with management, would there ever be a discussion of the amount of time that you would give drivers to perform on a route before switching them off a route?

MR. GARTLAND: Object to the form.

A It's not my -- it's not part of my job to switch drivers off a route. It's their route. They are the ones who select the route they go on. I don't assign it to them unless they're a cover driver, and in that case all they're doing is basically being a substitute for somebody who's not there.

BY MS. POLIN:

Q So they bid on a route; and so once they get that route through bidding, then they own that route in terms that they must perform on it?

A That's theirs for a year.

Q Okay. So every year they have to rebid the route?

A Correct.

Q Do you know why Ms. Shipman was doing the State route in -- well, scratch that.

So the bidding process -- drivers start at any time during the calendar year, or do they start January 1?

A They bid in January, and they start anytime within -- it's either 30 or 60 days after the bids are closed.

Q Okay. So once a driver gets assigned a route and they are not -- they're performing too slow on that route, is the only way to get off the route to be

disciplined off the route?

MR. GARTLAND: Object to the form.

A I don't really understand. I mean, they don't have the right to leave their route, no.

BY MS. POLIN:

Q Okay. Can they ask for the route to be reduced?

A No.

Q Can they ask for help during non-peak times?

A I apologize. They have the right to do whatever they want, but we don't -- that's not a game we typically involve ourselves in. If you can't do the job, that's on you. That's not on everybody else to help you do the job.

Q Can -- okay. Can they ask for assistance if it's non-peak time?

A They can ask whatever they want.

Q So would you acknowledge them asking for the assistance?

A Depends on what you mean by "acknowledge." Saying, "Yeah, did you ask? Okay. You asked."

Q No. I mean if some -- if a driver's out in the field and they get stuck and they call in and ask for help, are you going to acknowledge that they -- through communication systems, are you going to acknowledge that

they asked for help or are you just going to ignore their request?

A It depends.

Q So does that -- does "it depends" mean that sometimes you would acknowledge their request for help and sometimes you would ignore their request?

A I never --

Q I don't want to put words in your mouth.

A I'm sorry. I never ignore their request; I always acknowledge it. But I'm not required to dispatch help to somebody to do their job.

Q Okay. Do you recall the date that Ms. Shipman officially started on that North Carolina State route?

A I don't remember the exact date. I remember you saying it earlier, but I don't remember.

Q Okay. Do you feel that you properly trained Ms. Shipman for the route 31A?

A I know I did.

Q How do you know it?

A Because I gave her the same training I give to everybody else, and no one else has had a problem with it.

Q The same training on that particular route?

A Correct.

Q How do you know no one else had a problem with it?

A Because I've trained several people since her. To this day, I train the people on that route because I know it better than anybody and I can simplify it to the point where anybody can understand it.

Q So even though you don't necessarily supervise that particular driver, the company has asked you to train drivers for that route because of your experience?

A The managers have asked me to do that.

Q The managers. Okay.

A Correct.

Q And is it your testimony you provided a guide to Ms. Shipman that explained how different buildings are designated so that she would know, if a package came in and was labeled as, let's say, a particular dormitory, where that would -- a package would go?

A That's correct.

Q And the guide was, obviously, written?

A It was typed.

Q It's typed?

And you told her that if the packages that she is delivering to a particular dormitory, that because

they all go to the desk, that's considered one stop?

A Correct.

MS. POLIN: All right. We have no further questions.

E X A M I N A T I O N

BY MR. GARTLAND:

Q Mr. Smith, I just have a few follow-ups. First, could you describe the training or orientation, probationary period, if you will, that a new driver goes through when they are brought, for instance, from a part-time position into a full-time driving position?

A Yes. In the beginning, the first thing they go through is safety training because we want to make sure they're working safely, they won't cause any accidents or have any injuries. Then we go through the methods, and then we go through actual route training.

Q And how -- about how long a period does this training last?

A 30 days.

Q 30 days.

And then are there periodic safety rides that are conducted with drivers?

A Annually.

Q Okay. And what does a safety ride consist of?

A Making sure they're following the safety methods that we presented to them and using the information that we used to train them.

Q Okay. And in that -- for that particular safety ride, an on-road supervisor would ride with the package car driver for their day?

A Correct.

Q I also want to make sure, just for the record -- because you're the person -- you're the only person in the room that fully understands the left-at and other procedures we've discussed today -- what -- to make sure that I understand, we did discuss if, say, a driver is delivering to an apartment complex on their route for which security, the doorman -- whoever -- does not allow the driver to go up to individual apartments and attempt delivery, that the driver is permitted in that circumstance to deliver all packages for that apartment complex to the front desk. Correct?

A Correct.

Q And what -- how would that be properly coded in the driver's DIAD?

A You would scan them all and record it as one stop, because you got one signature and you made one attempt.

Q Okay. And if there was an occasion where

I'm a package car driver, I'm running behind during my day, and it is an apartment complex where I'm permitted to go up to the floors and make attempts, but I decide I want to speed things up by just delivering all of, let's say, 20 packages to the front desk -- I think we've established that if I coded that as left-at, the company and -- would view that -- or you would view that as dishonesty. Correct?

A That is dishonest.

Q If I were to code it as -- just like the previous scenario we discussed, as I scan all 20 and put it as one stop, that might not necessarily be dishonest, but it would be a methods violation?

A No. It -- it wouldn't be a violation of any kind if they allow you to do it.

Q Okay. So should I, in that scenario, have attempted, though, the individual deliveries to the people in the apartments?

A If you are allowed to take them all to the desk, as long as you get one signature and you record it as one stop, there's no questions.

Q And how do I know if I'm allowed to do that or not, as a driver?

A The apartment complex gives you that right.

Q They would -- the customer would give me the

guidance on that issue?

A Exactly.

Q Okay. There was some discussion today about how policies, procedures may have changed over the course of time at UPS. The particular left-at practice, in your view of what might be dishonest -- or dishonest in using that left-at practice, do you think that procedure has changed at any time between, say, 2009 and the present?

A No.

Q So as far as you can recollect, that's been the same throughout that time?

A No. I'm pretty sure it hasn't changed.

Q And we also discussed circumstances in which a package car driver might ask for help during the course of a day, and I think you expressed -- I don't want to put words in your mouth -- that if it's typical circumstances, where they're running behind because of, maybe, their own shortcomings, you are reluctant to offer assistance. Is that a fair characterization?

A That is fair.

Q Are there unusual circumstances which arise in which you would dispatch assistance to a driver?

A If something I've done or some extreme circumstance -- like, say, they had a fire drill and they shut down part of an area for a while -- I'd send somebody

to help them. If I dispatch them with 11 or 12 hours' worth of work and they weren't able to get it all done in a timely manner, then I would send somebody to help them.

Q Also, just finally, we had some discussion today about Ms. Shipman's discharge that occurred in March 2011 based on her first day driving Route 31A. Do you recall that discussion?

A Yes.

Q And you mentioned that at least one of the circumstances that came up in the audit of delivery records was this -- the next-day air and customer-request coding. Do you recall that?

A Correct.

Q Okay. And have you been shown any of those delivery records here today?

A No.

Q Do you believe that if you were shown those, it might refresh your recollection as to other circumstances that came up during that audit?

A Yes.

MR. GARTLAND: Thank you. That's all I have.

MS. POLIN: All right. Thank you so much for your time.

*(Deposition adjourned at 11:06 a.m.)*

CERTIFICATE OF NOTARY - COURT REPORTER

STATE OF NORTH CAROLINA)
)
COUNTY OF WAKE )

I, Jacqueline Castellow, Notary Public in and for the above county and state, do hereby certify that the deposition of **MICHAEL WARREN SMITH** was taken before me at the time and place hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth; that thereupon the foregoing questions were asked and foregoing answers made by the witness which were duly recorded by me by means of Stenomask, which is reduced to written form under my direction and supervision, and that this is, to the best of my knowledge and belief, a true and correct transcript.

I further certify that I am neither of counsel to either party or interested in the event of this case.

This 20th day of May, 2013.

____________________________
Jacqueline Castellow, CVR
Notary Public, Wake County,
North Carolina
Notary Number: 200705800096

S I G N A T U R E

I HAVE READ THE FOREGOING 81 PAGES WHICH CONTAIN A CORRECT TRANSCRIPT OF THE ANSWERS MADE BY ME TO THE QUESTIONS THEREIN RECORDED.

SIGNATURE IS SUBJECT TO CORRECTIONS ON ATTACHED ERRATA SHEET, IF ANY.

___________________________________________

(SIGNATURE OF MICHAEL W. SMITH)

STATE OF ________________________________

COUNTY OF________________________________

SUBSCRIBED AND SWORN TO BEFORE ME THIS ____________ DAY

OF _______________________________, 2013.

MY COMMISSION EXPIRES

_____________________

____________________________ NOTARY PUBLIC

## ERRATA SHEET

PAGE LINE CORRECTION

I, ______________________________, after having read the foregoing transcript of my deposition, wish to make the above corrections.

SIGNATURE_______________________________________

JRC DATE_______________________________________