IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| DENISE SHIPMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No: 5:12-cv-00589-F |
| | ) | |
| UNITED PARCEL SERVICE, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| ______________________________ | ) | |

DEPOSITION OF DENISE SHIPMAN

(Taken by Counsel for the Defendant)

Durham, North Carolina

Thursday, May 9, 2013

INDEX OF EXAMINATION

By Mr. Gartland....................................5
By Ms. Polin....................................260
By Mr. Gartland.................................329
By Ms. Polin....................................344
By Mr. Gartland.................................345

INDEX OF DEFENDANT'S EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| 1 | UPS's First Set of Interrogatories | 16 |
| 2 | Plaintiff's Responses to Interrogatories | 16 |
| 3 | Ms. Shipman's Application to UPS | 65 |
| 4 | Honesty in Employment Policies | 68 |
| 5 | Excerpt from Collective Bargaining Agreement | 71 |
| 6 | Professional Conduct and Anti-Harassment Policy | 74 |
| 7 | Exceptions Certification | 98 |
| 8 | Missed on Road Certification | 105 |
| 9 | Exception Certification | 106 |
| 10 | Termination Letter - March 1, 2011 | 115 |
| 11 | Teamsters Local Union No. 391 Complaint | 121 |
| 12 | Letter to Ms. Shipman - July 27, 2011 | 129 |
| 13 | Driver Responsibilities | 129 |
| 14 | Letter to Ms. Shipman - August 29, 2011 | 135 |
| 15 | Teamsters Local Union No. 391 Complaint | 139 |

INDEX OF EXHIBITS - CONTINUED

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| 16 | Statement by Mr. Smith - November 10, 2011 | 142 |
| 17 | Atlantic Area Parcel Grievance Committee Decision | 143 |
| 18 | Recording Procedures Document | 145 |
| 19 | South Atlantic District Discrepancy Review Form Certification | 147 |
| 20 | South Atlantic District Discrepancy Review Form | 148 |
| 21 | Letter to Ms. Shipman - January 12, 2012 | 150 |
| 22 | Teamsters Local Union No. 391 Complaint | 163 |
| 23 | Atlantic Parcel Grievance Committee Decision | 169 |
| 24 | Grievance Settlements/Payments Form | 172 |
| 25 | EEOC Intake Questionnaire | 182 |
| 26 | EEOC Charge of Discrimination Form | 184 |
| 27 | Collection of Disciplinary Notices | 188 |
| 28 | EEOC Dismissal & Notice of Rights | 192 |
| 29 | Complaint | 195 |
| 30 | Plaintiff's Initial Disclosures | 256 |

APPEARANCES

For the Plaintiff:

SANDRA J. POLIN, ESQUIRE
Law Office of Sandra J. Polin
514 Daniels Street
Private Mail Box 330
Raleigh, North Carolina 27605
(919) 883-7494
jyll.polin@yahoo.com

For the Defendant:

CHARLES A. GARTLAND II, ESQUIRE
Alston & Bird LLP
The Atlantic Building
950 F Street, NW
Washington, DC 20004
(202) 239-3978
chuck.gartland@alston.com

DEPOSITION OF DENISE SHIPMAN, a witness called on behalf of Defendant, before Suzanne G. Patterson, RPR, Notary Public in and for the State of North Carolina, at Alston & Bird LLP, 4721 Emperor Boulevard, Suite 400, Durham, North Carolina, on Thursday, May 9, 2013, commencing at 9:06 A.M.

P R O C E E D I N G S

DENISE SHIPMAN,

having been duly sworn, testifies as follows:

EXAMINATION

BY MR. GARTLAND:

Q. Good morning.
A. Good morning.
Q. This will be the deposition of Denise Shipman in the matter of Denise Shipman v. United Parcel Service, Inc., pending in the United States District Court for the District of Eastern District of North Carolina. This deposition is taken pursuant to notice and is taken for all purposes permitted by law, including the Federal Rules of Civil Procedure and the Federal Rules of Evidence.
Ms. Shipman, we have met before off record but my name in Chuck Gartland. I'm the attorney for UPS in this matter.
Present here today, aside from the court reporter and myself, is Ms. Shipman and Ms. Shipman's attorney, Sandra Polin.
If you could, please state your full name for the record, ma'am.
A. Denise Shipman.
Q. Do you have a middle name?

A. No, sir.
Q. Okay. Have you ever gone by any other name?
A. No, sir.
Q. And, again, you've been sitting through a couple depositions so far this week so you know the mechanics of the deposition, but I feel the need to repeat them anyway so that we're clear on the ground rules for today. I'm going to ask you questions and request that you respond truthfully and completely to the questions to the best of your ability. Is that fair?
A. Yes.
Q. And I will try to make my questions as clear as possible today. If at any point I ask a question that you do not understand, please let me know, I'm happy to rephrase or repeat as necessary. Okay?
A. Yes.
Q. If I ask a question and you do give an answer, I'm going to assume that you understood the question as asked. Is that fair?
A. Yes, sir.
Q. Since the court reporter is taking down what we say, I'll ask that you please respond verbally to my questions instead of shaking your head or nodding your head or giving huh-uh or uh-huh responses, and

this will enable the court reporter to make a nice, clean record for us here today. Okay?

A. Yes, sir.

Q. And, again, I will try not to speak while you are speaking and I would ask that you do the same for me. Wait until I finish the question, even if you know the answer and want to jump in, and I will do likewise for you, that way we get a nice, clean record. And as far as breaks, we can take a break anytime. As you may have heard your attorney asked UPS witnesses, the only request is that if there is a question pending before you, that we get an answer to that question before we take a break. Okay?

A. Yes, sir.

Q. Have you ever been deposed before, Ms. Shipman?

A. No, sir.

Q. And is there -- I'm going to ask you now a series of questions about your capacity to answer questions today and I want to let you know these are questions that I ask of every witness that I take a deposition of.

Is there any reason you can think of that would preclude you from being able to answer my questions fully and truthfully today?

A. No.
Q. Are you presently under the influence of any substance that would affect your memory or influence your ability to understand my questions?
A. No.
Q. And do you understand you're under oath, subject to the penalties of perjury just as if you were testifying in a courtroom here today?
A. Yes.
Q. Other than depositions, have you ever testified under oath before?
A. Yes.
Q. Okay. And tell me about that.
A. One was, I was working at Exxon part time, I was at Exxon and someone came in and he was a -- he was shopping but I sensed he was about to rob the store --
Q. Okay.
A. -- because he parked on the far tank and it was about 3:00 in the morning. And when he came in, I was in the store by myself and he came in with some other people and I noticed how the other ones was walking around so I got his attention to where he could talk directly to me and it was like I got him into a conversation and he was able to open up to me

and tell me who he was and everything. And I didn't know that he was involved in something else and about three days later was when the police knocked on my door and told me.
Q. So you said you testified under oath, was that in like a criminal prosecution of that person?
A. Yes, uh-huh.
Q. And you did testify at trial in that case?
A. Yes.
Q. Do you recall what year that took place?
A. No, sir.
Q. Was it more than five years ago?
A. Oh, yes.
Q. Was it more than 10 years ago?
A. Oh, yes.
Q. Can you give me just a ballpark range of when that occurred?
A. I want to say it was in the '90s, uh-huh, in the '90s.
Q. Any other circumstances in which you've testified under oath?
A. Not that I can think of.
Q. We'll discuss these more fully later but there have been panel hearings in at least two of the discharges that you experienced at UPS.

A. Oh, okay.
Q. Do you remember testifying under oath at those panel hearings?
A. Yes, sir.
Q. Do you know whether, other than the two discharges that we've been talking about this week in which there was a panel hearing -- you testified under oath at both of those panel hearings?
A. Yes.
Q. Now, other than those panel hearings, have you ever testified in another panel hearing during your tenure at UPS? Let me put it this way, maybe it's easier. Have you ever been to panel other than those two occasions?
A. Yes, sir. Yes.
Q. And do you recall whether you gave testimony in connection with those other times at panel?
A. Yes, sir, I had to.
Q. How many other times have you been to panel, putting aside the two discharges that we'll talk about later today?
A. I was -- what I can remember, I would say about two.
Q. Okay. Do you recall what years those were?
A. Maybe that one in '09 and the one in, I can't

remember if it was in 2000 or '99. But, yeah, there was one, yeah.

Q. Okay. And so we're estimating a total of four times that you've testified at panel?

A. Yes.

Q. And have you ever obtained a transcript of your testimony at the panel?

A. Yes, sir.

Q. And tell me for which ones.

A. I want to say for the -- for the last two -- last three panels.

Q. The last three panels?

A. Yes.

Q. And do you still have a copy of those transcripts?

A. Yes. What was -- yes.

Q. Okay. I will represent to you that I don't believe copies of those transcripts have been produced to us in discovery. Have you turned those transcripts over to your attorney?

A. I have the transcripts that was given to me, that was given to my attorney, that -- in that packet from the -- the information that we have that was sent to us, that's what I have.

Q. Okay. Well, let me maybe break it down a

little bit.
A. Okay.
Q. So there are, you know, briefs that the union and the company put together in connection with the panel hearings, saying, here's our statement of why we believe Ms. Shipman should not be discharged or on the company side, here's why we think a discharge is warranted. I'm not talking about those.
A. Okay.
Q. What I'm looking for is at the panel hearing when you're testifying under oath, someone is recording and transcribing that testimony in the same way that our court reporter is here today. And sometimes an employee or the union will request a copy of that transcript after the panel hearing. So my question is, for any of the times you went to panel, did you request or do you have a copy of your transcript of your testimony that says what you testified about in the hearing?
A. Oh, no, sir. No, sir.
Q. And with respect to the briefing that we talked about, was that what you were referring to when you just said you had information from three different panels?
A. Yes, sir.

Q. And all three of those information packets, if you will, you've turned those over to your attorney?
A. I have -- what I have is -- is what was produced to my attorney, that's what I'm talking about. What was produced to my attorney, that's what I have.
Q. Understood. Okay. Other than your panel hearing and your criminal proceeding testimony, are there any other occasions where you've testified under oath?
A. No, sir. Nothing that I can think of, no.
Q. Okay. And could you describe for me generally what you did to prepare for your deposition today?
A. I talked with my attorney, met with my attorney.
Q. Okay. Anything else?
A. No, sir.
Q. Okay. Now, I don't want to know what you discussed with Ms. Polin, but when did you meet with her?
A. We met Monday, Tuesday, Wednesday, and today.
Q. Okay. On each of those days for about how long did you meet?
A. About, Monday for about -- about four hours and then about 30 minutes on Tuesday and 30 minutes

Wednesday and 30 minutes today.
Q. All right. And other than your attorney, did you discuss your case or your claims with anyone else in preparation for your deposition?
A. No, sir.
Q. Okay. Did you review any documents to prepare for your deposition here today?
A. No, sir.
Q. You didn't read a copy of the complaint that was filed on your behalf in this case?
A. I -- no, sir.
Q. Did you take a look at any of the documents that were produced by UPS to your attorney in the case or that your attorney produced to UPS?
A. Are you asking me have I looked at them or did I look at them to prepare within the last week?
Q. The latter. Have you looked at them to prepare for your deposition?
A. No, sir.
Q. So when was the last time that you looked at any documents related to your case?
A. Well -- wait a minute. We looked at them every day this week so...
Q. Okay. That's fair. Let's put those occasions aside. Prior to the time the depositions started this

week on Tuesday, when was the last time before that that you looked at any documents relating to your case?
A. I would say about -- about a month ago.
Q. Okay. Do you recall what document that was?
A. No, sir.
Q. And have you now told me everything you did to prepare for your deposition today?
A. Yes, sir.
Q. Do you presently keep a diary or journal of any kind?
A. No.
Q. Have you ever kept one?
A. No.
Q. Do you have a calendar or planner where you write down things related to your work or panel hearings, grievances, et cetera?
A. No, sir.
Q. Have you ever made any notes relating to your employment for UPS, for instance, even if it wasn't a journal, just a recollection of what happened in a particular meeting or anything like that?
A. No, sir.
MR. GARTLAND: We're going to mark this as Exhibit 1 and Exhibit 2 respectively.

(DEFENDANT'S EXHIBITS 1 AND 2 MARKED FOR IDENTIFICATION.)

BY MR. GARTLAND:

Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 1 and Defendant's Exhibit 2. And what I'd like to do, these are a copy of the interrogatories that UPS issued to plaintiff through your counsel in this case, as well as a copy of the responses.

Now, because the responses do not repeat the interrogatories themselves, we're going to have to use these two documents together. Okay? I'm going to ask you some questions about these responses, so if you could, take a few minutes matching up the questions, which start on page 3 of our interrogatories and the responses.

First let me ask you, have you seen these documents before?

A. No, sir.

Q. And, again, I'll represent to you that these are copies of the interrogatories, which are questions issued to the plaintiff through your counsel in the case. If you could, I'd like for you to take a few minutes to review the questions that start on page 3 of Exhibit 1 where it says, interrogatories, and then

they are numbered, and then match those up with the response.

What I want to do is just make sure that the information that's provided in response to the interrogatories is 100 percent accurate and truthful to the best of your recollection. If there are additional pieces of information that are not included for whatever reason, or the answers have changed in any way, if you could please let me know that as we go along, I'd appreciate it. So take your time, I know if this is the first time you're seeing it, it might take a little bit of time to jive them up, so if you could do that for me, that would be wonderful.

A. (Complies.) Okay.

Q. All right. And to the best of your knowledge, the responses that you just reviewed here as Exhibit 2 true and correct to the best of your knowledge?

A. Yes, sir.

Q. Okay. And, again, I'm going to be asking you some questions, some of which relate to the responses here, so feel free to keep them open and refer to them where you need to.

Your date of birth is August 14th, 1963, correct?

A. Yes.

Q. So sitting here today, you are 49 years of age?
A. Yes.
MR. GARTLAND: And if we could go off the record for just a moment.
(A DISCUSSION WAS HELD OFF THE RECORD.)
BY MR. GARTLAND:
Q. Ms. Shipman, we had a conversation off the record about your social security number. If you could just affirm for me that the number I read is correct?
A. Yes.
Q. And is your current address 8020, Apartment 307, Angle Park Drive, Raleigh, North Carolina 27617?
A. Yes.
Q. And how long have you lived at that address?
A. About 10 years.
Q. 10 years. All right. And have you ever been married?
A. No.
Q. And who else lives at that address with you?
A. Gregory Wester.
Q. And Mr. Wester is just a roommate or do you have a romantic relationship with him?
A. We're roommates.

Q. Okay. And how long have you lived together?
A. About -- about 20 years.
Q. 20 years.
A. Uh-huh.
Q. And how did you come to know Mr. Wester?
A. I met -- we met at a restaurant.
Q. Okay. Did you ever at any point in time have a romantic relationship with him?
A. Yes.
Q. Okay. But that relationship is no longer romantic?
A. No.
Q. And when did you stop dating, if you will?
A. About -- about 15 years ago.
Q. Okay. But you lived together throughout that time?
A. Yes.
Q. Do you share any finances or bank accounts, anything of that nature?
A. No.
Q. Credit cards?
A. No.
Q. Any joint responsibility for expenses relating to the apartment?
A. Yes.

Q. Okay. So you split utilities, things like that?
A. Yes.
Q. Groceries?
A. Yes.
Q. Does Mr. Wester offer you financial support of any kind?
A. Yes.
Q. Okay. And if you could elaborate upon that.
A. He takes care of the rent when I'm not able to take care of it. Basically, all the expenses in the household when I'm not able to do it.
Q. Okay. And since the time of your discharge from UPS in January 2012, has Mr. Wester taken care of those household expenses?
A. Yes.
Q. Are there any household expenses you've been responsible for during that time? Since January 2012?
A. The cleaning, the washing clothes, the rent, whatever rent I could help him out with, light bill, I do take care of the light bill, water bill and telephone bill.
Q. Okay. But is it fair to say that Mr. Wester has paid the majority of the household expenses since your discharge?

A. Yes.
Q. Okay. Is Mr. Wester currently employed?
A. Yes.
Q. And what does he do?
A. Post office.
Q. Okay. He works at the post office as a delivery --
A. No, as a clerk.
Q. And how long has he had that job?
A. I'd say about 30-some years.
Q. Okay. Do you know what his annual salary is?
A. No.
Q. And is that the only job he holds?
A. Yes.
Q. Are there any other persons that live with you?
A. No.
Q. Okay. Do you or Mr. Wester have any children?
A. No.
Q. Do you have a cell phone, Ms. Shipman?
A. Yes.
Q. What is your mobile number?
A. 561-8880.
Q. And what area code is that?
A. 919.

Q. And do you have a personal e-mail address?
A. Yes, sir.
Q. How many?
A. One.
Q. And what is that address?
A. Denise, D-e-n-i-s-e Z45@AOL.com.
Q. And have you ever used that e-mail address to communicate with anyone regarding your employment with UPS?
A. No, sir.
Q. Have you used that to communicate with your attorney?
A. No, sir.
Q. Are you on facebook?
A. No, sir.
Q. Okay. Any other social media of any kind?
A. No, sir.
Q. And just for the record, Ms. Shipman, what is your race?
A. Black. Black female.
Q. Do you have any biracial heritage whatsoever?
A. No, sir.
Q. Do you have any relatives by blood or marriage -- well, not marriage -- but do you have any blood relatives over the age of 18 who reside in North

Carolina?
A. Yes.
Q. And could you tell me their full names, please?
A. Teresa Diane Jones.
Q. And how are you related to Ms. Jones?
A. That's my sister.
Q. Okay. Next?
A. Michael Jones.
Q. Is that her husband?
A. No, that's my brother.
Q. Okay. Anyone else?
A. No.
Q. Okay. Are either Teresa or Michael married?
A. No.
Q. Okay. And why is it that they have a different last name than you?
A. Different father.
Q. Okay. Were you raised in the same household together?
A. Yes.
Q. But they always had the last name Jones and you always had the last name Shipman?
A. Yes.
Q. Okay. And, Ms. Shipman, are you a member of

any sort of civic clubs or organization in Raleigh or the surrounding areas?
A. No.
Q. Are you a member of a church?
A. Yes.
Q. What church is that?
A. Raleigh First Assembly.
Q. Where is that located?
A. On Blue Ridge Road.
Q. And would you characterize yourself as an active member of that church?
A. Yes.
Q. And I'm going to ask you some questions now about the schools you've attended and educational courses you've taken. I believe there was some information provided in that regard as an attachment to the interrogatory responses, it's Attachment C, second to the last page, if you want to use that as a reference.
A. Oh, okay. Yes, sir.
Q. You attended Western Alamance High School from 1978 to 1982; is that correct?
A. Yes.
Q. In Elon, North Carolina?
A. Yes.

Q. And you did receive a diploma?
A. Yes.
Q. There's also listed a travel agency school in Pompano Beach, Florida.
A. Yes.
Q. From which you obtained a travel agent licensure in approximately 1983?
A. Yes.
Q. Okay. The Wilfred Academy of Beauty in Newark, New Jersey, attended from 1984 to 1985, correct?
A. Yes.
Q. Was that full time or part time?
A. It was full time.
Q. Full time, okay. Did you receive a license at the end of that attendance?
A. Yes.
Q. Okay. And is that an active license?
A. No, sir.
Q. Is there -- are there things you need to do every year to keep your license active?
A. Yes, sir. You have to go renew your license.
Q. Okay. When's the last time you had it renewed?
A. I want to say -- I want to say '95.

Q. Okay. Do you have any intention to seek renewal of that license in the future?
A. If -- yes, if I -- if I have an opportunity to, yes.
Q. Okay. Is there anything preventing you from renewing that now?
A. I guess time and finances, time and finances.
Q. Okay. Also listed is Sherrill's Beauty College in Raleigh, North Carolina, correct?
A. Yes.
Q. It indicates you obtained a cosmetology teaching certificate?
A. Yes.
Q. And is that certificate something you need to renew on a yearly basis?
A. Yes, sir.
Q. When was the last time you had that renewed?
A. Around about the same time, around '95.
Q. And I'll ask you the same question, if time and finances were not an obstacle, would you have an intention to renew that certificate?
A. Yes.
Q. Alliance Tractor-Trailer in Arden, North Carolina, indicates you obtained a commercial driver's license, correct?

A. Yes, sir.
Q. In 2000?
A. Yes.
Q. And what kind of coursework did you have to do to obtain that license?
A. I went full time and I -- I had to get the training, the DOT training to learn to drive tractor-trailers and learn how to do the -- and learn the inspection of the air brakes and everything that calls for a tractor-trailer inspection, plus driving and backing.
Q. And how long was that coursework?
A. About nine months. About nine months.
Q. Nine months. And you attended full time?
A. Yes.
Q. Did Alliance pay for that training?
A. No, sir, I did.
Q. And is a CDL license something you need to renew every year?
A. Yes, sir.
Q. When was the last time you had that renewed?
A. Can I look in my pocket and see?
Q. You sure can.
A. 2011.
Q. Okay. So if you wanted to operate under that

license today, you would need to renew it first?
A. No, sir, it's current until 2016.
Q. Okay. And did you drive for Alliance?
A. No, sir, that was tractor-trailer school.
Q. And have you ever used your license to operate a tractor-trailer?
A. For about two months.
Q. And when was that?
A. In -- I want to say around 2005 or six, something like that.
Q. Okay. So during the time that you were employed at UPS?
A. Yes.
Q. All right. I do not see that listed on the jobs that accompanied your interrogatories. Who was your employer during that time you spent driving?
A. It was UPS.
Q. Okay. Were you a feeder driver at that time?
A. Yes, feeder driver. What it was, they had an opening and I had to go through the training for a month.
Q. Okay. In terms of education, the next school listed is The Healing Arts and Massage School in Raleigh, North Carolina?
A. Yes.

Q. And what dates did you attend?
A. May 15th, 2011.
Q. And that indicates the date of your first degree?
A. Yes.
Q. I take it there's different degrees or different techniques that you obtain certification in, for lack of a better word?
A. Yes, sir.
Q. And that was the first degree. The second degree was November 6th, 2011?
A. Yes.
Q. And the third degree March 11, 2012?
A. Yes.
Q. Now, explain to me, if you could, just as someone who doesn't have a lot of experience with that field, why you would get three degrees?
A. In the Healing Arts field, Reiki, once you get your first Reiki degree, what that does is that entitles you to practice and become a deeper meditated person to where you can sit down and you can pretty much meditate more deeper within yourself. Reiki two, what that does is that helps you to help other people to meditate deeper. Reiki three, what that entitles you to do is that's when you receive your practitioner

license.

And you also receive different symbols going along with Reiki one and Reiki two and you have to practice these symbols on your own and as you become deeper in it, within your own practice and your own meditation, when you get into Reiki three as a practitioner, that entitles you to be able to heal distant, to meditate distant, you're able to go deeper with your meditation and your healing experience.

Not to get off the subject, that's what, all this ties back into me going to Wilfred Academy because it all heals from the inside out, from the outside in.

Q. And have you ever used -- so if you just have your first degree in Reiki, can you practice as a massage therapist?

A. No, sir. If I can just say this, massage therapy and Reiki, Reiki is an extension of massage, massage therapy is -- it's more -- you got to go school longer, it requires more time and everything. So it was like I was trying it and I am, I'm trying to take steps in getting into that.

Q. So as of March 11, 2012, when you have the third degree, are you able to be a massage therapist practitioner?

A. No, sir. You're able to be a Reiki practitioner.
Q. Okay. Have you ever worked as a Reiki practitioner?
A. No, sir.
Q. Have you ever applied to work as a Reiki practitioner?
A. No, sir.
Q. Have you ever applied to work as a massage therapist?
A. No, sir, 'cause I don't have a license.
Q. And you said your -- I think you indicated you're still working towards this. Since March 11th, 2012, are there any other degrees you've obtained or certifications or study in the healing arts?
A. No, sir.
Q. Do you intend to undertake any further study at this time?
A. Yes, sir.
Q. And what is the ultimate goal of that study?
A. My ultimate goal is to be able to open up a spa and with the spa I want to be able to have two sides of it, I want to be able to bring in younger people, even from international, to teach them that no matter the situation you come from in life, if you

look within yourself, you can bring out the best in you. Whether it's with the little girls, teaching them the culture, teaching them how to look proper, teaching them how to speak proper, teaching them that going to school versus being out here on the streets.

With the young men, how I'm going to tie that in too, is teaching them when you go get a decent haircut, when you got on a nice shirt, and I hate to say this, such as yourself, just taking the opportunity to have cuff links with your initials on them, which really cost nothing if you go to Zales and catch them on sale. It's the little things that I want to show them that you can do.

And then with the Reiki part, that way, you may have people that are working in jobs, that when they get off work they're stressed, instead of going to the bar, you can come to my spa and you can receive a Reiki treatment that allows you to sit down and meditate in a meditating atmosphere and just clear your mind, drink some tea, you know, without the alcohol in it. And when you get up, hey, I can make this happen today. That's my ultimate goal, to have something for everybody.

Q. Okay. Very good. And I'll pass the compliment on to my wife who bought these for me.

Thank you.
So what other licenses or certifications would you need in order to further pursue that profession?
A. I would need my massage therapy license. I would want to go on to get more training in working with different areas in it, meaning acupuncture, I would want my acupuncture certificate and I would want to obtain at least a two-year degree as I'm in it with some type of business administration or social skills. And then I would want to be able to have the knowledge, to acquire the knowledge through schooling to go international, everything I would need to bring the children over, to open up just a little small dormitory for them to be able to go to a decent school so that they can get to this level.
Q. And -- very good. Thank you. And other than the institutions we discussed, have you ever had any other formal education at any sort of college or university?
A. When I first got out of high school, there was a school called Har Barker, I believe.
THE COURT REPORTER: Say the first name for me again?
THE WITNESS: Har Barker, I think that was the name of it, yeah.

BY MR. GARTLAND:
Q. Was that a vocational school?
A. Yes.
Q. What was the vocations to which it was devoted or what type of courses did you take when you went there?
A. I believe it was business administration.
Q. Okay. But did not receive a degree or any other --
A. No, I didn't stay long.
Q. How long did you stay, if you were going to say, just ballpark?
A. I want -- I want to say about a year.
MS. POLIN: Can we take a break?
MR. GARTLAND: Sure.
(A RECESS WAS TAKEN FROM 9:49 A.M. TO 9:55 A.M.)
BY MR. GARTLAND:
Q. All right. We're back on the record.
And other than the institutions we've already discussed, are there any other formal education, college, university, or vocational training.
A. No, sir.
Q. Have you ever been in the military?
A. No, sir.
Q. And other than the EEOC charge and the lawsuit

you filed against UPS, have you ever filed any other litigation?
A. Yes.
Q. Okay. When was that?
A. I want to say around '94, '93 or '94.
Q. Okay. And tell me about the lawsuit.
A. Greg's family, when we first got together, started communicating threats towards me and I took the information down to the magistrate office and that's when they proceeded from there. And we did go to court and all I wanted was just an apology, that was it.
Q. And were you represented by an attorney in that proceeding?
A. Yes.
Q. Do you remember the name of the attorney?
A. I want to say Ron Moore.
Q. What ultimately happened with the case?
A. I just got an apology. His sister had to apologize in court, that was it.
Q. No compensation received as a result?
A. No, no.
Q. Any other lawsuits that you have filed?
A. No.
Q. Okay. Have you yourself ever been sued?

A. No.
Q. And I understand from the interrogatory responses that you have filed two separate claims for unemployment benefits; is that correct?
A. Yes.
Q. One in 2011 and one in 2012?
A. Yes, sir.
Q. The one in 2011, which of the discharges did that follow?
A. I'm sorry?
Q. And, again, we've talked this week about three discharges generally, the March 2011 discharge, the August 2011 discharge, and the January 2012 discharge. So the unemployment claim in 2011, did that follow after the first discharge or the second discharge, do you remember?
A. Second discharge.
Q. Do you recall what happened with that claim?
A. Okay. Now, in 2011, was it two?
Q. There were two discharges in 2011. And my question, and we can table it if you can't remember, but was which -- if you remember which one of those discharges you filed that unemployment claim after. Was it the first discharge or the second discharge?
A. The second discharge.

Q. To the best of your recollection, did you file any claim for unemployment benefits after the first discharge?
A. If I did, it was towards the end. I don't think I did. I believe I did. I believe I did. I believe I did.
Q. Again, that was the discharges that you reached a settlement with UPS to reduce it to a 95-day discharge?
A. Yes, sir.
Q. Prior to panel?
A. Yes, sir.
Q. Does that refresh your recollection, you do believe you filed a claim for unemployment benefits after --
A. I believe I did.
Q. Do you keep any records relating to your claims for unemployment benefits?
A. No, sir. I'm bad with records. No, sir.
Q. Do you have any recollection of what happened with that first claim for unemployment benefits filed after the first discharge? In other words, do you remember whether you received benefits or not?
A. Oh, yes, sir. Yes, sir, I believe I did, yes.
Q. And do you recall for how long?

A. I want to say for about a month.
Q. Do you recall approximately what the amount of your monthly benefit was or weekly?
A. Four something. 400 and something.
Q. 400 and something a week?
A. Uh-huh.
Q. And the second claim for unemployment benefits filed after the second discharge, do you recall what happened with that claim?
A. Yes, sir. I had to -- I was denied the unemployment and I had to get a -- get an attorney.
Q. Do you recall that attorney's name?
A. I don't remember that name.
Q. Okay. We might have it in documents somewhere so if you can't recall, it's not a big deal. And what ultimately happened with that claim?
A. I did get my benefits.
Q. Do you recall for what amount those benefits were?
A. It was about four something, still about four something.
Q. And do you recall how long you received those benefits?
A. I want to say about, maybe two or three months.

Q. And the benefits stopped when you went back to work with UPS?
A. Yes, sir.
Q. And you stated that you did recall -- you do recall filing a third claim for unemployment benefits after the third discharge in January 2012?
A. Yes, sir.
Q. And tell me what happened with that claim?
A. I had to -- I was denied benefits, I had to get an attorney.
Q. Do you remember who that was?
A. No, I don't remember the name.
Q. Someone here in Raleigh?
A. Yes, sir.
Q. A different attorney than the one you worked with previously?
A. Yes, sir.
Q. And you appealed or challenged that denial?
A. Yes, sir.
Q. What ultimately happened?
A. I received the unemployment benefits.
Q. And when did those benefits begin, do you recall?
A. I want to say in May.
Q. And when they first -- in what amount were

they paid?
A. Four something.
Q. Per week?
A. Yes, sir.
Q. And when they began, did the benefits include any sort of catchup for the --
A. No, sir.
Q. -- time that the benefit had been denied?
A. No, sir.
Q. They just started fresh with --
A. Yes, sir.
Q. And do you still receive that benefit today?
A. Yes, sir. I'm trying to get the emergency.
Q. I'm sorry. So --
A. It stopped.
Q. It stopped. When did it stop?
A. About a month ago. And they just sent me a letter for the emergency part of it.
Q. So there's an application where you can apply for emergency continuation of the benefits?
A. Yes, sir. I'm still in the file.
Q. You haven't applied yet?
A. Yes, I have.
Q. Oh, okay.
A. I'm still filing every week.

Q. And still receiving a benefit every week?
A. Yes, sir.
Q. Have you kept any of the paperwork associated with that?
A. Yes, sir, we have to keep my weekly -- week search.
Q. And have you turned all that paperwork over to your attorney?
A. Yes. When she asked me for it, yes, I gave it to her.
Q. Okay. Well, if there's any documents related to your job search or a claim for unemployment benefits, we believe those are responsive to the discovery request.
A. Okay.
Q. So to the extent you have those and haven't turned them over to your attorney, I would ask you to do so following this deposition, okay?
A. Yes, sir.
Q. Okay. Thank you. Any other claims for unemployment benefits in the last few years that we haven't discussed?
A. No, sir.
Q. Do you have any idea of how long you can continue to apply on an emergency basis?

A. I think just -- I think about two months, two or three months it was stated.
Q. And after that you believe it will be cut off?
A. Yes, sir.
Q. Have you ever filed for bankruptcy?
A. No, sir.
Q. And aside from the EEOC charge that you filed against UPS, have you ever filed a charge or complaint with a government agency?
A. No.
Q. And other than traffic violations, have you ever been arrested?
A. Yes.
Q. Okay. When was that?
A. I want to say maybe 2004.
Q. Okay. What were the circumstances of that arrest?
A. I went to the apartment complex and I had told them that my fire alarm, the battery needed to be replaced. And it went by -- about two or three months went by and I went back up there again on a Saturday and I told them, I said, you all, that fire alarm needs to be replaced, I said, it keeps beeping and something going to happen up in here, I said, that fire alarm got to be replaced. So they kept ignoring

me, I said, looky-here, this fire alarm got to be replaced. I said, you all want me to do it or not.

So that's when we all started going back and forth arguing about these fire alarms, right? And then the police came and they said that I was the one that came in and caused the problem, so then I got arrested and then when I went downtown, they let me out. But it never went nowhere, it was dropped.

Q. Okay. You didn't spend any time in jail in connection with that arrest?

A. No, sir.

Q. Okay. And what exactly were you accused of, do you remember the charge on which you were arrested?

A. No, I don't remember the charge.

Q. Was it making threats against the folks in the apartment complex management?

A. It could have been.

Q. Do you recall making any threats of violence against them?

A. Oh, no, huh-uh. No. All I wanted was the fire alarm replaced.

Q. And do you recall what you said that prompted them to call the police?

A. No, I called the police.

Q. You called the police yourself?

A. Uh-huh. Yes.
Q. Okay. Do you recall what the police said in terms of why you were being arrested?
A. No.
Q. Have you ever been arrested other than that incident?
A. I believe -- I believe I got arrested with Food Lion.
Q. Food Lion?
A. Uh-huh.
Q. Grocery store?
A. Yes.
Q. When was that?
A. Once again, I was there doing the night shift and a guy came through there, he had a long coat on, so I asked the grocery -- I was trying to figure out where the grocery manager was, couldn't find him. So I'm like, something getting ready to happen in this store.
Q. Now, let me stop you for one second. Were you an employee at the time or a customer?
A. I believe I was working part time there. I believe so.
Q. Okay. Sorry. And about when did this take place, do you recall what year approximately?

A. I want to say in the '90s. I want to say the late '90s, early 2000.

Q. Okay. And tell me -- if you could, continue telling me what happened.

A. Well, the police -- I left out of the store, 'cause I couldn't find the grocery manager, so I left out. When the police came, they said for me to get back in the store and I said, oh, no, I'm not going back in that store if we can't find that guy. So they kept wanting me to get back in the store and I said, no, I'm not going back in that store and I don't know where the guy is with that gun, I'm not going back in there. So then they arrested me.

Q. Did you call the police?

A. Uh-huh. That's why I don't call them no more.

Q. So you called the police after you left the store?

A. No, I called the police while the guy was in the store and then when I couldn't find the guy no more, I walked out.

Q. And what were you arrested for?

A. I don't know what the charges was.

Q. Was it making a false call to 911?

A. No, it wasn't no false call.

Q. Well, I understand that you did not believe it

to be a false call. I'm asking from the police's perspective when you were arrested, they should have told you what you were being arrested for.
A. Oh, oh, oh, I think it was something along the lines of not doing what the police officer told me to do.
Q. So not cooperating with the --
A. Right. Something along them lines.
Q. We heard a previous witness' testimony that he was arrested for mouthing off to police, would that be a fair characterization of what they believed you were doing?
A. Yeah.
Q. And other arrests? I'm sorry. Let me go back. So did you ultimately -- were you convicted of anything in association with that arrest?
A. No, sir.
Q. Spend any time in prison?
A. No.
Q. Any other arrests that you can recall?
A. No, none I can think of.
Q. Okay. Ever been convicted of a crime?
A. No.
Q. Never pled guilty to a crime or been indicted?
A. No.

Q. If you look with me, Ms. Shipman, at Attachment A to Exhibit 2. These are the responses to interrogatories, Attachment A, lists work history.
A. Okay.
Q. You began working for UPS part time in 1997; is that correct?
A. Yes.
Q. And what was your position at the time?
A. I was a -- I was a clerk.
Q. Okay. In what building?
A. The Raleigh hub.
Q. And what kind of clerk were you?
A. I was an exception clerk.
Q. In your capacity as exception clerk, did you participate in check-in audits?
A. No.
Q. So just give me a few sentence description of what you did as an exception clerk.
A. Okay. When the drivers would come in, they would take their packages off the truck and they put them on the table, and if it was a will call or need apartment, I would go in the computer and I would find the information as far as where the apartment is or the street or give them directions, and I would put it on the package.

Q. Okay. So that the package could be delivered the following day?
A. Yes.
Q. All right. And if you'll look with me at interrogatory number -- the response to interrogatory number 4, it lists a number of jobs held between 1983 and the year 2000. Do you see that list?
A. Yes, sir.
Q. If you could, just take a minute and look that over and let me know if that list is incomplete in any way to the best of your recollection, whether there's any other jobs that haven't been disclosed there?
A. Food Lion, I didn't put Food Lion up here.
Q. And I know we talked about that in connection with the arrest, do you recall approximately when you were employed with Food Lion?
A. I want to say -- I want to say right up there with, in between -- right up in there with Golden Corral and Colony Cleaners, up in there, all up in there, Atlantic Sandwich, all -- it was sometime up in there, all up there together.
Q. Okay. Now, was that a part-time position at Food Lion?
A. Yes.
Q. Do you recall what the title of your position

was?
A. A cashier.
Q. Okay. And do you recall what your hourly wage was as a cashier?
A. Just minimum wage.
Q. Were you a part of the union as a cashier?
A. No.
Q. And why did you leave Food Lion?
A. To work full time for UPS.
Q. Other than UPS, have you ever been fired from any job?
A. None I can think of.
Q. Ever been accused of dishonesty at another job?
A. No.
Q. Have you ever worked as a travel agent?
A. No.
Q. Okay. I think we discussed in connection with your education you took some travel agent courses, correct?
A. Yes.
Q. But never worked as a travel agent?
A. No.
Q. Or in the travel industry?
A. No.

Q. And never worked as a cosmetologist?
A. No.
Q. Or as a teacher of cosmetology?
A. Yes, I did.
Q. Okay. When was that?
A. You have to -- when you're taking your teacher's, you have to work in the field while you're getting your teacher's, so when I was actually going to school for it, that's when I was working in it.
Q. Okay. Ever since then?
A. No, sir.
Q. And since 2000, other than UPS, have you held any other jobs?
A. No, sir.
MS. POLIN: I don't want to interrupt, I don't know if this was before 2000 or after 2000 because I didn't hear about it till today, but you testified previously that you worked at Exxon.
THE WITNESS: Oh, yes, yes, yes, I did, I was at Exxon.
BY MR. GARTLAND:
Q. Okay. And when was that?
A. I want to say it was when I was at UPS part time in 2000, yeah. 'Cause I worked at nighttime.

Q. Okay. What was your wage, if you recall, during your time at Exxon?
A. Just minimum wage.
Q. What was your title?
A. Just a cashier.
Q. And when did you leave that work at Exxon?
A. I want to say maybe in -- it's hard for me to say what year I left.
Q. Was it before or after you went to work full time for UPS?
A. Oh, it was before I went to work full time for UPS.
Q. Do you recall why you left?
A. No, it was -- it was after I went to work for -- it's hard to say when it was.
Q. I understand it was a long time ago. Was there a time when you were working full time at UPS and working the night shift at Exxon?
A. Oh, no. No, no, no, we can't do that there, no. Too tired, no, you can't do that.
Q. So to the best of your recollection, why did you leave the job at Exxon?
A. To go work full time at UPS, more than likely.
Q. Do you recall whether you were fired or whether you resigned?

A. No, I resigned, uh-huh.
Q. Okay. Including, I guess including your time at UPS, have you ever held a position in which you supervised other employees?
A. Would I be considered the supervisor?
Q. I don't believe so in connection with your positions with UPS and I'm not sure of any of these other positions, that's why I'm asking. Do you recall ever being in a position where you were managing other employees, where you were a supervisor?
A. No.
Q. Where you were responsible for recommending or taking disciplinary action against other employees?
A. No.
Q. And it's your testimony that since going to work for UPS full time, you haven't held any other positions outside of UPS?
A. Yes.
Q. Including after your discharge?
A. Yes.
Q. Okay. So during your employment with UPS, have you ever looked -- during the time that you were employed with UPS full time, from 2004 forward, did you ever look for other jobs?
A. No.

Q. What about during the time you were on suspension pending discharge, did you ever look for alternative employment during that time?
A. Yes.
Q. And when was that?
A. Every day.
Q. Well, let's take it one at a time. In terms of the first discharge we're talking about today, in terms of the March 2011 discharge?
A. Oh, okay.
Q. After being taken out of service between that time and the time that you came back to work, I believe, July 5th --
A. Uh-huh.
Q. -- did you look for other employment during that time?
A. Oh, no, no.
Q. And what about -- after your second discharge, which occurred in August 2011, between that time and the time you came back to work, which I believe was in November, did you look for alternative employment during that time?
A. Wait a minute now. I -- during the first time, I looked for work.
Q. Okay. Well, that's what I mean by alternative

employment.
A. Yes. Yes.
Q. Did you look for other work?
A. Yes.
Q. Okay. Tell me what other work you looked for?
A. I looked for driving positions, went to Fed-Ex, post office, some trucking companies.
Q. Do you remember their names?
A. E.C. England, no C.F. England, that's C.F. England. B.F. Hunt.
Q. Any others?
A. Nothing I can -- not that I can remember right now off the top but...
Q. Okay. And when you applied for a position at Fed-Ex, did you submit a written application?
A. Yes.
Q. And what happened with that application?
A. They told me they would get back with me.
Q. Okay. Did they ever respond?
A. They did.
Q. And what did they say?
A. They told me that the way they hire is contract, it's contract work. And he told me right now they didn't have a driver that had a truck available that needed somebody to work on.

Q. Okay. Did they offer you the opportunity to become an independent contractor and purchase your own vehicle, anything along those lines?
A. They didn't have nothing available at that time, no.
Q. And did you interview with anyone specific?
A. No, not -- no.
Q. What about the job at the post office, what job did you apply for?
A. I applied for in the warehouse, a clerk position, and they didn't have anything available.
Q. Okay. You submitted a written application?
A. No, it was over -- computer.
Q. Were you using Monster.com or any other kind of online job search for this?
A. I think it was, it was one of those companies like that.
Q. Okay. And looking for driving jobs and clerk jobs?
A. Yes.
Q. Any other type of jobs you were looking for?
A. I was looking for warehouse work, you know, working in a warehouse, pulling orders and everything.
Q. And you said the post office indicated they didn't have anything available in the clerk position?

A. Yes. Or driving.
Q. Or driving?
A. Uh-huh.
Q. What about the trucking companies, did you submit an application to C.F. England?
A. Yes.
Q. Online or --
A. Online.
Q. And what happened with that application?
A. They informed me that you -- right now here in North Carolina, they wasn't sending recruiters out to North Carolina to do recruiting, 'cause you would have to go to their schools and everything, but they wasn't sending recruiters out to North Carolina, so you would have to go to Atlanta for a recruiter.
Q. And was that a tractor-trailer hauling job?
A. Yes.
Q. Okay. What about B.F. Hunt?
A. You would have to go to their school and then they would put you on the road.
Q. You couldn't use your CDL that you already have?
A. No, sir, 'cause they want you to do their school all over again.
Q. So why couldn't you do their school?

A. If I went to do their school, then that would mean -- well, really, they didn't offer me to come to do it, that was just the guidelines, the recruiter was supposed to get back in touch with me.
Q. And did the recruiter get back in touch?
A. No.
Q. Do you have any documentation associated with these applications or these denials from Fed-Ex, the post office and these two trucking companies?
A. I can look and see.
Q. Okay. Please do so.
A. Okay.
Q. Any other places you applied during that first suspension that you can recall?
A. No, not that I remember.
Q. How about during the second suspension? That is, following the second discharge August 2011 to November 2011?
A. That second one I did, I tried to look at a lot of restaurants.
Q. Okay. Why restaurants?
A. Because I felt that would be easier for me to get on, you know, and at least get back on my feet, you know, get it going and then take it from there.
Q. Okay. And where did you apply?

A. Golden Corral, a lot of the places I had applied to before.
Q. Applied to before, do you mean that you had worked before?
A. Yes.
Q. Okay. Any others that you can remember specifically?
A. No, sir.
Q. Did you submit written applications?
A. Yes.
Q. Online or in person?
A. In person.
Q. And were you interviewed for any of those jobs?
A. No.
Q. Were you applying for a server position at each of these?
A. Yes. A server and in the kitchen.
Q. And you said you did not receive an interview for any of the positions?
A. No.
Q. And you didn't ultimately hire into any of those positions?
A. No, sir, I didn't.
Q. Were you ever offered a position?

A. No.
Q. Any other places you applied during your second suspension that you can remember?
A. No.
Q. Now, following the discharge in January 2012, when did you begin looking for other work?
A. That same day.
Q. Okay. And where did you apply?
A. I remember Bojangles, Cook-Out, T.J. Maxx.
Q. Any other places?
A. I did but I can't remember them.
Q. And Bojangles, what position was that?
A. Just a cook or a server.
Q. Okay. And did you apply online or in person?
A. In person.
Q. And what happened with your application?
A. The lady said she was going to get back with me and they never did.
Q. Did you follow up?
A. Yes.
Q. And what was the response?
A. She told me she'd get back with me.
Q. So never offered a position there?
A. No.
Q. And Cook-Out?

A. Cook-Out, I went back there three times and they said, we'll get back with you.
Q. But never received an offer?
A. Never received an offer.
Q. What about T.J. Maxx, what position were you applying for there?
A. Cashier or floor -- or floor sales.
Q. And did you ever hear back?
A. No.
Q. Have you followed up?
A. Yes. They said, we'll get back with you.
Q. Do you know how much approximately the floor sales and the cashier positions paid?
A. I want to say about $9 an hour.
Q. Okay. Anywhere else that you've applied since the January 2012 discharge that you can tell me about?
A. Nothing I can remember but I have them on my work search sheet.
Q. And I think you referenced that in connection with your unemployment claim, correct?
A. Yes.
Q. That's a document. How often do you have to submit that?
A. We have to keep it on file once a week.
Q. So you submit it to the North Carolina

Unemployment Commission once a week?
A. No, whenever they -- they'll write us a letter and they ask us for it, and then we take it down there to them.
Q. And how often do they ask for it?
A. About once a month.
Q. But it's a worksheet you're supposed to fill out as you're applying for jobs?
A. Yes, sir.
Q. What information do you keep on that sheet?
A. You keep the date, the place you go to or where you go online and if you had a contact person, you do that, and the position that you're applying for.
Q. And do you keep a copy of that sheet?
A. Yes, sir.
Q. Even after you submit it to the state?
A. Yes.
Q. You keep a copy for yourself?
A. Yes, 'cause they may re-ask for it again so...
Q. Okay. And so do you have a copy of that at home?
A. Yes.
Q. And, again, I would ask, you probably need to after the deposition, send that over to your attorney.

A. Okay.
Q. But sitting here today, understanding you don't have that worksheet in front of you, any other positions that you can recall applying for?
A. No, sir.
Q. And you said you have not tried to explore cosmetology or travel service, any of the other previous certifications that you have?
A. When I'm able to go back and get recertified, you know, 'cause we have to go back and get your license recertified and since my license has been out of certification for a number of years, I have to go back and get recertified.
Q. Do you know how much that would cost?
A. No, sir. But I know I could go and get recertified, you know, but I would have to pay for it.
Q. But have you investigated how much that would cost?
A. I did go to Sherrill's and ask Sherrill. Yes, she told me it would be about $1500 to get recertified for my teacher's.
Q. What about even to be a practitioner?
A. Now, since -- you have to get recertified as a -- as a -- license as a cosmetology before you get recertified to be a teacher.

Q. Okay. So how much would it cost just to be recertified in cosmetology?
A. The way, 'cause I've been out so long, they're saying that I may have to take the course all over again. So about $5,000 altogether with everything, everything.
Q. What about commercial driving jobs, have you applied for any?
A. I have. And they, same thing, they told me they'll get back with me.
Q. Do you recall what employers those were?
A. I can't recall -- I can't recall the name right offhand. No, I can't recall them.
Q. Okay. Even without the name, do you remember what position you were applying for?
A. Oh, yeah, local truck driving.
Q. Making deliveries?
A. Yes. And I applied for TTA.
Q. What's TTA?
A. Triangle Transit.
Q. Is that local public transit?
A. Yes, sir.
Q. What would you be driving in that position?
A. A bus, a passenger bus.
Q. What happened with that application?

A. They told me they'd get back with me.
Q. And the local delivery company, what position -- do you recall how much that position paid?
A. I want to say about $12 an hour.
Q. Did you ever get a response from your application?
A. No, sir.
Q. Did you follow it up?
A. Yes, they just told me they'd get back with me.
Q. Do you recall how much the TTA position paid?
A. About 12.50 an hour.
Q. Have you applied for any over-the-road driving, tractor-trailers, anything like that?
A. No, sir, not -- no.
Q. To the best of your recollection, have we discussed all the positions that you applied for since your January 2012 discharge?
A. Yes.
Q. So since your January 2012 discharge, have you received income from any source other than unemployment benefits?
A. No.
Q. When you submit these other applications, are you asked to describe or list your most recent

positions?
A. Yes.
Q. Including your position with UPS?
A. Yes.
Q. Have you been asked whether or not you were discharged from that position?
A. It asks you your reason for leaving.
Q. And what do you typically put down?
A. I put, terminated.
Q. Just the word, terminated?
A. Well, I may put discharged, terminated, and then if they -- sometimes they ask me to go in depth, you know, they'll say, describe the reason why you was terminated, and that's when, you know, I put work methods, I will put work methods. I put terminated for work methods. And then sometimes I would put, I don't -- I just put work methods.
Q. Okay.
(DEFENDANT'S EXHIBIT 3 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 3, entitled, Employment Application. Do you recognize this document?
A. Yes.

Q. Is that your signature at the bottom of the second page?
A. Yes.
Q. And does this appear to be a true and correct copy of your application for part-time employment with UPS?
A. Yes.
Q. And you indicated that you began your employment with UPS in 1997 as an exception clerk?
A. Yes.
Q. What was the -- how long did you stay in that position?
A. I'll say until 2000.
Q. And that's the time at which you went full time with UPS?
A. Yes.
Q. How did you go about becoming a full-time employee?
A. What we do is, we -- they put jobs up on the board and we bid on these jobs, and whenever you bid on a job, according to your seniority, that's how you receive the position. And in 2000, my seniority allowed me to get a combo, full-time position.
Q. So you said a combo, full-time position, is that Article 22.3 job?

A. Yes.
Q. So what was the combination?
A. I drove for drop boxes at night and what we call from twilight and then midnight I would work in the building, that's what we call midnight.
Q. Doing the sort?
A. Yes, sir.
Q. And so in the Raleigh building?
A. Yes.
Q. And did you interview at all as part of that process?
A. No, what you had to do was, you have to, once you're selected, once your name come up, you have to attend a week class, you have to attend a class.
Q. A training course?
A. Yes. And if you pass the class, if your score, your score had to be, I want to say it was -- really was a hundred, to tell you the truth -- I want to say 80, you have to have an 80 to score, yeah, 80 to, you know, pass out 'cause they take everything into consideration during that week.
Q. And so what sort of training are you receiving during that week?
A. They give us a, what we call a safety, a safety packet, and you have to remember all of the

safety habits in that packet. And the following day, you received the class and the next day, like the first hour of that next day, you test, you have a test on what you learned the following day, and then depending on what you scored that day for that class, if you really -- if you don't pass two tests, then you know, you know, you out the door.

Q. Right. You would go back to your part-time position?

A. Yes, sir.

Q. All right. But you did pass at the time?

A. Yes, sir.

Q. And do you recall the name of the person who was evaluating or scoring you?

A. Yes. Pam Smith, I believe it was.

Q. Okay. Do you recall Ms. Smith's race?

A. Yes. She was a -- she's White.

Q. Do you know approximately how old she was at the time?

A. No.

(DEFENDANT'S EXHIBIT 4 MARKED FOR IDENTIFICATION.)

BY MR. GARTLAND:

Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 4, entitled, Honesty in Employment Policies. If you

could take a moment to look at that and let me know when you're finished.
A. Okay.
Q. Do you recognize this document?
A. Yes.
Q. For the record, what is it?
A. It's our Honesty in Employment that we sign when we first get hired.
Q. Okay. And is that a copy of your signature at the bottom of the page?
A. Yes.
Q. And it says, witnessed by Patricia Prince. Do you recall who that person is?
A. No.
Q. And does this appear to be a true and correct copy of the Honesty in Employment Policy?
A. Yes.
Q. And do you recall receiving training on this policy during your employment with UPS?
A. I received the document but...
Q. Do you recall having the document reviewed with you at any time during your employment with UPS?
A. Can I -- I don't, as far as we actually going over the document?
Q. Well, let me say it this way, the document

says, I have read the above information and I understand UPS policy that reflects their high regard for honesty, I understand my obligations to maintain personal honesty and prevent the dishonesty of others.

Do you see that language?

A. Yes, sir.

Q. And you signed beneath that language, correct?

A. Yes, yes.

Q. Indicating you understood the policy, correct?

A. Yes.

Q. Okay. You understood at the time you worked for UPS that the company expects all of its employees to be honest and have integrity in all of their work activities, correct?

A. Yes, sir. Yes.

Q. I'm sorry, we're doing a little bit of talking over each other, so I just want to make sure, I'll wait until the end of my question.

And you understood that those policies applied to you, the Honesty in Employment Policy, that is, applied to you as a package car driver, correct?

A. Yes.

Q. And you understood that your employment could be terminated if you violated this policy?

A. Yes.

MR. GARTLAND: Defendant's Exhibit 5.
(DEFENDANT'S EXHIBIT 5 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 5. I will represent that this is an excerpt of the current Collective Bargaining Agreement between UPS and teamsters, specifically the cover page and the excerpts of Article 50. If you could take a look at that and let me know when you're ready. And, again, you don't necessarily need to read through the whole thing, unless you want to, I just want to make sure you're familiar with the document.
Are you ready?
A. Yes.
Q. And does this appear to be a true and correct copy of Article 50 of the current Collective Bargaining Agreement?
A. Yes.
Q. Have you read this article before?
A. No.
Q. Okay. And as a package car driver you were represented by teamsters during your employment with UPS, correct?
A. Yes.

Q. And the terms and conditions of your employment were governed by the CBA between UPS and teamsters?

A. Yes.

Q. And is it true that Article 50, to your understanding, contains certain violations by which an employee may be terminated immediately as opposed to be subject to progressive discipline?

A. Yes.

Q. And did you understand dishonesty to be one of those offenses?

A. No.

Q. Elaborate on that for me, if you can.

A. At any time I never -- I didn't -- I didn't think about as far as dishonesty or anything like that, so I wasn't -- I never tried to be dishonest there, so I wasn't, my mind wasn't going towards whatever dishonesty was or whatever, I only went there to do my job and that was it. I didn't never -- my mind was never focused on looking at our, looking at this and just, you know, stand bent set to it, because I went in knowing that I was going to do a -- try to be honest or be honest every single day.

Q. Well, the CBA is the document that, you know, I think elsewhere characterizes as a contract between

you and the company, correct?
A. Yes, sir.
Q. And that contract has lots of terms, including compensation, progressive discipline for certain offenses, Article 50 immediate termination for certain offenses. Your testimony is you didn't familiarize yourself with the provisions of the Collective Bargaining Agreement?
MS. POLIN: I'm going to object to that. That wasn't response to your question.
MR. GARTLAND: That's why she's been asked is it her testimony.
BY MR. GARTLAND:
Q. Let me ask it this way, during your tenure at UPS as a package car driver, you, yourself, and other employees that you work with have been subject to disciplinary action, correct?
A. Right.
Q. So you understand that in some cases that disciplinary action was progressive, it went from warning to suspension, maybe up to discharge; is that correct?
A. Yes.
Q. And so did you also have an understanding that there were some offenses that UPS viewed as so serious

you would be discharged off the job immediately without progressive discipline?

A. Yes, sir.

Q. Okay. Did you have any understanding as to whether dishonesty was one of those offenses? Understanding that you disagree with the company's allegation of dishonesty in this case, let's put that aside, I'm just asking, did you have an understanding as to where, if you were found to be dishonest, you could be taken off the job immediately?

A. Yes, sir.

Q. Okay.

(DEFENDANT'S EXHIBIT 6 MARKED FOR IDENTIFICATION.)

BY MR. GARTLAND:

Q. Ms. Shipman, you've now been handed what's been marked for identification as Defendant's Exhibit 6, entitled, Professional Conduct and Anti-Harassment Policy. Do you recognize this document?

A. Yes, sir, I've seen it when we first started, when I first started there, yes.

Q. Does it appear to be a true and correct copy of the policies that you were provided?

A. Yes.

Q. Do you have any reason to believe that this is not a correct copy, is what I'm trying to get at?

A. It's been so long since I've seen it, I...
Q. Okay. Do you recall signing a document like this one during your employment?
A. I can't remember.
Q. Okay. And what was the context in which you recall being provided a copy of this document? Was it when you first began your employment with UPS?
A. I want to say, yes.
Q. That would have been as a part-time employee or as a full-time employee?
A. Part time.
Q. Do you recall whether you saw it again in connection with your full-time employment?
A. No.
Q. And you most recently worked in the Cary Center, which is part of the Raleigh Hub, correct?
A. Uh-huh.
Q. Okay. Do you recall whether this policy or a similar policy is posted within that hub in an employee break area or other similar area?
A. I don't recall.
Q. Is there an employee break area in the Cary Center?
A. Yes, there's one up the steps.
Q. And are there posters in that area about

different employment policies or union materials perhaps, do you recall?
A. I didn't never go up there.
Q. You've never been in the break area?
A. I walked up there but as far as going up there, no, I didn't go up there.
Q. Okay. Are you aware that UPS has a 1-800 number, a compliance line that employees can contact if they have concerns about their employment?
A. No.
Q. You never recall seeing any posters or other literature about that 1-800 hotline during your employment with UPS?
A. No.
Q. Do you -- have you ever heard the term, corporate concern, before?
A. No.
Q. Do you know of any other employees who have filed an internal complaint of harassment or unfair treatment other than a grievance?
A. No.
Q. Have you yourself ever reached out to UPS' Human Resources Department to raise any concerns?
A. No.
Q. All right. I think we talked a little bit, I

want to just discuss briefly your history with UPS prior to becoming a package car driver. We've talked about your time as a clerk and then moving to full time as a combo, combo driver and sorter. Are those the only two positions you've held prior to becoming a full-time package car driver?
A. I worked over -- well, being a clerk also consists of customer counter also.
Q. Okay. You worked the customer counter?
A. Yes.
Q. Was that also in the Raleigh hub?
A. Yes.
Q. Prior to 2000?
A. Yes. Well, no, I did it also during 2000 while I was a full-time package car driver also.
Q. All right. While you were a combo driver?
A. No, while I was a full-time package car driver, also I worked the customer counter.
Q. When did you become a full-time package car driver? Well, I'm sorry, I didn't ask that the right way. Let me ask this, after the combo driver position, what was your next position at UPS?
A. It was a full-time driver.
Q. Okay. And when did you go into full-time driver?

A. 2005, I believe.
Q. Okay. And describe for me the process to move from your combo driver position to a full-time driver position?
A. You have to go out on the truck with a -- with a supervisor and you train for a month, and after that month, the driver -- no, right before that month, about a week it end, before the month is over with, the manager of that center will ride with you.
Then -- first a supervisor ride with you that train you to evaluate you to see if you are -- if you're really, you know, if you're going to get to the stage to where the manager is willing to accept you as a driver. And once he do that, then about the following week is when a manager will ride with you, and then when the manager ride with you, he will write down everything or she will write down everything that they feel that you need to improve on or everything that you're not good at or whatever and then at the end, he will notify or she will notify your supervisor with the results.
And at that point, the supervisor will let you know how you're going to look as far as the next week, if you're going to make it or not. And then once they come to you and they tell you, okay, you done made it

for full-time driver, then that's when you're classified as a full-time driver.
Q. Okay. And you're aware of the availability of the full-time driving position because of a posting?
A. Yes. Yes.
Q. How do you go about expressing an interest in going full-time driver?
A. You have to sign a sheet again and then if your seniority comes up, then you're selected for that position as a full-time driver.
Q. Okay. And you were successful in your first 30-day attempt?
A. Yes.
Q. And who was the supervisor who rode with you at the time?
A. It was, his name was -- I cannot believe this, I don't remember his name. It's going to come to me.
Q. Okay. I think you said, he, so we're talking about a male?
A. Yes.
Q. Do you recall his race?
A. He was a Black male.
Q. And do you recall approximately what age he was?
A. He's retired now so he had to have been in his

50s then, so I'd say he was about 55.
Q. Okay. And who was the business manager at the time?
A. Ray Sawyer.
Q. Ray Sawyer. What was Mr. Sawyer's race?
A. He was Black.
Q. And he was technically the business manager of the Cary center?
A. Yes.
Q. And do you recall what Mr. Sawyer's age was at the time?
A. I want to say Ray was about -- he could have been about 59, 60, 'cause he's retired too.
Q. And at that point you became a full-time driver in the Cary center?
A. Yes.
Q. Have you ever been based out of any other center?
A. No.
Q. And have we, including your time as a full-time driver, have we now discussed every position that you held at UPS? In other words, you never changed after that to being in a different position than a full-time driver?
A. No.

Q. And you said at the time that you were full-time driver you did work some customer counter clerk, why was that?
A. What they do is, when they cut your route, they will -- you have to go in the building and work, and since I had customer counter experience, they sent me over to customer counter to work.
Q. And I think we heard some testimony earlier this week that routes out at the Cary center are seasonal in nature, in large part due to the university presence here, correct?
A. Correct.
Q. So there are times when they cut routes out from the center during the year?
A. Yes.
Q. If your route is one that is cut, you're reassigned to inside work?
A. Yes.
Q. But still at the same rate of pay, correct?
A. Yes.
Q. Per the Collective Bargaining Agreement?
A. Yes, sir.
Q. Are you still guaranteed a certain number of hours a day?
A. Yes, sir.

Q. So for you, your route was cut during that time?
A. Yes, sir.
Q. What route was that?
A. 24 -- 24B.
Q. And does that include part of the university?
A. No, sir.
Q. Why -- do you have any understanding as to why that route was cut?
A. I was told there wasn't enough work on it and it was cut, and when I would come in, they would tell me it was cut and I would say, okay, and I would just go back home and come back at 3:00 or 4:00 and work my evening shift.
Q. All right. Any other positions that you worked inside the building when your route was cut over than customer counter clerk?
A. Car wash.
Q. Any others?
A. Small sorts, retaping, sorting, unloading, really, whatever they asked me to do, I would do. If they asked me to take packages to the airport, I would do that. Oh, and I did -- I have worked at the airport, that just dawned on me. When I worked at UPS part time, I worked at the airport also.

Q. As a clerk?
A. Yes.
Q. All right. And in terms of the UPS management structure, each center is managed by a business manager or center manager, correct?
A. Yes, sir.
Q. And who was -- your most recent business manager, business manager at the time of your -- the three discharges was Lindy Blankenship Hill, correct?
A. Yes, sir.
Q. And who was the center manager or business manager prior to that?
A. Chris Smith.
Q. And what is Mr. Smith's race and his age, if you know?
A. A White male. I don't know his age. He's got to be in his 50s, late 50s, maybe -- I don't think he's 60.
Q. Late 50s at the time that he managed you or now?
A. I want to say -- I want to say now.
Q. Okay.
A. I really don't know how old Chris is.
Q. All right. And prior to Chris, who was the business manager before that?

A. Ray Sawyer.
Q. Do you recall approximately when Mr. Smith took over from Mr. Sawyer as the business manager?
A. I can't remember.
Q. And do you recall who the business manager before Ray Sawyer was?
A. No, I don't.
Q. Okay. And I think you testified that Mr. Sawyer was the business manager at the time that you became a full-time driver, correct?
A. Yes.
Q. So during your time as a full-time package car driver, you only had three business managers?
A. Yes.
Q. Ray Sawyer, Chris Smith, and Lindy Hill?
A. Yes.
Q. And as a package car driver, your direct report is an on-road supervisor, correct?
A. Yes.
Q. Now, when you first became a package car driver, do you recall who your on-road supervisor was?
A. That's the one who trained me and I'm still trying to think of his name.
Q. And I think you testified that was a Black male, approximately 55 years old at the time?

A. Yes.
Q. And if we remember it, great; if we don't, it's not a big deal.
A. Okay.
Q. Who was your next on-road supervisor, if you recall?
A. Dwight King.
Q. What is Mr. King's race?
A. I say Dwight in his --
Q. I'm sorry. His race?
A. Oh, he's Black, Black male.
Q. And approximately how old at the time?
A. I'd say in his 50s.
Q. Okay. And approximately how long or do you recall when Mr. King became your supervisor instead of the previous Black male whose name you can't recall?
A. How long was he --
Q. I'm sorry. When did that transition occur?
A. Oh, I don't remember the year.
Q. Okay. Do you recall how long Mr. King was your on-road supervisor approximately?
A. For about two years.
Q. And after Mr. King, who became your on-road supervisor?
A. Mike Smith.

Q. Do you recall approximately when that was?
A. No.
Q. And Mr. Smith, for the record, is a Black male, correct?
A. Yes.
Q. And do you know how old he is?
A. In his 30s.
Q. And how long was Mr. Smith your on-road supervisor?
A. For about -- about two years, two, three years. Yeah, about two years.
Q. Do you know approximately when, either the month or the year, that he stopped being your on-road supervisor?
A. No, sir.
Q. Okay. Who was your next on-road supervisor?
A. Greg Hawkins.
Q. So would that have been sometime in 2011?
A. Yes, sir.
Q. And what is Mr. Hawkins' race?
A. He is a White male.
Q. And do you know how old Mr. Hawkins is?
A. I'm going to say probably in his late 40s.
Q. Have you ever discussed his age with him?
A. No.

Q. So it's just based on his appearance?
A. Right.
Q. And how long was Mr. Hawkins your on-road supervisor?
A. About two months. Oh, before Greg there was another man, he was there for about a month, his name was, I can't even remember his name 'cause he wasn't there long.
Q. Was his first name Neal?
A. Yes, uh-huh. He was only there a month.
Q. What was his Race?
A. He was a Black male.
Q. Do you recall approximately how old?
A. I'm saying late 40s, early 50s.
Q. And we may see it in the documentation but his last name, do you recall?
A. No, sir, I don't remember.
Q. And you said he was only your on-road supervisor for about a month?
A. Yes.
Q. Did he move to a different facility?
A. Yes, sir.
Q. Where did he go, do you know?
A. I don't know.
Q. How about Mr. Hawkins, when he ceased being

your on-road supervisor, did he leave the building?
A. I left the building.
Q. Okay. So he was your last on-road supervisor?
A. Yes.
Q. And do you know whether Mr. Hawkins is still employed with UPS?
A. He is -- I don't know. I don't know.
Q. To the best of your knowledge, he is?
A. Yes.
Q. Okay. Was David Murphy ever your on-road supervisor?
A. David was -- yeah, David was -- he was in another group though but, you know, he was --
Q. He was in the building?
A. Yes.
Q. Okay. What is Mr. Murphy's race and age, if you know?
A. White male and I'd say David got to be in his late 50s.
Q. What about Peter Broadwood?
A. I've never seen him before.
Q. Frederick Fuller?
A. Yeah, Fred. Fred Fuller.
Q. Was he ever your on-road supervisor?
A. He's in our center.

Q. Okay. But never directly supervised your team, your driver group?
A. No, never.
Q. And what's Mr. Fuller's race and age, if you know?
A. He's a Black male, I'd say he's in his late 50s.
Q. And Cornelius Lawrence, do you know who that is?
A. Huh-uh.
Q. Never heard that name before?
A. No.
Q. And I think he's testified. Same as Peter Broadwood, you've never heard that name before?
A. No.
Q. And if you could just generally, ma'am, describe the job duties and responsibilities of a package car driver?
A. Our duties, first the job is, we go -- we -- our appearance needs to be up to par, that's the first thing they want. We come in, we grab our board with our DIAD which is on the wall there, you grab what route you're on and you go directly to your truck.
When you go to your truck, it's your job to make sure where your air is located at on the truck

and check your air and then you want to inspect your vehicle, do a cold pretrip of your vehicle, and then after you do your cold pretrip you want to make sure that all the packages at the back of your truck is inside the truck. And at that point you want to prepare yourself to leave the building, to get your air off and everything.

And your duties is, while you're out there, first duty is safety, you want to be safe at all times, you want to operate the vehicle in a safe manner at all times, that's first and foremost. Then you want to make sure that you're delivering -- your packages get delivered and make sure you stay in communication with the OMSs at the building and then you want to return back safely.

Q. And for the record, the OMSs are?

A. They are the over -- they're the ones that we communicate with over the board, they're the ones that do the dispatching over the board. Operation -- I can't remember their -- but they're the ones that we communicate with.

Q. Okay. And are they supervisors or hourly employees, if you know?

A. Well, their title is supervisor but I don't know how -- if they get paid by the hour or what

because I never discussed their pay with them.
Q. And upon returning to the building, what are the duties of the driver?
A. To come in, give all your exception packages to your exception clerk, explain whatever you got to explain to them, let them know what's going on with the packages, then you park your truck where it's supposed to be parked at and you clock out, and put your board in.
Q. Okay. And I think you talked about your board or your DIAD, same thing, correct?
A. Oh, yes, sir.
Q. And DIAD stands for Delivery Information Acquisition Device?
A. Yes, sir.
Q. And you used the DIAD in connection with delivering packages, correct?
A. Yes.
Q. Okay. And so, walk me through just the typical use of the DIAD, you're walking up to me as a residential customer to deliver a package that requires a signature.
A. Uh-huh.
Q. Walk me through the process.
A. Okay. When I come up to you with the package

and I'm going to need a signature, first thing I'm going to say, sir, I'm going to need a signature for this package. And then you -- if it requires an ID, I'm going to ask you for your ID if it's alcohol. So I'm going to ask you for your ID and then whenever I scan the package, it's going to pop up I need the ID off the top and then when -- after I scan it and then I'm going to get you, I'm going to go to my signature section and then I'm going to hand you the board, pass you the board and then you're going to sign for it. And then I'm going to click it back over to me, make the board come back over to me and at that point I'm to going ask you, I'm going to say, sir, what is your -- could you clarify your name for me because it needed a signature, so I got to make for sure I get the right signature. So then I'm going to type that in.

Q. Okay. And at what point in that process do you scan the label on the package?

A. Oh, oh, you scan it when I said -- I scan the package, I scan it when I come up to you for you to sign it.

Q. Okay. Is that the point at which a delivery cross is put on the document? When does that occur? On the package, when does that occur?

A. That's going to occur if I come to your door and you're not there. When I knock on your door and no one is there and you don't, you know, no one is there, and then at that point after I done scan the package and you're not there, at that point I'm going to go in the board and I'm going to put, not in 1, and whenever I put in, not in 1, when I go back to the truck, I really, when you're walking you aren't supposed to be doing no recording, no anything. When you get back to the truck is when you take the package and you -- when you're going back to the back, you take it and you can put your service cross on it then.

Q. And just for the record, what does a service cross look like?

A. Service cross, it's like a cross, and you put your initials, your time, the not in 1, 'cause it was a not in 1 with no signature, and then you put -- oh, and the date.

Q. Okay. Is that something that prints out from your DIAD?

A. No, sir. It's just something you write on there. Really it's for your own -- you do it for yourself and for the next driver who gets the package so they'll know, you know, the information without having -- 'cause the next driver don't have the

information in front of them, but if they look up there and they see or you look up there and you say, oh, okay, this is the package from yesterday, where they not in 1, so they'll probably -- if they're not -- if they weren't in at 2:00 yesterday, I'm going to go by there at 5:00 today, instead of 2:00. It's just, you know, to let you familiarize yourself with that particular package what's going on.

Q. Thank you.

A. Uh-huh.

Q. And in addition to, scanning and delivery information gets communicated back to the center, you also use the DIAD as kind of your timecard for the day, correct?

A. Yes, sir. Yes, sir.

Q. You use it to record when you start work?

A. Yes.

Q. And use it to record when you took breaks or lunch?

A. Yes.

Q. And it's true that UPS has a computer-based system through which people can track their packages on line?

A. Yes.

Q. And from the moment they're picked up from UPS

until the moment they're delivered, correct?
A. Yes, sir.
Q. They can log in and see the status based on the tracking number?
A. Yes, sir.
Q. And so that service, the ability to track your package on line, that's part of what UPS sells to its customers, correct?
A. Yes.
Q. Have you ever sent a package by UPS or been waiting for a package by UPS?
A. Oh, yes.
Q. Have you gone online and checked the status of a package?
A. Oh, yes.
Q. So it's important that information be accurate, correct?
A. Yes.
Q. And as a package car driver, again, part of the training that a driver receives is on the proper methods and procedures for delivery, correct?
A. Yes.
Q. Both at the beginning of employment and during the time that you're a package car driver, correct?
A. Okay, okay, okay. Now, you say training

during?
Q. Yes. Both in that 30-day period and then during the time that you are a package car driver?
A. We -- can I elaborate a little bit?
Q. Absolutely.
A. We receive knowledge of information the way things are changing. The way we do things.
Q. Okay. And you all also receive knowledge or reminders about appropriate methods and procedures, correct?
A. Yes, sir. Yes.
Q. And through a PCM perhaps?
A. Yes, sir. Yes, sir.
Q. For the record, can you state what a PCM is?
A. A PCM is what we have about 30 -- it's a meeting, it's a meeting that we have, each center or each line, we call it a lineup has, and a lineup is your supervise group, like Mike had us as his supervise group. So about 15 minutes before we pull out, we have what's called a PCM. And a PCM is to prepare us to go out on our route for that day. To let us know of any new stuff that's going to come in or any -- anything that may happen out on the road that we need to know about. Really to, it's that communication with all of us together there in the

morning time.
Q. Okay. And do PCMs ever include a refresher or a reminder by the on-road supervisor about the appropriate method and procedure for a specific delivery or anything like that?
A. We used to have those where we had the reminders, we used to have what we called a Safety PCM.
Q. But with respect to methods and procedures on delivery, during a PCM, would an on-road supervisor ever review, you know, this is how you're supposed to scan or code a certain type of package?
A. We used to but that stopped.
Q. When did that stop?
A. That stopped, I want to say, that stopped right after Dwight left, right after Dwight King left, that stopped.
Q. Do you recall approximately what year that was?
A. No, sir.
Q. Do you know what an OJS ride is?
A. Yeah. That's when your supervisor rides with you.
Q. And OJS stands for on-the-job supervision?
A. Yes, sir. That would -- now, that will follow

up under that training, that's what that will follow up under.
Q. And to the best of your knowledge, what are the reasons that a driver might receive OJS ride?
A. Well, we're really supposed to receive them every year. Every year that really, when they doing the safety ride, they also do an OJS ride. So sometimes they may combine them both together. And other times, they may do an OJS ride because your -- they want to know why your route, why you're going over your time allowance.
Q. Okay. So if a driver is over allowed on his or her route, that might be an occasion where the manager or the supervisor decides to do an OJS ride?
A. Yes, sir.
Q. To figure out what's going on, on the route that's causing the driver to be late?
A. Yes, sir.
(DEFENDANT'S EXHIBIT 7 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 7. If you could, take a moment to look through those three pages. Bates labeled UPS 304, UPS 305 and UPS -- I'm sorry, four pages, UPS 308, and UPS 311.

A. Okay.
Q. And do you recognize these documents?
A. Yes, sir.
Q. Can you confirm for me that that is your signature on each of these pages?
A. Yes.
Q. And the other supervisor's signature that appears there, is that, to best of your knowledge, Mike Smith?
A. Yes.
Q. So presumably this was during the time that Mr. Smith was your on-road supervisor?
A. Yes.
Q. Tell me if you can what these documents are?
A. These are the certification for whenever -- for the exceptions, our send agains, damages, it's when we take them off and give them to the clerk. And it's telling us, we place it behind the driver's seat and tell us which position the packages go in in the truck and making sure that we take them off the truck and give them to the -- to the PM clerk.
Q. And in this specific instance from these documents, it appears that these are four separate occasions where the procedure was reviewed with you again; is that correct?

A. Yes.
Q. So tell me what prompted this first review, if you recall?
A. Okay. Whenever the OMS call us and let us know to take a package off our car and make sure that it's given to the PM clerk, because it's been called in and they may want it on will call or something of that nature. And when we forget about it and leave it on the car, at that time -- at that time they would notify us to ask us to take the package off the car and give to the PM clerk. If it was a, not in 1 and not in 3, and not in 2, we would take it off when they tell us -- ask us to, take it off and give it to the clerk.
Q. Well, according to this document, all exception packages, which would include not in 1, is that correct, and will call?
A. At that time, yes, that's what this was.
Q. So, send agains, you used that term to apply to all those documents that couldn't be delivered on that specific day?
A. Yes.
Q. In that classification there. Those documents, according to this certification here, were supposed to be given to the PM clerk upon return to

the building and not left on the package car, correct?
A. Yes, sir.
Q. And so is it your recollection that you were provided this certification because you had in some way violated these procedures?
A. Okay. Whenever Mike would bring me this, it would be in the morning time, he would bring all the drivers to let us know that we didn't remove a package off our car and give it to the clerk. And at that point, we would sign and say, okay, you know, all right, we left it on the car.
Q. And he was -- was he advising everyone in the driver group or the specific driver who left it on the car?
A. Whatever drivers left it on the car.
Q. Okay. So in this specific circumstance, you had left one or more packages on the package car?
A. On the package car.
Q. Instead of handing them to the PM clerk?
A. Instead of handing them to the PM clerk.
Q. So the first is dated, September 4th, 2008?
A. Yes.
Q. So presumably on September 3rd you would have left one or more packages on the package car?
A. Yes. With the exception packages.

Q. Right. So he had come to you the next morning to remind you and have you recertify on the policy, correct?
A. Yes.
Q. The next one is December 18th, 2008?
A. Yes.
Q. Okay. So presumably the day before you had left one or more exception packages on the package car instead of giving them to the clerk?
A. Yes.
Q. And September 22nd, 2008. Again, that would mean September 21st, 2008 you had left exception packages on the car instead of handing them to the PM clerk?
A. Yes.
Q. And this document's entitled, final warning.
A. Yes.
Q. And then again the last page is March 25th, 2009, again, presumably that means March 24, 2009 exception packages were left on the package car and not handed to the PM clerk, correct?
A. Correct.
Q. Is this an example of retraining, if you will, that a driver might receive if they violated a method or procedure?

A. What this right here was, in the morning times when we went in, it was -- they would call it a recertification but it was more or less, if I remembered that I left that package on that car, as an off such person, then I could say, okay, yes, I remember leaving it there, but it could be a possibility it wasn't on my truck. But more than likely what this was, it was to recertify us to let us know that we left that package on that car, yes.

Q. Okay. Can you back up. I don't understand the distinction. I mean, it seems to me, based on the testimony and my understanding of UPS procedure, that this document would be given to you and this procedure reviewed with you if you had failed to follow the procedure and left exception packages on your package car the night before?

A. Right. Right.

Q. Instead of handing them to the PM clerk, correct?

A. Correct.

Q. So explain to me again, I didn't understand the distinction you were trying to draw between remembering or forgetting?

A. Oh, okay. A lot of times, some packages are on someone else's truck and they may have it on their

truck for will call, but at this time here, this system here, it would show whereas it would be on my truck or another driver's truck.

Q. Is it your testimony that Mr. Smith would counsel you about packages that a different package car driver left on his or her truck?

A. It's a possibility that could happen.

Q. To the best of your recollection, is that what prompted these reminders?

A. I'm not sure, sir. But I can say with some of these packages, yes, I did leave on my car, because Mike, I would tell Mike, you're right, I did leave that up there. So, yes, I'm going to say, yes, I did. This was a recertification.

Q. So is it safe to say that, to the extent you didn't understand it before, you certainly understood it after these additional recertifications that you were required to give exception packages --

A. Yes, sir.

Q. -- to the PM clerk upon returning to the center?

A. Yes, sir.

Q. Correct? And not leave them on the package car?

A. Yes, sir.

Q. Thank you.
MR. GARTLAND: Defendant's Exhibit 8.
(DEFENDANT'S EXHIBIT 8 MARKED FOR IDENTIFICATION.)
MS. POLIN: Can we go off the record?
MR. GARTLAND: Sure.
(A DISCUSSION WAS HELD OFF THE RECORD.)
BY MR. GARTLAND:
Q. All right. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 8. Do you recognize these two pages entitled, MOR, missed on road, certification?
A. Yes, sir.
Q. Okay. And is that your signature next to the word, driver, on both pages?
A. Yes, sir.
Q. First one is dated 1-28 and the second one 1-8. Do you recall in what year you executed these documents?
A. No, sir.
Q. The supervisor's signature that is on the first page, marked 1-28, do you recognize that signature?
A. No, sir.
Q. And second page, dated 1-8, do you recognize the signature next to the supervisor?

A. Well, it looks like Mike Smith's signature.
Q. Okay. And can you tell me, describe for me what this certification is?
A. Okay. This right here is, okay, this right here is whenever you have packages on your car that the business is closed, if you know they close between 12:00 and 1:00, you don't go there and don't sheet them up. Then you have to make all your businesses by 5:00. Any service that you failed -- any businesses or services you failed to do after 5:00, you have to report it to your center.
Q. And it has to be coded as a missed delivery?
A. Yes, sir.
Q. As opposed to, customer was closed?
A. Yes, sir.
MR. GARTLAND: If you want to take a lunch. break now, we'll go off the record.
(A DISCUSSION WAS HELD OFF THE RECORD.)
(A RECESS WAS TAKEN FROM 11:39 a.m. TO 12:43 P.M.)
(DEFENDANT'S EXHIBIT 9 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 9. If you can look with me at the first page and confirm that that is your signature at the bottom --

A.   Yes.
Q.   -- page marked, UPS 290.  I'm sorry.  Go ahead.
A.   Yes.
Q.   And this is a -- can you generally for the record describe this document?
A.   This is a -- an exception failed to pull off your package car sheet, which they bring around in the morning time to let us know we left packages on the car.
Q.   And this particular sheet indicates the package was -- that there were two packages found on your package car and the exceptions processed?
A.   Yes.
Q.   Who would have processed them if you did not hand them to the PM clerk?
A.   The PM clerk processed it, someone came on the car and pulled the packages off from my car and gave it to the PM clerk to process.
Q.   And who would have been the person who pulled it off the car, do you know?
A.   No.
Q.   Would that likely be something an on-road supervisor would do?
A.   More than likely.  The way this looks, this

looks like an OMS or the package was called in and they needed it to go out for an exception, they need to change the address or something on it.

Q. Okay. But I'm saying, who would physically be the person who would find the package on your car that was not handed to the clerk and bring it to the clerk to process the exception?

A. One of the OMSs.

Q. Okay. As part of an audit check?

A. No. The OMS had received the information that they needed these two packages and they would go on your car and they look behind the driver's seat and they would find the two packages and take it to the exception clerk.

Q. But we established, I think, in previous testimony regarding these documents, that under the proper procedure a package car driver who returns to the center is supposed to take all of those send agains, including exceptions, and give them to the clerk, correct?

A. At that time, yes. At this time here, these two packages was called in by the OMS. They send the information through the board and like, if it's a not in 1, this customer here may have wanted these two packages here to be put on will call, meaning they was

going to come to the building and pick them up.
Q. Right. But the question is, whose responsibility is it when the package car comes back to the center to hand these documents -- or these packages to the clerk?
A. The driver.
Q. Okay. And this indicates that the package was found on your package car, not given to the clerk, correct?
A. Yes, sir.
Q. So that's your responsibility to have done that?
A. Yes.
Q. Okay. And it says, as previously instructed, you are required to turn any exception package into the E2DC clerk as part of the inside PM routine. These clerks are positioned at the entrance of each bay door.
Is that correct?
A. Yes.
Q. And the PM clerk and the E2DC clerk, are those the same person?
A. Yes, sir.
Q. Okay. If you turn with me to the second page marked 291, have you seen this document before?

A. Yes, sir.
Q. And is this tracking information for one of the packages that's referenced in the first page?
Well, strike that.
If you can, just turn with me to the page Bates labeled as UPS 297 in the right-hand corner. Probably six or seven pages in.
A. Okay.
Q. And confirm with me that that is your signature at the bottom of the page of UPS 297?
A. Yes, sir.
Q. This is the same exception report entitled, Service Provider Failure To Turn In Exception Packages, this one dated September 4th, 2009, correct?
A. Yes, sir.
Q. And here it indicates the package was not found or scanned at the clerical table with the GSS scanner, therefore, your exception was not processed.
A. Yes, sir.
Q. Do you know what that means?
A. That means I did not pull the package off from my car and it wasn't processed that day by the clerk.
Q. So no one found it that night and made sure it got processed?
A. No, sir. It wasn't found.

Q. Okay. So it would have been presumably on your car the following day?

A. It wasn't found on the car and it wasn't scanned, so what they're saying is, it wasn't found at all.

Q. It wasn't found at all?

A. Right.

Q. Do you remember this specific incident?

A. No, sir.

Q. Now, if you could, just describe for me generally the bidding process that occurs annually at UPS with respect to package car drivers and routes?

A. What -- every year the routes go up for bid and you are able to bid on the route according to your seniority, and whoever has the top seniority within your center, within your center, you get to bid on the routes. And then it's broke up into groups, like, you got supervisor's group, like we had Mike group and then we got Fred group, and then we got the next group, so your sheet -- the sheets come up and then you bid according to what you want, what you want to bid to when your name came up to bid for your route.

Q. And during the time that you were a full-time package car driver in the Cary center, you testified that you delivered route 24B for a time, correct?

A. Yes.
Q. And eventually in, I believe, January 2011, you bid on Route 31A, correct?
A. Yes.
Q. Were there any other routes that you drove during your time?
A. No, sir.
Q. Did you talk to anyone about 31A before you bid on it?
A. No.
Q. And why did you end up bidding on route 31A instead of 24B?
A. When it was my turn to bid, there was only like three routes left and that was the one that I picked.
Q. Okay. And that was based on the seniority?
A. Yes, sir.
Q. Were you one of the least senior drivers in the center at that point?
A. Yes.
Q. And the more senior driver had selected your route 24B?
A. Yes.
Q. Do you recall who that driver was?
A. No, I can't remember his name.

Q. Do you remember what race and approximate age of that driver was?
A. Yes. It was a White male, he was in his -- had to have been in his 20s, late 20s.
Q. But someone with more seniority than you?
A. Yes.
Q. Did you file a grievance or did you contend there was anything improper under the CBA about the way that the bidding went that year?
A. Oh, no.
Q. Who had been delivering Route 31A immediately before you, do you know?
A. I can't remember his name but he had been on that route for years, I want to say five years, six years.
Q. So you were bumping him off of that route by bidding on it?
A. No, sir, he bidded on another route.
Q. Okay.
A. Uh-huh.
Q. So no one was on the route at the time you bid it?
A. No, sir.
Q. You said you don't remember that driver's name?

A. No, I don't remember.
Q. Do you remember what race he was?
A. Yes.
Q. What race?
A. He was a Black male.
Q. Approximately what age?
A. I would say maybe early 40s.
Q. All right. And so the bidding for routes occurs in January of each year?
A. Yes.
Q. And you began training on that specific route in February 2011; is that correct?
A. Yes.
Q. With Mike Smith?
A. Yes.
Q. And I believe he testified that he rode with you for five days' worth of training on that route, correct?
A. Yes.
Q. Do you know whether other drivers who had new routes that year received training as well?
A. Yes.
Q. Are you aware of any other drivers who received five or more days of training on their route?
A. I don't know how many days. I don't know.

Q. Do you have any sense of what is a sort of standard set of training days to receive for a new route?

A. No.

Q. And at this point we're going to start talking about the discharges that occurred, the three that we've been discussing this week. And there will be a time in the deposition later when I'm going to give you a chance to explain why you disagreed with the decision that UPS made and why you felt it was unfair. For right now I just want to focus more on the timeline and the conversations that occurred and the meetings and who was there, kind of the who, what, where, when, and we'll get to the why in a little bit.

So if you could kind of focus your testimony as we talk through the discharges and the grievances, along those lines, I think that will help us use our time efficiently.

A. Okay.

(DEFENDANT'S EXHIBIT 10 MARKED FOR IDENTIFICATION.)

BY MR. GARTLAND:

Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 10, a letter dated March 1st, 2011 to Denise Shipman and signed by Lindy Blankenship. Do you recognize that

document?
A. Yes.
Q. And do you recall receiving a copy of it on or shortly after March 1st, 2011?
A. Yes.
Q. Would you state for the record what this letter is?
A. It's a letter of termination letting me know that I was discharged from employment at UPS.
Q. Okay. And it states that on February 21st, 2011, it was discovered through an audit of your NDA delivery records that you were dishonest in your recording of these packages. You also intentionally were dishonest in receiving compensation for work not performed, which resulted in a large and unacceptable amount of service failures to our customers. Your overall work record is unacceptable.
Do you see that language?
A. Yes.
Q. Prior to receiving this letter, was there an in-person meeting in which you received notice of your discharge?
A. Yes.
Q. Do you recall when that occurred?
A. The day after this happened.

Q. So February 22nd?
A. Yes.
Q. Okay. Based on the recording activity of February 21st?
A. Yes.
Q. So when you came to work that morning you were called into Ms. Hill's office?
A. Into Nicole's office.
Q. That's Nicole Brandon, the division manager?
A. Yes. Uh-huh.
Q. And for the record, what is Ms. Brandon's race?
A. She is a Black female.
Q. Okay. And do you know approximately what age Ms. Brandon is?
A. I want to say late 40s.
Q. Have you ever discussed Ms. Brandon's age with her?
A. No.
Q. And Ms. Brandon, the division manager, she has an office in the Raleigh hub?
A. Yes.
Q. And who was present for that meeting?
A. Nicole, Vince, Vince Simmons, the shop steward, Lindy.

Q. Who's Lenny?
A. Lindy Blankenship, Ms. Hill.
Q. Oh, I'm sorry.
A. That's all I can remember right now.
Q. Okay. Vince Simmons, you said, was a shop steward at the time?
A. Yes.
Q. And the CBA requires the presence of a shop steward for any disciplinary meeting?
A. Yes.
Q. What is Mr. Simmons' race?
A. Black male.
Q. Okay. Do you know approximately what age?
A. I want to say about 50 something, I guess.
Q. Okay. And for the record, Ms. Hill is a White female, correct?
A. Yes.
Q. Do you know approximately what age she is?
A. No.
Q. Do you have a guess based on appearance?
A. In her 30s. Wait a minute. I'm sorry. I'm sorry. Vince wasn't in that meeting. Jim, I think his name is Jim, Jim Long -- Jim Freeman. It was Jim Freeman that was in that meeting.
Q. Okay. Jim Freeman, he's also a shop steward?

A. Yes.
Q. And what's his race and approximate age, if you can?
A. It's a White male.
Q. And about how old?
MS. POLIN: I'm going to just for the record object to the practice of asking Ms. Shipman people's ages based on her appearance of them.
MR. GARTLAND: That's fine.
BY MR. GARTLAND:
Q. To the best of your knowledge, again, based on appearance, what was Mr. Freeman's age?
A. I don't know.
Q. Okay. If you had to guess based on appearance, what would you say?
A. I want to say in his 30s maybe.
Q. Okay. And if you can, was that meeting in the morning before your shift began?
A. Yes.
Q. I'm sorry. You punched in at that time or not?
A. I can't remember if I had punched in or not.
Q. And so tell me everything that took place in the meeting to the best of your recollection.
A. Only thing I remember to the best of my

recollection is, I was told I was going to be let go, I was told I was going to be terminated.

Q. Did you have any conversation before the meeting with Jim Freeman or anyone else from the union about what was going to take place in the meeting?

A. No.

Q. And Jim didn't give you a heads up about what was going to happen in the meeting?

A. No.

Q. Do you recall a discussion of your next day air delivery records from the previous day?

A. No, I don't remember any of that from then.

Q. Do you recall a discussion regarding the practice of coding a next day air as customer request late on that day?

A. No.

Q. So what was your understanding at that time, based on your recollection, about what the company was accusing you of in terms of dishonesty?

A. Not delivering the packages.

Q. Do you remember dishonesty being referenced in that meeting?

A. No, I don't remember.

Q. You don't remember one way or another?

A. No, sir.

Q. And do you recall what, if anything, you said in response to the notice of your discharge in that meeting?
A. No, sir, I don't remember that meeting at all so, I'm not...
Q. Okay. But you were taken out of service as of that day, correct?
A. Yes.
Q. And after that meeting, what was your next contact with UPS?
A. At the local level hearing.
Q. Well, between your meeting and this letter, did you have any communication with UPS management about the discharge?
A. No, sir.
(DEFENDANT'S EXHIBIT 11 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. Okay. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 11, entitled, Teamster's Local Union No. 391 Complaint, dated Monday, March 7, 2011. Do you recognize this document?
A. Yes, sir.
Q. I will represent that, with respect to this and a number of the other exhibits to follow, there is

an exhibit number from a panel hearing that appears in the upper right-hand corner, presumably that didn't appear on the original of the document, but putting that aside, does it appear to be a true and correct copy of the grievance?

A. Yes.

Q. And does your signature appear on this document, Ms. Shipman?

A. Yes.

Q. Towards the bottom where the terms of settlement are noted?

A. Yes.

Q. So this is the grievance that was filed on your behalf by the union with respect to that March 1st, 2011 discharge notice, correct?

A. Yes.

Q. And if you'll look with me at the top of the page, there's an article and section of contract violated, a space for the employee and union to indicate which article of the CBA they believe has been violated. And article 50 is listed there, correct?

A. Yes.

Q. And the complaint is Denise Shipman protests the unjust and/or improper discharge issued to him or

her on March 1st, 2011, copy received in the local union office on March 3rd, 2010, for an alleged compensation for work not performed, dishonesty, and overall work record. It is the position of the local union that this discharge is not for just cause.

Was that a fair statement of your grievance regarding the discharge at the time?

A. Yes.

Q. And so following the filing of this grievance, the next step in the procedure outlined in the CBA is for a, what we'll call, a local level hearing. And who typically attends that meeting, if you know?

A. Lester Grant, Ms. Hill, and the business agent, at this time it was Steve Bishop.

Q. And do you know what Mr. Grant's race is?

A. A White male.

Q. Okay. If I were to indicate to you that Mr. Grant's been identified as a Native American, are you aware of that or do you have any reason to doubt that?

A. No, people can be whoever they want to be these days.

Q. Fair enough. And you indicated Steve Bishop, the business agent who is a teamster's employee, correct?

A. Yes.
Q. Does Ms. Brandon typically attend these meetings, the division manager?
A. I got to ask one question.
Q. Sure.
A. Was this the local level hearing?
Q. Oh, I'm asking about the local level, yes. The local level hearing.
A. This was the first one?
Q. Right. I think based on testimony that was received into the record earlier this week, there may have been two meetings that occurred regarding this discharge?
A. It was.
Q. Okay. So let's talk about the first one.
A. The first local level hearing?
Q. Yes, the first one.
A. Nicole was at this one, yes.
Q. Okay. And what do you recall -- tell me everything you recall being said or discussed in that first local level hearing?
A. I can't remember what all was said, it was mostly discussed about -- I can't -- I can't remember anything that was said.
Q. Do you recall any discussion about the next

day error recording activity and the allegation of dishonesty?
A. No.
Q. Do you recall reviewing any records during the course of that local level hearing?
A. No. I'm for sure they showed me some but I don't remember.
Q. Do you recall making any statements on your behalf in that meeting?
A. No.
Q. And Mr. Bishop was presenting your case, so to speak?
A. Yes.
Q. Do you remember anything he said in that case?
A. No, sir.
Q. And how did that meeting end, if you recall?
A. I was told I was -- they asked me to go out and sit in the lobby and then I -- then they came -- Steve came back and told me at that point I was still -- I was still taken out of service. So that meant I wasn't going back, I was still discharged at that point.
Q. Okay. And the case would proceed to the panel?
A. Yes, sir.

Q. And so how -- I understand there was a second meeting or local level hearing on that discharge. How did that come about, do you know?
A. I don't know how it came about but I know Steve called me and I went in and we just, they started talking and I was listening.
Q. Okay. Let me back up. I forgot to ask a question about the first hearing, so I apologize.
You filed the grievance or the union filed the grievance on your behalf on Monday, March 7th, do you recall how much longer after that that the first local level meeting took place?
A. No, sir.
Q. There's dates discussed with employer line on Defendant's Exhibit 11 that indicated 3-9-2011. Does that sound about right for the first meeting or do you have any reason to doubt that that's the date on which the first local meeting took place?
A. No, I don't have a reason to doubt.
Q. The resolution line indicates, 4-4-2011, File AAPGC. Does that refer to the date on which the case was -- panel was notified that the case would go to panel?
A. Yes, sir.
Q. And then sometime between that date and the

date it was actually scheduled to be heard by the panel, you had this second meeting that you talked about, correct?
A. Yes, sir.
Q. And it looks like that took place on June 29th, 2011? Well, the grievance, Defendant's Exhibit 11 indicates, settled 6-29-2011.
A. Okay. Yes.
Q. So we think that's the date of that second meeting?
A. Yes, sir.
Q. And I'm sorry, I interrupted you. You were talking about what took place in the second meeting.
A. Second meeting, it was Steve Bishop and Lester.
Q. Was Ms. Blank -- Ms. Hill or Ms. Brandon there?
A. No.
Q. Okay. And were you in the room at the time?
A. Yes.
Q. Okay. And what do you recall being said between Mr. Grant and yourself and Mr. Bishop?
A. Just that they had decided that I could -- I would be reinstated, they was going to put it as a suspension. And that's what I remember.

Q. Do you recall -- did you -- do you know if you requested that second meeting?
A. No, they called me.
Q. Mr. Bishop called you?
A. Yes.
Q. Did he indicate whether the union or UPS had requested that meeting?
A. He didn't say.
Q. And were you required as part of that meeting to make any statement with respect to your conduct in connection with the discharge?
A. I don't remember.
Q. Do you have any recollection of making a statement admitting fault in the discharge?
A. I don't remember.
Q. Do you recall making any statement regarding acknowledging that you had not properly recorded the next day air packages on the day in question?
A. I don't remember if I did or not.
Q. Okay. But you understood as a result of that meeting that you would be returned to work with the -- all time off as an unpaid suspension, correct?
A. Yes.
Q. And scheduled to return to work on July 5th, 2011?

A. Yes.
Q. And was there any -- you entered into that settlement voluntarily, is that fair to say?
A. Yes. That -- yes.
Q. In other words, no one physically coerced you into signing this document, you signed it of your own free will, correct?
A. Oh, yes. Yes.
(DEFENDANT'S EXHIBIT 12 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. Defendant's 12, a letter dated July 27, 2011 to Denise Shipman, signed by Ms. Blankenship. Do you recognize this document?
A. Yes.
Q. Does appear to be a true and correct copy of a letter that you received on or about July 27th, 2011?
A. Yes.
Q. This document reflects the terms of the settlement that had been entered into at that second local level hearing?
A. Yes.
(DEFENDANT'S EXHIBIT 13 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. Did you have -- do you recall any discussions with Mr. Bishop or anyone else at UPS in connection

with your return to employment about what the status of any disciplinary action was with respect to you? In other words, what might the consequence be of any subsequent conduct that the company deemed to be methods and procedures or anything along those lines?
A. No, sir.
Q. You've been handed what's been marked for identification as Defendant's Exhibit 13, entitled, Driver's Responsibilities. Do you recognize this document?
A. Yes.
Q. Okay. And you'll find that your signature appears, or your initials appear throughout the document and your signature on, what's been handwritten as page 9 of the document?
A. Yes.
Q. And this was training regarding driver responsibilities that you undertook in connection with your return to employment on July 5th, 2011, correct?
A. Yes.
Q. And do you recall being told what the intent of undergoing this training was?
A. Yes.
Q. Okay. What was that intent?
A. She -- I read over the document and then I

signed it.
Q. And where did you read it over?
A. I believe I was in the building at the time, I was in the building.
Q. And this was your first day back on the job?
A. Yes.
Q. Okay. And that first day back, you were still on Route 31A, correct?
A. Yes.
Q. Do you know who had delivered Route 31A during your --
A. It was several people, it was someone named Mohammed, someone named Tim Pearson.
Q. Okay.
A. I remember them two, they had ran that route.
Q. Now, could Mohammed's last name be Hussein?
A. Yes.
Q. And do you know what race Mr. Hussein is?
A. I don't know his race.
Q. Is he Middle Eastern?
A. Yes.
Q. Okay. Middle Eastern male, approximately what age?
A. I'd say he's in his 30s.
Q. Okay. And what about Mr. Pearson?

A.   A Black male.
Q.   And, I'm sorry.  And approximately what age?
A.   In his late 20s.
     MS. POLIN:  Again, I'm going to object for the record of the practice of asking Ms. Shipman to give an age for someone based on their appearance.
     MR. GARTLAND:  That's fine.  And we'll just consider that a standing objection to any future question I ask along those lines.  Is that fair?
     MS. POLIN:  No, it's not fair.
     MR. GARTLAND:  I would rather not have my deposition interrupted with an inappropriate objection along those lines every time.  So I'm asking, can we agree that you have a standing objection to that practice?
     MS. POLIN:  I'm not going to agree.
     MR. GARTLAND:  Why not?
     MS. POLIN:  Because I don't want to agree.
     MR. GARTLAND:  Other than being difficult, is there any reason not to agree with that?
     MS. POLIN:  You're assuming that I'm difficult.
     MR. GARTLAND:  I believe -- I don't believe there's any legitimate reason for not entering into that agreement.  So I'm asking, what is the

reason?
MS. POLIN:  I'm not going to agree.
MR. GARTLAND:  Then I'll repeat, what is the reason for not agreeing?  I'm just trying to save us both time.
BY MR. GARTLAND:
Q.   Ms. Shipman, again, understanding that this is speculation based on their appearance, could you give me approximate age for Mr. Pearson?
A.   I don't know.
Q.   Based on his appearance, you can't give me a guess like you would any member of the public?
A.   I'm not sure.
Q.   Okay.  Now, at the time that you returned to work, had your supervisor changed?
A.   The second time?
Q.   I'm sorry, I should have clarified.  July 5th, 2011, the day you filled out this driver responsibilities marked as Defendant's 13, do you recall, was your supervisor still Mike Smith or had it changed?
A.   Mike Smith was still my supervisor.
Q.   Okay.  And did Mike Smith ride with you at that time on Route 31A?
A.   Yes.

Q. For how many days?
A. I'm not sure how many days he rode with me.
Q. I believe that he testified he rode with you an additional five days. Would you have any reason to disagree with that testimony?
A. No.
Q. Do you know any other drivers who have had suspensions of, let's say, greater than 30 days during their time at UPS?
A. Yes.
Q. And do you know whether those drivers have received a supervisor riding with them when they returned to employment?
A. Yes.
Q. And typically do you know how long a supervisor rode with them?
A. It's something that we call a five-day ride so...
Q. Okay. And what does that mean, five-day ride?
A. They ride with you for five days.
Q. And when is that -- how often does that occur?
A. It may happen if you had an accident, it may happen if you -- it just depends on the circumstances that they ride with you for five days.
Q. Did you object to Mr. Smith riding with you at

that time?
A. No.
(DEFENDANT'S EXHIBIT 14 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 14, a letter dated August 29th, 2011, to Denise Shipman signed by Ms. Blankenship. Do you recognize this document?
A. Yes.
Q. Do you recall receiving this document on or about August 29th, 2011?
A. Yes.
Q. The letter states, on August 19th, 2011, it was discovered through an audit of your delivery records that you were dishonest in your recording of deliver and pickup stops. You also intentionally were dishonest in receiving compensation for work not performed. Your work record is unacceptable.
Do you see that language?
A. Yes.
Q. And did you have a meeting prior to August 29th, 2011 in which you received notice of this discharge?
A. Yes, uh-huh.

Q. Okay. And consistent with the previous discharge, this one indicates it's based on delivery activity that occurred on August 19th. Did that meeting take place the following day, August 20th?
A. I think so.
Q. Or sometime shortly thereafter?
A. Yes.
Q. And who was in attendance at that meeting?
A. Lindy was, Ms. Hill, I can't remember who else. I can't remember.
Q. Okay. Do you remember whether Ms. Brandon was there?
A. I don't think she was there.
Q. And where did the meeting take place?
A. I'm unsure where this meeting took place. No. In Lindy's office.
Q. Okay. And do you remember a union steward being present for that meeting?
A. I don't remember who it was.
Q. But to the best of your recollection someone from the union was present?
A. Yes.
Q. Okay. And tell me everything you can remember being discussed in that meeting.
A. I can't remember nothing that was discussed in

that meeting.
Q. Okay. Do you remember Ms. Blankenship or anyone else from UPS discussing with you the allegation that you had padded stops on the previous day?
A. Oh, yes. Yes.
Q. And tell me what you -- again, understanding that you disagree with that allegation, tell me what you recall about what it was you were accused of doing?
A. Mashing the left at button for the packages that go to a dorm room.
Q. Okay. And in UPS's mind, that's a practice that would increase your time allowance for the day?
A. Yes.
Q. And when someone at UPS, whether it's a driver or management, uses the term, padding stops, can you tell me, what's your understanding of that phrase? What does that mean to you?
A. I don't have any meaning of it 'cause, really, I'm just learning about that padding stop, so I don't know.
Q. Okay. Now, anything else you remember about the mashing of the left at button, I think was the term you used, anything else you recall being

discussed?
A. No.
Q. Do you recall being shown any records in that meeting?
A. No.
Q. You don't remember one way or the other?
A. I don't remember. I don't remember.
Q. Okay. Do you remember anything that your union steward might have said?
A. No, I don't remember.
Q. Okay. Do you remember being advised in that meeting that you would be taken out of service effective immediately?
A. Oh, I remember that, yes.
Q. And that meeting, like the other meeting was early in the morning before you went out on the package car, wasn't it?
A. Yes.
Q. So at that point, for an employee taken out of service immediately, you return your board and punch out?
A. Yes.
Q. Okay. And at that point you're escorted from the property, correct?
A. Yes.

Q. Between the time that you had that meeting and the receipt of this letter, do you recall any other communication with UPS management about the discharge?
A. No.
(DEFENDANT'S EXHIBIT 15 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 15, Bates labeled UPS 353, a Teamster's Local Union No. 391 Complaint Form, dated Friday, December 2, 2011. Do you recognize this document?
A. Yes.
Q. Does it appear to be a true and correct copy of the grievance filed on your behalf regarding this second discharge we've been discussing?
A. Yes.
Q. And, again, at the top where the employee and union note the article and section of contract alleged to be violated, Article 7 and 50 are listed, correct?
A. Yes.
Q. Unjust and improper -- and/or improper discharge. Denise Shipman protests the unjust and/or improper discharge issued to him or her on August 29th, 2011, copy received in the local union office on August 31st, 2011, for an alleged

dishonesty-compensation for work not performed. It is the position of the local union that this discharge is not for just cause.

Does that appear to be a true and correct statement of your grievance regarding this discharge?

A. Yes.

Q. And following the filing of this grievance, there was a local level hearing that took place regarding the discharge?

A. Yes.

Q. And do you recall how long after this grievance was filed that local level meeting took place?

A. No, sir.

Q. And where did the local level hearing take place, if you recall?

A. At the union hall, I believe. Yes, at the union hall.

Q. Okay. And where is the union hall in connection with the Raleigh hub?

A. It's off Raleigh Avenue on Angus Drive.

Q. And do you remember who was present for the local level hearing?

A. Steve Bishop, Lester Grant, Ms. Hill was there, yeah.

Q. Anyone else?
A. I don't remember. I can't remember.
Q. And tell me everything that you recall being discussed in the meeting?
A. I can't remember anything that was discussed in that meeting.
Q. Do you recall making any statements on your behalf in the meeting?
A. No.
Q. Do you recall you or Mr. Bishop reviewing any records in connection with the meeting?
A. No.
Q. And how did the meeting end?
A. I went out like I did the last time, then Steve came back and told me that at this time I wasn't going to be put back to service.
Q. Did Steve tell you, or Mr. Bishop tell you what he and the UPS managers discussed once you stepped out of the room?
A. No, sir.
Q. So Mr. Bishop advised you that the case -- you would remain out of service for the time being and that the case would go to panel?
A. Yes.
Q. And I believe that panel took place in

November 2011, does that sound correct?
A. Yes.
Q. Do you remember where that panel was geographically?
A. I think Wrightsville Beach.
Q. And did you travel for that panel hearing?
A. Yes.
(DEFENDANT EXHIBIT 16 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 16, a statement dated, November 10th, 2011, signed by Michael W. Smith. Do you recognize this document?
A. Yes.
Q. Is it true that it was a part of the materials submitted by the company at that November panel hearing regarding your discharge?
A. Yes, it was.
Q. If you could take a moment to review that document for me. And let me know if you disagree with any of the statements made by Mr. Smith in that document.
A. Okay. This is -- everything is here, yes.
Q. Do you have any reason to dispute any of the statements that Mr. Smith makes in here?

A. No.
(DEFENDANT'S EXHIBIT 17 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. All right. Defendant's Exhibit 17 appears to be a copy of the decision issued by Atlantic Area Parcel Grievance Committee. Do you recognize this document?
A. Yes.
Q. Does it appear to be a true and correct copy of the decision issued by the panel with respect to your August 2011 discharge?
A. Yes.
Q. Okay. And if you could, read for the record what the decision is at the bottom in the bold text.
A. Discharge of Denise Shipman.
Q. I'm sorry, at the bottom.
A. Okay. The discharge is reduced to a time served suspension. The grievant is instructed to properly record all packages.
Q. And then Non-Precedent, No Reference?
A. Yes.
Q. And I think you -- you testified earlier that you did speak or give testimony at the panel hearing, correct?
A. Yes. They asked me questions, yes.

Q. Okay. Do you recall what questions they asked you?
A. No.
Q. And you've never arranged for a transcript of that testimony to be ordered?
A. No.
Q. Do you recall being asked about the practice of padding stops or any of your delivery activities on the day in question?
A. No.
Q. Did they ask about your work history at UPS?
A. I can't remember.
Q. Okay. Now, did you at the time review the actual written decision issued by the panel?
A. No.
Q. Okay. Were you provided with this document by the union after the panel issued its decision?
A. I'm for sure it was mailed to me.
Q. Okay. And the words, the grievant is instructed to properly record all packages, tell me what you understand that to mean going forward in your employment?
A. To make sure that that -- that left at button, that I -- I use an alternate button instead of the left at button, instead of the left at key.

Q. And why would you use an alternate button?
A. At that time they had placed the button, the key was there, in which you could use that key instead of the left at key for that particular situation in which I was in for the campus instead, 'cause I was used to using it for apartments and you use one for apartments and one for the campus, for whatever situation I was in. At that time, that's when I knew you use the key for whatever situation it was needed for.
Q. Okay. And so after that decision, you were -- you returned to work in November 2011, correct?
A. Yes.
(DEFENDANT'S EXHIBIT 18 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. Ms. Shipman, you've been handed a document that's been marked as Exhibit Defendant's 18. And, again, I apologize for the copy area, Denise training after panel decision, appears to be a Post-It note that was picked up in that copying. Aside from that note, would you please review the document and confirm, have you seen it before?
A. Yes.
Q. And does your signature appear at the bottom of each page of this document?

A. Yes.
Q. Dated, November 21st, 2011, correct?
A. Yes.
Q. And it's titled as, partially obscured but, Recording Procedures. Can you tell me just generally what this document is?
A. This is -- this lets you know how to select the proper key for the proper -- for the situation you're in at that time.
Q. Okay. And so did you review this document on your first day back after the panel decision?
A. Yes.
Q. Okay. And the other signature appearing on each page is Ms. Hill's signature?
A. Yes.
Q. Okay. And presumably this wasn't the first time you had ever seen this document during your employment with UPS, correct? Well, let me ask it this way, had you seen this document before November 21st, 2011, whether as part of your initial training or any subsequent training?
A. I --
Q. If you don't remember either way, that's --
A. I don't remember.
Q. Okay. And did you at the time that you came

back to work following the second discharge on November 21st, 2011, do you recall who your supervisor was at that time?

A. I believe it was Greg, it was Greg or Neal.

Q. Okay. And do you remember, whether it was Greg or Neal or Mr. Smith, do you remember anyone riding with you on the first day or days that you were back from the suspension?

A. I believe it was Neal.

Q. Do you remember how many days Neal rode with you?

A. I want to say -- I can't remember. I can't remember.

Q. Okay. Do you remember if it was more than one day?

A. Yes, it was more than one day.

Q. Okay. Do you think it was five days?

A. I don't think it was the whole five days. It could have been but I don't remember.

(DEFENDANT'S EXHIBIT 19 MARKED FOR IDENTIFICATION.)

BY MR. GARTLAND:

Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 19, entitled, South Atlantic District Discrepancy Review Form Certification. Do you recognize this document?

A. No.
Q. Okay. And it's dated as January 4th, 2012, and the service provider is listed as Shipman. Do you see where I'm looking?
A. Yes, sir.
Q. Okay. And do you recall -- you do not recall, I think your testimony is, seeing this document prior to today?
A. No, sir.
(DEFENDANT'S EXHIBIT 20 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 20, entitled, South Atlantic District Discrepancy Review Form. Do you recognize this document?
A. Yes.
Q. Okay. Tell me the first time you saw this document.
A. I believe I saw this in Rick Armstrong's office, the business agent.
Q. Okay. In connection with the eventual grievance and panel hearings on this discharge?
A. Yes.
Q. Okay. At one point in the document it uses the phrase, D-N-E-D discrepancy detail. Do you know

what D-N-E-D stands for?
A. No.
Q. Okay. That's not an acronym you're familiar with?
A. No, sir.
Q. And the packages that are listed there indicate that they are packages from Route 31A. Are these the packages that UPS alleged were left on your package car the evening of January 3rd, 2012?
A. Yes, the ones that was circled.
Q. The ones that were circled?
A. Yes.
Q. Okay. What about the ones that weren't circled, do you know what UPS alleged happened to those?
A. No, I don't know.
Q. So tell me how it is that you first became aware of the circumstances of your January 2012 discharge?
A. Lindy told me that morning. Oh, no, it was -- I want to say it was -- someone -- I don't remember. I know it was a supervisor whatever told me to go into the office.
Q. Okay. Would that have been Mr. Hawkins?
A. Yes.

Q. And that was the morning of January 4th or a different morning?
A. No, it was on the 12th.
Q. Okay. So and, again, I just want to establish the timeline here. So understand that the -- from UPS's view, the documents -- I'm sorry, the packages were left on the package car the evening of January 3rd, 2012, correct?
A. Correct. Yes, sir.
Q. And on the next day, January 4th, 2012, do you recall any discussion with UPS management about those packages?
A. No, sir.
Q. And so your recollection is that the first discussion occurred sometime after that?
A. Yes.
(DEFENDANT'S EXHIBIT 21 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 21, a letter dated, January 12, 2012, to Denise Shipman, signed Lindy Blankenship. Do you recognize this document?
A. Yes.
Q. Do you recall receiving it on or about

January 12th, 2012?
A. Yes.
Q. And does it appear to be a true and correct copy of that letter?
A. Yes.
Q. Now, the letter indicates on January 3rd, 2012 it was discovered through an audit of your package car that you did not complete your delivery work and customer packages were left on the car, having no valid delivery attempt, resulting in service failures. On January 4th, 2012, it was discovered through an audit of your delivery records that you were dishonest in your recording of delivery packages. Your overall work record is unacceptable.
I think you were testifying that you believe prior to the time you received this letter that you had a meeting with Ms. Blankenship at the prompting of your supervisor on the morning of January 12th?
A. I want to say it was around the 12th.
Q. Okay. Well, as best you can recall, we don't have to hold you to that. You had a morning meeting similar to the procedure of the other discharges?
A. Yes.
Q. If you can, where was that meeting?
A. In Lindy's office.

Q. And who was in attendance?
A. Lindy, myself, I want to say his name is Jim Freeman.
Q. Okay. The union steward?
A. Yes.
Q. Anyone else?
A. No.
Q. Was there an on-road supervisor present for the meeting?
A. No.
Q. Tell me everything you recall being discussed in the meeting.
A. I went in and Lindy said, she said -- she said, Denise, she said -- she said, I have -- I have -- I think she says she has some pictures of some packages I left on the truck, and after then -- I didn't say nothing. I just let -- I just let Lindy talk and when she -- she showed -- before she even showed me the picture, I said, oh, I said, you're talking about that soap box that was supposed to stay on future. I said, and it weighed over 75 pounds and I said, it was at the back of the truck.
At that point Jim looks at me, the shop steward, and then when Lindy got ready to speak, he said, I remember him saying, let her explain the rest

of the packages. So, and I looked at him, I say, yeah, I say there was some more packages. And then I went on to explain the packages, some of them was books that went to certain professors that was not there, in there. And at that point, Lindy said, you can save it for the panel. So I just kept quiet.

And then she just kept talking, I don't remember, you know, nothing as far as what she was saying at that point so I just kept quiet. I didn't say anything because she was, you know, she was getting louder and everything, so I just kept quiet.

Q. Do you recall -- understanding you disagree with the allegation, do you recall why it was that Lindy and UPS were accusing you of being dishonest in the processing of those packages?

A. No.

Q. Do you recall making a statement either in that meeting or any other meeting regarding these packages, that you had driven up to the customer site but the business was closed and put them aside and forgot about them?

A. Yes, yes. You right.

Q. Tell me about that.

A. Okay. The soap box --

Q. Was this in the same meeting?

A. Yes, uh-huh. The soap box. The soap box, most of these packages went to dorms, and when I drove by the dorm, I could see where it said, closed until January 6th. So at that point I just -- I put the ones that I could put in my hand, 'cause the soap box was too heavy, and I just put it behind the seat 'cause I knew it had to go back in the future cage again 'cause that's where it came out of. So I put them back there and I just kept on driving.
Q. Okay. Were there any of these packages left on the car that were not to dormitories?
A. No, sir. Most of them was for dorms and to professors that was not going to be back until after the 6th, or they had been relocated to a different place.
Q. Okay. It's your testimony that there were not any packages left on the car that were a residential or a business?
A. Correct. Whereas, they wasn't already in the exception.
Q. So you think each of these packages came out the exception?
A. Yes, sir.
Q. That someone had previously tried to deliver them but the university had been closed?

A. I was that previous person.
Q. So this was, according to your testimony, you had seen these same packages before on your car?
A. Yeah. All during the holidays.
Q. Okay. Is there a way, and this is kind of an aside, if I'm delivering a package, if you're the package car driver and you see it says, closed until January 6th, and it's December 20th, is there any way to code it as, don't try to -- don't make another attempt of delivery until January 6th and hold it until then?
A. Yes, sir.
Q. So why would these packages have ended up back on your car?
A. They came out of the future cage. It's what we call future.
Q. That's where documents -- I mean, packages are held to be delivered at a future date?
A. Yes, sir.
Q. So why would they come out of that cage before people had come back to the university?
A. That depends on who's working the future cage. They could have brought them out by mistake or I don't know why. But they came out of the future cage onto my truck.

Q. Is it your testimony that you coded those dormitories, for example, dormitory bound packages not to be reattempted until January 6th?
A. Yes, sir, future.
Q. Would you ever put the specific date in there?
A. I put it on the package and the exception clerk would put it in the computer.
Q. Okay. Fair enough. That would be part of the service cross you would put on it?
A. Yes, sir.
Q. So you've heard UPS's testimony that there were no service crosses on these documents from that day or any other day, correct? That's been the testimony of the UPS personnel, correct?
A. Oh, yes, sir.
Q. Do you dispute that testimony?
A. Yes, sir.
MS. POLIN: I'm going to object. I don't recall the testimony was that there were no service crosses put on that day and previous days. I only recall that there was testimony that Ms. Shipman failed to put a service cross on.
MR. GARTLAND: I recall -- the record is what the record is, but I believe the testimony was that those packages did not bear a service cross,

which would mean, extrapolating a little bit, but that would mean a service cross wasn't put on that day or any previous day. So with that noted for the record.

BY MR. GARTLAND:

Q. What other documents do you recall being shown -- now -- thank you for that aside clarification, now I want to talk about the meeting again. What other documents, if any, do you recall being shown in the course of that meeting?

A. That's all I remember.

Q. Okay. And do you recall making any statements other than the one about businesses being closed and putting them aside?

A. No.

Q. Do you recall any statements made on your behalf by Mr. Freeman?

A. I remember Jim actually saying something to the extent of, well, we -- we know that she did go to these places because if -- how would she know closed was on the door, and closed actually is on the door so we know she went there and they was closed. So he was more or less saying, we know she been there, she just didn't, you know, she didn't, you know, rescan it or whatever to let you know, but the people aren't there,

they already was on future. So he was trying to explain what -- what she wanted me to explain about the package, he was explaining it for me to explain what actually happened with the packages.

Q. And I think -- don't let me put words in your mouth, but your testimony is that Mr. Freeman said she had to have attempted the packages or at least been at the location to know that it was closed?

A. Correct.

Q. Okay. But, again, I'm not saying you did this, but couldn't you have just made up that they were closed?

A. No. Huh-uh, huh-uh.

Q. How would UPS know that they were closed?

A. All they got to do -- what they did the next -- what they did do the next day, they sent a driver out and the driver tried to deliver the same packages and it was closed on the door.

Q. Okay. So it was closed for multiple days, this wasn't just after 5 p.m. and so it's closed?

A. No, sir, it was closed until the 6th.

Q. Okay. Thank you. Anything else that you recall, statements made in that meeting either by you, Mr. Freeman, or any UPS personnel?

A. At the end of the meeting, at that point, you

know, after Lindy finished talking and still I didn't say nothing and Jim, you know, he had finished talking, Lindy looked at me and she said, you have not said anything to make me feel all warm and fuzzy, so you're fired. I said, okay.

Oh, she did ask me for my badge and I looked at her and I said, well, Lindy, you didn't give me my badge back from the last time. And then she said to me, she said, well, you haven't said anything to make me feel all warm and fuzzy, so you're fired. So I said, okay, and I just got up and left the office.

Q. Now, the badge issue, again, as I understand it, that's part of the standard procedure is to ask for return of employee ID if a driver is being taken out of service?

A. It is.

Q. And that was done by Ms. Blankenship in connection with the 2011 discharge?

A. Yes.

Q. And you don't -- you never received that badge back when you returned to employment in November?

A. No.

Q. So how did you obtain another employee ID?

A. When I went through the gate there, they would give me a little paper, a little paper one every time,

I would get a little paper.
Q. Every single day?
A. About once a week I would get a little paper pass.
Q. Okay. Did you ever ask Ms. Blankenship for your badge back?
A. No.
Q. Well, let me say this, wasn't it an inconvenience to get this paper badge every week?
A. Well, my thing was, after the holidays, whatever, I was just going to go up to the office up at the top of the hill and just take another picture.
Q. Okay. Just not bother with it during peak season?
A. Right.
Q. So aside from the inconvenience of getting a paper badge once a week, does that have any detrimental effect on your employment, using the paper badge instead of the employee ID?
A. No.
Q. It didn't prevent you from performing your job duties?
A. No.
Q. And then the statement that you've alleged Ms. Blankenship made about not making her feel, I think

you said, all warm and fuzzy?
A. Oh, yes.
Q. Did you understand her to mean something sympathetic or something that would explain the situation? What was your understanding of what --
A. I didn't have an understanding, nothing.
Q. Are you aware of Ms. Blankenship having allegedly said something like that with other employees in their discharge or disciplinary meetings?
A. No.
Q. Did you ask Ms. Blankenship what she meant by that?
A. No, 'cause I got up and left.
Q. Did you talk about that comment with Mr. Freeman or anyone else at the union?
A. He came out to -- he followed me out to my car, Jim did, and Jim was trying to explain what she meant by the warm and fuzzy.
Q. Now, who -- again, we talked about the procedure, someone escorts you off the property if you're taken out of service.
A. Uh-huh.
Q. Who from UPS was escorting you off the property?
A. Nobody.

Q. Nobody. Just Mr. Freeman was with you?
A. Yes, just Mr. Freeman was with me.
Q. And what was Mr. Freeman's, what was his explanation for it?
A. I can't even remember 'cause I was just -- I was just focused on, you know, just trying to keep myself together so I can't even remember what it was.
Q. Okay. And you did file a grievance regarding that discharge, correct?
A. Yes.
Q. And between the time of the local level hearing -- between the time of the discharge meeting and the local level hearing, did you have any communication with UPS management about the discharge?
A. No.
Q. Either a supervisor or the business manager?
A. Other than calling them and letting them know about it and that was it.
Q. Oh, and I don't mean union personnel, but I mean, calling up Michael Smith or Greg --
A. Oh, no, no, no, no, no.
Q. Hey, did you hear I got fired?
A. Oh, no, no, no, no, no. No.
Q. And I was trying to find the copy of the grievance, I want to put it in the record.

MR. GARTLAND: Well, why don't we do this, why don't we just take a quick break, five minutes, and stretch our legs and I'll try to find that grievance. Thank you.

(A RECESS WAS TAKEN FROM 2:02 P.M. TO 2:11 P.M.)

(DEFENDANT'S EXHIBIT 22 MARKED FOR IDENTIFICATION.)

BY MR. GARTLAND:

Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 22. Do you recognize this document?

A. Yes.

Q. Does it appear to be a true and correct copy of the grievance filed on your behalf regarding the January 2012 discharge?

A. Yes.

Q. And, again, if you'll look with me, the article and section of contract violated indicates Article 7 and 50, correct?

A. Yes.

Q. The nature of the complaint reads, unjust and/or improper discharge. Denise Shipman protests the unjust and/or improper discharge to him or her on January 12th, 2012, copy received in the local union office on January 13th, 2012, for an alleged falsification of company records and documents,

dishonesty, and overall work record. It is the position of the local union that this discharge is not for just cause.

Is that a fair statement of your grievance regarding your discharge?

A. Yes.

Q. And as with the previous discharges, there was a local level hearing that took place regarding this discharge?

A. Yes.

Q. And if the grievance is filed on January 17th, do you recall approximately when the local level hearing took place?

A. No, sir.

Q. If I said mid February 2012, would that sound approximately right?

A. I don't know.

Q. That's fair. Do you recall where -- when the local level hearing for this discharge -- I'm sorry. Where the local level hearing for this discharge took place?

A. Yes.

Q. Where was that?

A. At our UPS hub.

Q. In someone's office?

A. No, sir. Up in what we call, I think it's midnight's office where the managers be at for the building, up in that office.
Q. Who was in attendance at the meeting?
A. Lester Grant, Ms. Hill, several union representatives were there, I mean, within the building they were there. I remember Johnny Gentry came in.
Q. You said Johnny Gentry?
A. Uh-huh. I remember he came in and some of the other union stewards was there but I can't remember who they was.
Q. Okay. And Mr. Gentry is a union steward?
A. Yes.
Q. You said several union personnel other than Mr. Gentry were there?
A. Yes.
Q. Was Mr. Bishop there?
A. Steve -- Steve wasn't there then, Steve wasn't with us, it was Rick Armstrong was with us then.
Q. Okay. Anyone else that you can recall?
A. No, I don't remember. It was a lot of people at that one.
Q. Okay. Do you know why there were more people at that one?

A. I don't know.
Q. Was Nicole Brandon there?
A. No.
Q. From UPS, just Mr. Grant and Ms. Blankenship?
A. Yes.
Q. So just so the record is clear, you were taken out of service the day of the discharge meeting, which you think happened on or about January 12th, correct?
A. Correct.
Q. So you had worked between January 3rd and 4th to January 12th?
A. Correct.
Q. Back to the local hearing. If you can, tell me everything you remember being discussed at the local level?
A. I can remember there was a lot of just going back and forth about packages, how packages or when they were placed in the cage, how they're brought out into the future cage, going back to the future cage and how packages are brought out of the future cage, it was just a lot of that going back and forth with everybody.
Q. Do you recall what statements you made specifically?
A. No, sir.

Q. Did you review any records in connection with that meeting?
A. I don't remember.
Q. Again, understanding that you disagree with the allegation, do you recall what UPS had accused you of in terms of dishonesty?
A. The -- I want to say it was not recording the packages that was on my car, for not recording them or failing to deliver the packages that was on my car, that's what it was. Something along that line.
Q. Do you recall UPS making the argument that some of the packages that were left on the car were addressed to the same customers that other packages had been delivered to that day?
A. Okay. I don't remember that but some of the packages did go to the same building, within that same building, but not the same person's name was on there.
Q. But if those other packages were delivered, then presumably that was a building that was open, correct?
A. Oh, the building was open but remember I said the professor may not be there at that time.
Q. Okay. And I'm just wanting to clarify which packages we're talking about here.
A. Okay.

Q. So your testimony is that if there were other packages delivered to that same address, that would have been a building where some professors were there and some were not?
A. Correct.
Q. Anything else you can recall UPS saying in terms of an allegation of dishonesty?
A. No, I can't remember.
Q. Okay. Do you remember what other arguments the union or you may have made in your defense at that meeting?
A. No.
Q. Was it -- presumably the union was arguing for a reduction of the discharge?
A. Yes.
Q. And how did the meeting end?
A. I went out of the room and I sit out in the lobby part and that's when Steve came and told me, at this time you won't be returning back to service, you're still taken out of service.
Q. Well, actually, probably Rick, right?
A. Yeah, Rick. Rick. I said Steve, sorry.
Q. No. We got into the habit of Mr. Bishop but it was Mr. Armstrong at that point who was the new business agent?

A. Yes.
Q. Did Mr. Bishop retire or what did he --
A. He got voted out.
Q. All right. So at that point, you understand that the case is going to panel, correct?
A. Yes.
Q. And do you recall when -- the panel hearing took place in April of 2012; is that correct?
A. Yes.
Q. And do you remember where the panel hearing was held?
A. Asheville.
(DEFENDANT'S EXHIBIT 23 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. Okay. And did you travel for the panel hearing?
A. Yes.
Q. And did you give testimony at that panel hearing?
A. I can't remember.
Q. Okay. Do you remember answering questions from the panel at that hearing?
A. I can't remember what I answered and what my answers was.
Q. Okay. Do you recall any discussion about the

company's allegation of dishonesty at that panel hearing?

A. I don't recall.

Q. Okay. You've been handed what's been marked for identification as Defendant's Exhibit 23, Atlantic Area Parcel Grievance Committee decision dated April 17th, 2012. There are two pages, I'll state for the record this is ordinarily a legal size document so in reducing it to a letter size it's been turned into two pages, UPS 79 and UPS 80.

Do you see the decision in the bold text at the bottom of the second page.

A. Yes, sir. I see that on this.

Q. It's on the first and second page but the complete copy is on the second page.

A. Okay.

Q. So if you would read the decision into the record, please.

A. Okay. Based upon the facts presented, including the testimony of the grievant, just cause was shown for discharge of the grievant for continued failure to follow methods and procedures, including in particular those relating to proper recording of the packages.

The charge of dishonesty, however, was not

proven.

Then it went on to, pursuant to Article 7 and 50, the grievant is to be paid for the period of January 12th, 2012 to April 17, 2012. The discharge however, is sustained.

Q. Thank you. And you were provided with a copy of this decision at some point?

A. Yes.

Q. And do you recall discussing the decision with Mr. Armstrong or any other union personnel?

A. No.

Q. And since the time of your panel hearing until yesterday and the day before when we had depositions that involved UPS witnesses, have you spoken with any member of the UPS management, either a supervisor or a manager about your discharge?

A. No.

Q. Okay. Haven't run into anyone at the Home Depo or anything like that and talked to them about the discharge?

A. No.

Q. And in connection with the panel's decision, you understood the panel to have ruled that the charge of dishonesty was not proven and that, therefore, the termination was for methods and procedures and should

have essentially been a working termination?  Is that a fair characterization?
A.   Yes, sir.
MS. POLIN:  I'm going to object to that.  The decision language itself says, just cause was shown for the discharge of the grievant for continued failure to follow methods, particularly those relating to the proper recording of packages.
MR. GARTLAND:  Okay.  Noted for the record that is the language of the decision.
(DEFENDANT'S EXHIBIT 24 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q.   All right.  Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 24, two pages, UPS 75 and UPS 74.  Prior to the depositions this week, had you seen the first page, UPS 75, before?
A.   Yes.
Q.   Okay.  And how did you come to see that?
A.   I don't remember.
Q.   Okay.  And I apologize that the text is faint, but if you'll turn with me to the second page.
A.   Uh-huh.
Q.   This is the copy of the settlement payment,

indicates that it was mailed to the home of Denise Shipman May 21st, 2012.  Do you recall receiving this payment on or about that date?
A.   Yes.
Q.   Does this appear to be a true and correct copy, again, with apologies for the quality of the copy, of the check that you received?
A.   Yes.
Q.   Do you recall any discussion with the union at the time or UPS about whether the unemployment compensation you had received should be taken into account when the company made this payment?
A.   No.
Q.   So if UPS -- if UPS had a conversation or a dispute with the union about whether to include that unemployment compensation as an offset, you would not be aware of that conversation?
A.   No.
Q.   You didn't talk about that with any union personnel?
A.   No.
Q.   Did you ever speak with any union personnel about the timing of receipt of this payment?
A.   Yes.
Q.   Okay.  Tell me about that conversation.

A. I went to Rick and I asked Rick, I said, Rick, when is it going -- and I kept going, I said, Rick, I said, when will the payment be sent, he say, I'm going to keep checking on it, keep checking on it. The last time I said, well, okay, Rick, I said -- I think I went there two times and then the third time I went and I said, okay, Rick, I say, I understand, and I just walked out.

Q. Okay. Did you -- did you ever file a grievance on the fact about the timing of the payment?

A. No, 'cause he kept saying he was going to check on it, he was going to check on it and then he said after that third time, when I said, okay, Rick, or I understand, and he was telling me then, well, we're going to file a grievance if you don't get it.

Q. Do you recall when you had that discussion?

A. No.

Q. And did you receive the payment shortly after that?

A. It was about -- it's hard to say when it was, because, I just, I said, okay, and I just banked it up to where I probably won't be receiving it and kept on moving.

Q. But did you follow up after that meeting to indicate that he should file a grievance on it?

A. Well, he told me that, 'cause when I said, okay, he said he was going to file a grievance on it if I didn't get it within a certain amount of time, come back to him. And I think he said within a week or two or whatever and I said, okay, and within that time I had -- I had received it.
Q. Okay. So that's why you didn't follow up with him and say, let's file a grievance?
A. Right.
Q. And after your second or, I'm sorry, after the January 2012 discharge, were routes being bid at that time?
A. Yes.
Q. So that was in the middle of the bidding process?
A. Yes.
Q. And that process probably takes a few weeks, correct, while everyone is going through and writing their names and seeing what someone before them picked?
A. Yes.
Q. So do you know who bid on Route 31A during that time?
A. I believe it was Tim Pearson.
Q. Was Mr. Pearson senior to you?

A. No, he's junior.

Q. So by the time you were taken out of service, had it become your turn to bid yet?

A. It was around that time, yes.

Q. But had you written your name on the sheet?

A. No, sir. No, sir.

Q. So it was coming up on your turn and then you were discharged?

A. Right.

Q. And during the time you were out of service, did you try to continue to bid on a route or how was that handled?

A. No, sir, I didn't try to bid on a route or anything because I didn't have no contact with no one in the building.

Q. But with the union, did you ever speak with the union about bidding on a route while you were out of service?

A. No, sir.

Q. And presumably during that time is when Mr. Pearson bid on 31A?

A. Yes.

Q. When a driver, and it could be 31A, could be any route, if a driver on a particular route retires in the middle of the year, let's say, how do they go

about, not assigning, but who takes that route and how?

A. Um, it -- the proper way for it to be handled, the official way for it to be handled is a cover driver.

Q. All the way up until the next bidding?

A. No. A cover driver is to cover that route and it could be all the way up to it or if that cover driver is covering the route and then you've got one with more seniority wants to cover that route, but this one can run it better than the one with the seniority, they have to give it to the one with the seniority. That's the way it's supposed to be done.

Q. Okay. And so it just stays kind of open, they don't hold like a special mid-year bidding process or anything?

A. No, sir.

Q. And to the best of your knowledge, is Mr. Pearson still delivering 31A today?

A. Yes.

Q. And how do you know that? Well, let me back up. How did you come to find out Mr. Pearson was delivering 31A?

A. I saw him at a cookout, at a cookout, a cookout one Saturday and that's when he told me that

he was on that route.
Q. Now, was that like barbecue at someone's house or the restaurant Cook-Out?
A. No, it was a barbecue at a soccer field and it was motorcycles and everything was there.
Q. Okay. It was a UPS event or just happened to be a mutual friend of the two of yours?
A. It was a community event.
Q. Okay. He told you that he was delivering 31A?
A. Right.
Q. Did you guys discuss your discharge at all?
A. No.
Q. Did he say anything about the route in particular?
A. Yes, he spoke on the route.
Q. What did he say?
A. He was telling me that, how much work was still on the route, how he was coming in late on the route, how he wasn't getting any help on the route. He was asking me a lot of things about what did I do when I was on there to kind of get the campus delivered within time to where he could get his residentials off to be back to the building in time. Just in general, different things about the route.
Q. Okay. So it sounds like he was complaining

about some aspects of the route?
A. Yeah.
Q. And asking for your advice on others?
A. Yes.
Q. Okay. Do you know whether anyone has been hired from the outside or promoted from within to full-time package car driver position since your departure?
A. No, I don't know.
Q. All right. Ms. Shipman, I'm going to ask you some questions about your search for an attorney to represent you in this case. I'm not asking you to reveal, nor do I want you to reveal the substance of any discussions you've had with Ms. Polin or any other attorneys. When did you first begin looking for an attorney to represent you in connection with any of the three discharges we've discussed?
A. May I -- I got to ask, does that include the unemployment?
Q. Oh, no. Let's put aside the unemployment issue and just in connection with believing that you were unfairly discharged. When was the first time -- when did you begin looking for an attorney to represent you in connection with that claim?
A. When was that panel decision? It was right

after the panel decision.
Q. The most recent panel decision was April 17th.
A. Uh-huh.
Q. Okay. So shortly after that?
A. Shortly after that.
Q. Okay. And was Ms. Polin the first attorney you spoke with?
A. No.
Q. Okay. Who else did you speak with? Just the name again, not the substance of the communications.
A. I can't even remember the name. I know the office is on Six Forks Road.
Q. Six Forks Road?
A. Uh-huh. I remember that.
Q. A male or a female lawyer?
A. Female.
Q. All right. And did you retain that lawyer?
A. No.
Q. Okay. Anyone else that you spoke with other than Ms. Polin?
A. No.
Q. Okay. So she was the second attorney you spoke with?
A. Yes, 'cause the rest I just went online looking.

Q. So did some research on other attorneys?
A. Yeah, online.
Q. But Ms. Polin is the only attorney you've retained to represent you in the case?
A. Yes.
Q. And when did that engagement begin?
A. I want to say, I don't remember if it was August or September, somewhere, I don't remember. I know it was at the deadline.
Q. What deadline?
A. For me to find an attorney.
Q. Okay. And so I think you testified that you started looking shortly after the April panel decision?
A. Yes.
Q. Spoke with one lawyer on Six Forks Road but decided not to retain her?
A. Right.
Q. And then researched some other folks and didn't retain Ms. Polin until August or September?
A. Uh-huh.
Q. Okay. And did you pay Ms. Polin a retainer to represent you in this case?
A. Yes.
Q. And how much?

A. Is a retainer the --
Q. Yeah. How much did you pay to her in the form of a retainer?
A. 10,000.
Q. Have you made any other payments to Ms. Polin for attorney's fees for work on this case?
A. I mean, that was for the whole -- for everything.
Q. Okay. So you haven't made any other payments?
A. That's what I've been making along, yes.
Q. So you made that payment in installments?
A. Yes.
Q. And how much -- have you paid the full 10,000 so far?
A. Yes.
(DEFENDANT'S EXHIBIT 25 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. All right. Ms. Shipman, you've been handed what's been marked for identification as Defendant's 25. U.S. Equal Employment Opportunity Commission Intake Questionnaire. Do you recognize this document?
A. Yes.
Q. And if you could turn with me to page 4 of the document and confirm that that is your signature at the bottom of the page, dated May 29th, 2012?

A. Yes.
Q. Okay. And did you prepare this document in connection with your EEOC charge against UPS?
A. Yes.
Q. Did anyone assist you in filling out this document?
A. No. Huh-uh.
Q. Do you recall where you filled this out?
A. At the EEOC office when it was on -- off Wade Avenue.
Q. In Raleigh?
A. Yes.
Q. Did you speak with an intake officer at EEOC at the time?
A. Yes.
Q. Was it a he or a she, do you recall?
A. It was a she.
Q. Did she give you any guidance in completing the questionnaire?
A. I can't remember.
Q. Okay. But as far as you can recall you weren't represented by an attorney at the time you filled this out?
A. Oh, no, sir.
Q. And you did fill it out yourself?

A. Yes.
Q. And, again, you understood at the time you filled this out that the EEOC would use this information to conduct an investigation regarding your discharge?
A. Yes.
Q. And you tried to give EEOC complete information about the discrimination that you believed occurred during your employment with UPS in this form?
A. Yes.
(DEFENDANT'S EXHIBIT 26 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 26. Do you recognize this document?
A. Yes.
Q. Does this appear to be a true and correct copy of the charge of discrimination that you filed with EEOC against UPS?
A. Yes.
Q. Is that your signature at the bottom of the page, dated May 29th, 2012?
A. Yes.
Q. And did anyone assist you in writing in the information contained in this charge?

A. No.
Q. Okay. To the best of your knowledge, where was this charge completed?
A. In Raleigh.
Q. At the office?
A. Yes.
Q. Okay. And did you physically type it up or did someone at the EEOC type it up?
A. Someone at EEOC typed it up for me.
Q. Okay. After you handed them the intake questionnaire form we just discussed?
A. Yes.
Q. And you understood that at the time that you were signing this document that it was a declaration under penalty of perjury that all of the allegations therein were true and correct. Is that true?
A. Yes.
Q. Now, if you'll read with me the state -- the EEOC chart states in the particulars section that Ms. Lindy Blankenship, Caucasian female, under 40, told me that I was fired because I failed an audit; however, at the time, management did not produce any audit documentation. Additionally, I have not had any disciplinary actions during my tenure.
That last sentence indicating that you have

not had any disciplinary actions during your tenure, is that a correct statement?
A. No.
Q. Okay. Do you recall reviewing that statement prior to signing this EEOC charge?
A. Yes, I signed it.
Q. Okay. But can we agree that the statement that you have not had any disciplinary actions during your tenure prior to the January 12th, 2012 discharge is not, in fact, a truthful statement?
A. It is, but I'm for sure I let them know that I was -- I didn't even look at that.
Q. I'm sorry. You feel for sure that you let them know what?
A. That I had been discharged twice earlier.
Q. Okay. If you want to take look at the intake questionnaire.
A. I see it.
Q. Is there any reference to the previous two discharges in there?
Can you -- I'll just repeat the question because some time has passed. It's okay. Can you point me to somewhere where the other two discharges are referenced in the intake questionnaire?
A. No.

Q. Okay. And if you'll look with me on Defendant's Exhibit 26, the EEOC charge, dates discrimination took place in the middle of the page on the right-hand side. The dates are January 17th, 2012 to January 17th, 2012, correct?
A. Right here.
Q. No, I'm sorry. I'm talking about the actual charge itself now.
A. Okay.
Q. In the middle of the page on the right-hand side, where it lists the dates the discrimination took place, earliest and latest, and you list January 17th, 2012 for both. Do you see that?
A. I see it.
Q. Okay. And I think you stated that -- or do you recall whether at the time of signing this charge you were represented by counsel or not?
A. I wasn't.
Q. Okay. And at the time again, as with the intake questionnaire, you understood EEOC would use this information to conduct an investigation, correct?
A. Yes.
Q. And as a result tried to give EEOC complete information about the discrimination you believe occurred, correct?

A. Yes.
Q. And prior to the March 2011 discharge, the first discharge we've been talking about here today, you had experienced other discharges during your time as a package truck driver at UPS?
A. Yes, two.
Q. Okay. What were -- just quickly, what were the circumstances of those discharges?
A. Dishonesty, work method.
Q. Okay. Prior to March 1st, 2011?
A. No, no, no, no.
Q. I'm sorry.
A. No, no, no, no, no.
Q. I'm talking about before the time that Ms. Hill was the business manager.
A. Oh, no.
Q. Had you experienced any other discharges?
A. No.
Q. Had you experienced any other discipline of any kind?
A. Yes.
(DEFENDANT'S EXHIBIT 27 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. Exhibit 27, Ms. Shipman, is a collection of disciplinary notices, and probably the fastest way to

do this, take your time, of course, but read through and let me know when you're finished. All I want to do is confirm that you've seen these documents before and that you don't have any reason to believe they're not true and correct copies of previous notices of disciplinary action.

A. Okay. Yes.

Q. Okay. If you'll look with me just at the last page, which is UPS 228. Just for clarity of the record, so having had a chance to look over them, they appear to be true and correct copies of letters, disciplinary notices that you received during your employment with UPS?

A. Yes.

Q. And the last page, UPS 228, a letter dated, September 11th, 2009, signed by Chris Smith. Do you recognize that document?

A. Yes.

Q. Okay. And the final paragraph it indicates that on September 1, 2009, once again, you failed to follow your supervisor's instructions. You failed to remove a package qualifying as a Group 2 exception -- a Group 2 exception is something recorded by the PM clerk in order to provide our customers with the tracking information they expect. Your failure to

remove this package from your car resulted in the failure to properly serve our customer. As a result of your continued failure to correct this problem, your employment with UPS is hereby terminated.

What ultimately happened with that discharge, do you recall?

A. I don't remember.

Q. Okay. Presumably you got your job back, you continued to work after that in 2010 and beyond. But do you have any specific recollection of a local level hearing or a panel hearing on that discharge?

A. No, sir.

Q. And if you'd flip with me back to UPS 227. The final paragraph there indicates, as a result of a failure to record a one-hour lunch, and as a result of your continued failure to correct this problem, this letter shall serve as your official notification that your employment with UPS is hereby terminated, in a letter dated, August 13th, 2009. Do you have any recollection of what happened with that termination?

A. I was -- one of the drivers came and told me that my name was on a piece of paper to go to a panel down in Clayton's office. And I said, huh? And he say, yeah, your name is on there, he said, I just left up out of there. I saw your name up there.

So I went in there, I went and knocked on the door, that was when Steve motioned for me to come in, I went in and I remember Steve was sitting there and Clayton Dom was sitting there, Chris Smith and Clayton was sitting there. And that's when Clayton looked at me and Clayton said, you need to slow down and remember to put your lunch in that board. So I said, okay, I said, I said, what I did, I forgot, and I called back and told OMS to put my lunch in after I had clocked out. He said, I see what you did, he said, but we're going to stop the OMSs from doing that for ya'll, he says, so you better remember to start putting your lunch in the board. And I went and got on my truck and left.

Q. So you were never taken out of service, obviously, in connection with this discharge?

A. No, that's the first time I'm ever seen it. They --

Q. Clayton -- I'm sorry.

A. That was just -- I'm sorry.

Q. No, no, I interrupted you.

A. No. Clayton was the district manager at the time.

Q. The district manager or division manager?

A. Division manager.

Q. So the same position that Nicole Brandon served in?
A. Uh-huh.
Q. Thank you.
(DEFENDANT'S EXHIBIT 28 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:
Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 28, entitled U.S. Equal Employment Opportunity Commission. Do you recognize this document?
A. Yes.
Q. Does it appear to be a true and correct copy of the dismissal and notice of rights sent to you or received by you on or about June 11, 2012?
A. Yes.
Q. And, again, were you represented by counsel to the best of your recollection at the time that you received this letter?
A. From the EEOC?
Q. Yes. This letter, Defendant's Exhibit 28, do you recall whether you were represented by counsel at the time you received this notice?
A. Oh, no, sir, I wasn't.
Q. And earlier you referenced a deadline that motivated you to retain an attorney in the case. Does

this refresh your recollection, was the deadline the 90 days of the receipt of this document?
A. Yes, sir.
Q. Okay. Now, the charge indicates, Defendant's Exhibit 26, that it was filed an May 29th, 2012, the notice of right to sue was issued on June 11, 2012. I will tell you, having practiced in this area, that's the fastest turnaround I've ever seen with a charge and dismissal of notice of rights. Do you know why the charge was processed so quickly?
A. I don't know.
Q. Did you have any conversation with EEOC, either at the intake office or subsequently about issuing this notice of rights?
A. No, sir.
Q. So you didn't request them to issue a notice of right to sue?
A. No.
Q. And to the best of your knowledge, did anyone request the notice of right to sue on your behalf?
A. I don't know, the lady that did the intake --
Q. Oh, I'm sorry. I mean an attorney or someone acting on your behalf?
A. Oh, no, sir.
Q. Did you have any communication with EEOC

between the time you filed the charge and the time you received this notice?

A. No, sir.

Q. Did anyone contact you from EEOC to explain what was happening with the charge?

A. No, sir.

Q. You don't recall any conversation from an investigator to say, we're going to issue a dismissal and notice of right to sue and here's why?

A. No. I think I received a letter.

Q. Separate from this?

A. I can't -- don't -- I'm not for sure but I believe I did, I'm not for sure.

Q. Would you still have a copy of that letter?

A. No, sir. I don't know. I know I don't have a copy of it. Maybe I did, I don't know.

Q. Do you recall what that letter said?

A. I don't know. But I know -- I think I received a letter of it and that was it.

Q. All right. So you have, sitting here today, you have no knowledge as to why the EEOC dismissed the charges so quickly?

A. No, sir, I don't know.

Q. Do you recall any discussion when you were at the intake office filling out the charge, do you

recall any discussion with the investigator about how long the investigation might last?

A. I don't remember.

(DEFENDANT'S EXHIBIT 29 MARKED FOR IDENTIFICATION.)

BY MR. GARTLAND:

Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 29, a copy of the Complaint filed in this case on your behalf by your attorney.

Do you recognize this document?

A. Yes.

Q. Have you reviewed this document prior to today?

A. Yes.

Q. Do you recall whether you had an opportunity to review it prior to the time it was filed with the court?

A. I can't remember.

Q. If you turn with me to the, what is the fourth page from the back, or fourth or fifth page from the back.

A. Uh-huh.

Q. It's a document entitled, verification.

A. Uh-huh.

Q. If you could find that page in the stack

that's marked as 29. Is that your signature on the document dated September 5th, 2012?
A. Okay. I see my name. Oh, yes, I see where you're speaking of. Yes, uh-huh.
Q. So it indicates that you have read the Verified Complaint and the allegations therein and that the facts as alleged there are true and correct to the best of your knowledge. Is that true?
A. Yes.
Q. So does that refresh your recollection, did you have a chance to review this prior to the time it was filed?
A. Oh, yes. Yes, yes, yes.
Q. And one of the claims asserted by you in this case is a claim for race discrimination under Title 7; is that correct?
A. Yes.
Q. And it's my understanding that in the Complaint you alleged that you were discharged in March 2011, August 2011, and January 2012 because of your race; is that correct?
A. Yes.
Q. And I understand there's more than one claim but I just want to break them down and talk to them one at a time. So in addition to those discharges,

are there any other actions that you believe were taken against you because of your race?
And let me preface that by saying, in order to make sure I give you a totally fair opportunity to discuss each of your claims and each of the actions that UPS took against you that you believe are discriminatory, I want to just kind of make that list for each of those claims and then we'll go back and talk about each one of them. So, but for right now, the only way I can keep it straight is to ask you up front, I understand the three discharges you believe were based on race, so that we have a complete list, are there any other actions you believe were taken against you because of your race?
A. No.
Q. Do you know or have an understanding as to who made the decision with respect to your March 20, 2011 discharge?
A. I don't know who made the decision. It had to be -- it was my manager at the time that made the decision.
Q. And that was Ms. Hill?
A. Ms. Hill.
Q. And the same question for August 2011 discharge. Do you have an understanding as to what

person or persons made that decision?
A. Ms. Hill.
Q. Okay. And with respect to your January 2012 dismissal, who do you believe made that decision?
A. Ms. Hill.
Q. And aside from the fact that Ms. Hill was the one to communicate that to you, signed the letters we've looked at, what other information are you basing your statement on that she was the one responsible for each of those decisions?
A. Because she was the one that came and told me that I was terminated.
Q. Okay. Did Ms. Hill indicate that she had discussed the discharge with anyone else?
A. Not when she terminated me, no.
Q. Since then?
A. In -- in -- in this procedures, yes, but not as far as directly to me, no.
Q. So not prior to the depositions this week?
A. Correct.
Q. So if you could, tell me -- tell me each and every fact regarding your March 11th, 2011 discharge that you believe shows or suggests that you were discharged because of your race?
A. Okay. In our group, I'm the only Black female

in my group and on --

Q. I'm sorry to interrupt you but I want to make sure I understand as you go. In your group, do you mean your driver group?

A. Yes.

Q. So this is the 20-some drivers that report to a specific on-road supervisor?

A. Yes.

Q. I'm sorry. Please continue.

A. And on that particular day, it was to my understanding that Mike Smith was going to ride with me that morning and then the information got to me was that Mike Smith was not going to ride with me anymore. And then when I -- every time that I would call her for help, it was like, you have to do the best you can do, you make it happen, you do what you got to do, and it clearly, I mean, we -- if you called -- they say you called and you get help and I didn't receive any help.

Q. Okay. So the first part was that Mr. Smith, you believe, indicated he was going to ride with you that morning and he didn't end up riding with you that morning?

A. Right.

Q. Okay. And there's been testimony this week

that Mr. Smith was on that day riding with a different package car driver?
A. He was driving that car.
Q. He was driving that car because the package car driver in question had a suspended driver's license?
A. Right.
Q. Okay. Now, is it fair to say that when help is requested on a route, if help is dispatched, it's typically dispatched in the afternoon?
A. No.
Q. No.
A. Huh-uh.
Q. Have you had help dispatched to you in the morning?
A. Yes.
Q. Okay. When was that?
A. When I was doing the -- doing the 24B route, anytime when they look in your board and they see that you need help, they will send you out help or they'll tell you another driver is coming to get some packages off from your truck.
Q. Prior to?
A. Yes.
Q. How often would you say that happened when you

were riding the 24B route?
A. I would say during peak season, every day during peak.
Q. And what form of help, are you talking about another driver helper?
A. No, another driver would come. Another driver would come and get some packages off from your truck.
Q. Okay. So other than peak season, were there occasions when you received help prior to noon?
A. Uh-huh. I'd say about, about once a month, if I had too much on there, once a month.
Q. And what about the time that you go, for the entire time that you delivered the 31A route, did you ever receive help prior to the afternoon?
A. During peak time, yes.
Q. Okay. And were there times, other than peak time, when you received help in the afternoon?
A. Yes.
Q. But you can't recall an instance outside of peak time when you received help in the morning on 31A?
A. No, sir. No, sir.
Q. All right. Any other facts that you believe show or suggest that the March 2011 discharge was based on your race?

A. No, sir.
Q. Okay. Are you aware of any oral or written statement made by any UPS supervisor or manager that stated or suggested that that discharge was specifically based on race?
A. I can remember some of the drivers would come and tell me, Denise, Lindy said that she's going to get you, she's going to get you.
Q. And which drivers do you contend said that to you?
A. I know -- I want to say -- I believe Pulley did come and tell me that. Some -- I can't remember the names right now.
Q. What was the name you just mentioned?
A. Pulley. P-U-L-L-E-Y.
Q. Is that a nickname?
A. Huh-uh, that's his last name, I don't know his first name.
Q. Okay. And what is that driver's race?
A. He's a Black male.
Q. Okay. And when is it -- when did this conversation take place?
A. That was when she came in January, that's when, you know, the drivers would come up and tell me different things that were said and I wasn't paying

attention 'cause I keep on running -- I keep on driving, I keep on working, you know, I'm working.

Q. What exactly, to the best of your knowledge, did Pulley tell you about a statement about Ms. Blankenship?

A. That she's going to get you.

Q. And did he indicate how he heard this?

A. Just in listening to them talking in the hallway.

Q. Is that what Pulley said or is that what you're assuming?

A. That's what I'm assuming.

Q. Did he indicate what was said before this alleged comment or after this alleged comment?

A. No, no, 'cause I didn't stay around to listen so...

Q. Did you ever ask Ms. Blankenship if she made that statement?

A. No.

Q. Did you take any notes or did you -- does Pulley have any documents or notes regarding that statement?

A. No.

Q. Did you keep any notes or documents at the time?

A. No.
Q. And it's your testimony that more than one driver told you about this alleged comment?
A. Yes.
Q. Who are the others?
A. I can't remember their names right now. I don't remember their names.
Q. Do you remember their faces or who they were in terms of the route they -- anything else that could help us figure out who these people are?
A. No, I don't remember.
Q. And, again, the same questions with respect to Mr. Pulley's statement, were there any notes that you took or that these other drivers took regarding that comment?
A. No.
Q. Did they indicate what the context of the comment was?
A. No. And if they did -- I'm sorry.
Q. No, no. Go ahead.
A. If they did, I didn't pay it any attention, I just kept on working. 'Cause I just tried to always stay focused on work.
Q. And the statement, again, that Lindy or Ms. Blankenship was alleged to have made was that she was

going to get you?
A. Yes.
Q. And you believe that indicated some sort of personal animosity against you?
A. Yes.
Q. Did you --
MS. POLIN: I'm going to object to that.
MR. GARTLAND: Okay.
BY MR. GARTLAND:
Q. So did you have any interaction with Ms. Blankenship prior to the time that you allege hearing these purported comments?
A. No.
Q. So when you heard that statement, what did you believe about why Ms. Blankenship might be out to get you?
A. I didn't think no more about it 'cause all I was focused on was working.
Q. Have you heard any other comments from Pulley or other drivers that Ms. Blankenship was out to get anyone else?
A. No.
Q. That there were any other drivers that she had -- was out to get in the same way?
A. No.

Q. Okay. Any other statements made by UPS supervisor or manager that you believe states or suggests the action of the March 2011 discharge was based on race?
A. No.
Q. And are you aware of any oral or written statements made by UPS supervisor or manager that you believe indicate a bias against African Americans?
A. No.
Q. And to the extent Michael Smith was involved in the March 2011 discharge, do you contend that he was discriminating against you based on your race?
A. No.
Q. Because Mr. Smith is himself African-American, correct?
A. Correct.
Q. Are there any other facts or statements that you believe suggest or show that the March of 2011 discharge was based on race that we haven't discussed?
A. No.
Q. With respect to your August 2011 discharge, tell me all of the facts that you believe show or suggest that the August 2011 discharge was based on race?
A. Once again, it goes back to me being the only

Black female in our group, and also there are other people in -- women in our group, the White ladies that use the left at button, we all used that left at key, and I was the only one that was completely just discharged or terminated for using that key.

Q. And what is the basis for your statement that other -- well, let me go back. You indicated you're the only Black female in the driver group at that time?

A. Right.

Q. Were there other Black female drivers in the Cary center?

A. No.

Q. Even if they were in another group?

A. No.

Q. And you said you believe that other package car drivers in the center had used the left at key in the same way you did?

A. Yes.

Q. In connection with the August 2011 discharge?

A. Yes.

Q. And what's the basis for that?

A. Because Mohammed came and told me, Mohammed said -- Mohammed said, Denise, he said -- 'cause that's when I was about to leave out and Mohammed

said, he said, don't worry about that, he said, 'cause you going to be back to work tomorrow, he said, 'cause I use that key all the time, he said, and they just got on me about it.
Q. When did that conversation take place?
A. I want to believe it was that same morning or something around line because Mohammed told me that and other people used that key.
Q. Well, let's take it one at a time.
A. Okay.
Q. Is the same morning of your discharge?
A. I want to say it is, yes. I know Mohammed did tell me that.
Q. And he said that -- he indicated that he used the left at key as well?
A. Yes.
Q. Do you know whether -- have you ever spoken to any UPS supervisors specifically about Mohammed using the left at key?
A. No.
Q. So the basis for that statement is Mohammed's statement to you?
A. Yes.
Q. Did he describe specifically how he uses the left at key?

A. When he was on N.C. State campus, 'cause he would drive that 31A route too sometimes.
Q. Did he say that or are you --
A. No, that's what he said.
Q. And how did he say he used it?
A. He say he used it the same way I do, when we go to the dorms, we mash, left at.
Q. And you said he indicated that he had received some disciplinary action in connection with --
A. They just came and told him, you know, showed him, don't do it, and they showed him the other key to use and that was it.
Q. And that's what Mohammed said?
A. Yes.
Q. And who is "they"?
A. Oh, whatever the supervisor was that came and showed him which key to use specifically for that left at.
Q. Did he indicate when he had been counseled on the use of the left at button?
A. It was within a couple of days of that.
Q. A couple days before your discharge?
A. Yes.
Q. And with which driver group was Mr. Hussein in?

A. My driver group.
Q. So Mr. Smith was his supervisor as well?
A. Yes.
Q. Did you ever talk with Mr. Smith about Mr. Hussein's use of the left at button?
A. No, huh-uh.
Q. Did you ever witness personally any conversations between a UPS management employee and Mr. Hussein about the left at button?
A. No.
Q. And do you personally know if he experienced any disciplinary action in connection with his use of the left at button?
A. No.
Q. Have you spoken with Mr. Hussein about offering testimony in this case?
A. No.
Q. Other than Mr. Hussein, is there anyone else that you contend used the left at button in a similar way?
A. Yes. I think his last name is Dalton or something, he informed me that he -- he has used the left at button, and just this year they told him that -- to stop using the left at key. To use it -- they showed him how they want it used.

Q. And you said his last name is Dalton?
A. I think that's it.
Q. What race is Mr. Dalton?
A. He's a Black male.
Q. Okay. And when did you have this conversation with Mr. Dalton?
A. I saw -- I saw him out one day, I want to say it was about -- I want to say a couple of months ago.
Q. Okay.
A. And I think he -- that's when he told me that -- he said -- he said, UPS came back and he said, you know they just got on me about the left at key, and he said, I've been doing it all these years and he said, they just told me about it. And I looked at him and I said, oh, I said, well, you lucky, and that was it and I walked on off.
Q. And who -- did he say who "they" was in terms of getting on him about it?
A. His supervisor.
Q. Do you know who his supervisor is?
A. No, he didn't tell me. We didn't go into detail. When he said -- told me that, I just said, you lucky, and I walked on off.
Q. And he indicated he had been counseled about improper use of the left at button?

A. Yes.
Q. Where was this conversation, you said it was at a --
A. I just saw him out. I saw him out and we was just in general speaking and that's when he went on to tell me and I looked at him and I said -- I said, well, you're lucky then, and I just walked on off.
Q. And aside from that exchange, did you talk about any of your other discharges or --
A. No. No.
Q. Okay. And, again, just for the record, you didn't personally witness any conversation between UPS management personnel and Mr. Dalton about the use of the left at key?
A. No.
Q. You don't have any personal knowledge about whether he received discipline or why?
A. No.
Q. Are there any other drivers that you contend also use the left at key inappropriately?
A. No, none that I know of.
Q. Okay. I'm sorry, you trailed off a little bit. It's been a long day. I know it's been a long day.
A. No, sir. No one that I know of.

MR. GARTLAND: Did you need to take a break in a couple minutes?
MS. POLIN: Off the record, please.
MR. GARTLAND: Okay.
(A DISCUSSION WAS HELD OFF THE RECORD.)
BY MR. GARTLAND:
Q. So have we now discussed all of the facts that you believe show or suggest that your August 2011 discharge was based on race?
A. Yes.
Q. With respect to the January -- well, let me back up. Are you aware of any oral or written statements made by a UPS supervisor or manager that you believe state or suggest that the August 2011 discharge was based on race?
A. No, I'm not aware of any.
Q. Are you aware of any oral or written statements made by -- well, I think the answer to that, you told me you're not aware of any statements on behalf of UPS managers or supervisors that you believe indicate a bias against African-Americans?
A. No.
Q. You've never witnessed a UPS manager in the Cary facility use an ethnic slur to refer to African-Americans or anything like that?

A. No.
Q. With respect to the January 2012 discharge --
MS. POLIN: I'm going to object to that. Her claims are against her, she can't speak to African-Americans in general.
MR. GARTLAND: I simply asked her if she was aware of any ethnic -- use of ethnic slurs or other similar remarks demonstrating bias on the part of UPS managers or supervisors in the Cary center. And I believe her testimony was, no. I believe that's a fair question.
BY MR. GARTLAND:
Q. With respect to the January 2012 discharge, same exercise, can you tell me every fact that you believe shows or suggests that the January 2012 discharge was based on race?
A. That's the last one, right?
Q. Correct.
A. Okay. I want to say that, in which I truly do believe that no one else has -- you say you did an audit on my truck and an audit was never performed on my truck, and there was no audit done on the truck. And this just doesn't happen to anyone else in that building.
Q. Do you know -- and your statement that no

audit was ever performed on the truck --
A. Yes.
Q. -- understanding that you believe -- well, let me say it this way, on the evening of January 3rd, 2012 when you returned to the center, the night that Mr. Hawkins says he discovered these packages on your package car, after you punched out, did you stay at the center?
A. No.
Q. Okay. So you would have no way of knowing whether Mr. Hawkins had inspected your package car after the time you left the building, correct?
A. But can --
Q. Just roll with me and I'll give you a chance to explain.
You would have no way of knowing whether he inspected your package car after you left the building, correct?
A. Correct.
Q. Okay. Now, so what is the basis for your statement that no audit was ever performed?
A. Because every package that was on my package car, I placed the packages at the exception table with him -- he told me to pass them to him at the table. So -- and I was going to explain each package to him

to let them know they came out of the future cage and they need to go back in the future cage.

Q. Okay. So if Mr. Hawkins testified that those packages were found on the package car and not on the table, you dispute that testimony?

A. Yes, because I took them out of the package car, he was standing at the step and he told me, he said, you hand me these packages, and that's what I did.

Q. Is it possible there were other packages on the package car aside from the ones you handed to him?

A. No, sir, because when I gave him the packages, he came up the little two step and he looked around the seat there and he told me, he said, go ahead on and park the truck and clock out. And that's what I did.

Q. So isn't it possible that Mr. Hawkins, in addition to that interaction, performed an inspection of the package car after the time you punched out and left?

A. If he did, he would have had a sheet to show me that next morning and he didn't -- I didn't see that.

Q. Okay. But it's possible he did the audit and just didn't show you the sheet the following morning,

correct?
A. It's possible.
Q. And you would -- don't let me put words in your mouth -- but you would say that if he conducted an audit, he should have showed you the sheet the next morning, correct?
A. Yes, sir, that's the way it normally works, that's the way UPS do it.
Q. But it's possible he did do an audit and just didn't present you with any paperwork the next day?
A. Yeah.
Q. All right. So in addition to the -- the disagreement over the audit procedure, what other facts do you believe show or suggest that the January 2012 discharge was based on race?
A. That's it.
Q. Okay. Have we now discussed all of the facts that you believe -- well, one more question.
Are there any statements that you're aware of, oral or in writing, by a UPS manager or supervisor that you believe indicate that specific decision was based on race?
A. No.
Q. Okay. And, again, I know it may -- maybe it sounds farfetched, but a supervisor or manager coming

to you and saying, you know why we discharged -- we discharged you because your Black?
A. No.
Q. That's what I'm -- the type of statement I'm referencing.
A. Okay.
Q. So we have now discussed all of the facts that you believe support your claim of race discrimination with respect to the March 2011, August 2011, and January 2012 discharges?
A. Yes.
Q. Okay. You are also asserting in the case, in this lawsuit a claim for sex or gender discrimination; is that correct?
A. Yes.
Q. And is that also based on March 2011, August 2011, and January 2012 discharges?
A. Yes.
Q. Are there any other actions that, other than those discharges, that you believe were taken against you because of your gender?
A. No.
Q. And for the March 2011 discharge, could you describe for me every fact that you believe shows or suggests that that discharge was taken against you

because of your gender?
A. It goes back to not giving me any help that day.
Q. Were there -- you mentioned you were the only Black female driver in your driver group, were you the only female driver in your driver group?
A. No.
Q. There were White females in your group?
A. Yes.
Q. What were their names?
A. I can't remember her name.
Q. How many? Just one other?
A. Just one other in my group. No, it's one in my group and then there's one on the other side. So it's two of us, two of us actively driving, and there's another one, she's not driving, she's out on leave.
Q. In the driver group?
A. In the driver group.
Q. Do you have any idea of how many drivers center-wide in the Cary center?
A. How many White females or Black females?
Q. Just females.
A. Just females. I'd say about five.
Q. And, again, you stated that the fact that you

believe shows or suggests the March 2011 discharge was based on gender was the fact that you weren't, according to your testimony, given the help you requested on that day?

A. Right.

Q. You did receive help that afternoon, correct?

A. Correct.

Q. From -- who came to help you?

A. It was -- it was a man, a supervisor named, he was the first one on the scene. You called his name yesterday.

Q. David Murphy?

A. Dave Murphy, yes.

Q. And other drivers came to help as well?

A. Yes. Mike Smith came and I believe Tim Pearson came.

Q. Okay. Anyone else that you can recall?

A. No, it was some more but I can't remember who it was.

Q. Okay. And, again, that discharge related to failure to follow methods and procedures and dishonesty, that was the charge against you --

MS. POLIN: I'm going to object to that.

BY MR. GARTLAND:

Q. That was the charge against you by the company

included those grounds, correct?
MS. POLIN: I'm going to object to form to that because that is not what the discharge was for.
MR. GARTLAND: You can object to form and that objection is noted.
BY MR. GARTLAND:
Q. Ms. Shipman, I'll repeat the question slightly rephrased.
Do you recall an allegation in connection with that March 2011 discharge of dishonesty, failure to follow methods and procedures?
MS. POLIN: I'm going to object to that again --
MR. GARTLAND: You can object --
MS. POLIN: -- because the decision for the March 2011 --
MR. GARTLAND: You're testifying for the witness, Ms. Polin.
MS. POLIN: Well, you're putting words in the witness' mouth because the decision was not for: failure to follow instructions and methods.
MR. GARTLAND: Let the record reflect Ms. Polin is testifying for her client inappropriately, she's raising her voice.

MS. POLIN: And let the record reflect attorney -- that the attorney is putting words in my client's mouth because the decision was not for failure to follow methods and procedures.

MR. GARTLAND: Okay. You've testified for a third time.

MS. POLIN: Why don't you just show the decision letter?

MR. GARTLAND: I will proceed -- it's my deposition --

MS. POLIN: Then do it right.

MR. GARTLAND: Ms. Polin, that is not necessary and I don't think you're behaving professionally right now.

MS. POLIN: And I don't think you're behaving professionally because you are putting words in my client's mouth because the testimony --

MR. GARTLAND: You're continuing to --

MS. POLIN: The testimony and the documentation do not reflect what you're saying.

MR. GARTLAND: Ms. Polin, that is inappropriate testimony, I'm going to continue with my examination. Any more discussion along those lines is going to be noted for the record and I will take appropriate action.

MS. POLIN: And if you continue to characterize the decision as it is and then I'm going to ask for this deposition to stop.

MR. GARTLAND: If you believe that I've mischaracterized previous testimony --

MS. POLIN: You have mischaracterized it.

MR. GARTLAND: Can I finish my sentence, please, without you raising your voice or interrupting me? If you believe I have mischaracterized previous testimony, then object to the form. A speaking objection is not appropriate and that's clear under the rules. Can we agree on that?

MS. POLIN: We're not going to agree, no.

BY MR. GARTLAND:

Q. Okay. Ms. Shipman, did you recall the grounds for which UPS charged you in the March 2011 discharge?

A. No, I don't remember. I would have to look at it and I don't remember right off.

Q. Do you recall whether being over allowed for that day or having taken too much time on your route was part of the grounds for the discharge?

A. That was second one or the first?

Q. I believe that was the first one.

A. That was the first one. Okay. No.

Q. Okay. Any other facts that you believe show or suggest that March 2011 discharge was based on your gender?

A. No.

Q. Okay. Now, with respect to the August 2011 discharge -- well, I'm sorry. Just for the record, are you aware of any oral or written statements on the part of UPS managers or supervisors that indicated the March 2011 discharge was taken on the basis of your gender?

A. No.

Q. And with respect to the August 2011 discharge, could you tell me every fact that you believe shows or suggests that discharge was taken because of your gender?

A. Yes. The other drivers in my group, they were given just all warnings and said do not mash that left at key for the commercial, and they was just shown exactly how to do it, which way to go about doing it and let them know, I mean, just sternly letting them know, do not do that 'cause this is how we're going to do it.

Q. And you contend that was before or after your discharge?

A. It was before and after my discharge.

Q. Okay. And who were the other drivers that you believe were counseled in this way?
A. Mohammed, Tim, the other driver that I -- that I saw out, Dalton, I believe his name is, I saw him out. Yeah.
Q. And what about the White female driver in your group?
A. Marie, her name is Marie, Marie Pearson. Yes, Marie.
Q. Thank you.
A. I can't say because I don't know. I didn't have this discussion with her.
Q. Was this counseling given to the driver group as a whole or individuals?
A. Individuals.
Q. Okay. And so the conversation you had about the left at button with Mohammed, is that the same conversation we talked about earlier?
A. Yes.
Q. And the one with Mr. Pearson, when did that take place?
A. Within that, you know, within the time in which I was, I was there and he ran my routes some days, whenever they told me that it wasn't enough on there to run but then come to find out the route would

be in. They would tell me, Denise, it's not enough on your route today so we had to cut it, but then I find out somebody else ran my route when they sent me home.

Q. And when did that occur?

A. It happened some when I was on 24B and then it would happen during 31A also.

Q. And so when did your conversation with Mr. Pearson about the left at button occur?

A. I want to say it was around the same time as with me being discharged, around that same time.

Q. And what exactly did Mr. Pearson say to you?

A. He told me he was using it too until they told him to stop using it.

Q. Did he say how he was using it?

A. In the same way, when you go to the dorm, is mash left -- scan the packages and put -- mash that left at, and get a signature.

Q. And did you take any notes regarding that conversation?

A. No.

Q. Okay. Anyone else other than Mr. Hussein, Mr. Dalton, Mr. Pearson?

A. No. No one I can remember.

Q. And you never talked about this issue with the other female driver in your group?

A. No.
Q. So you don't know whether she received any counseling along the same lines?
A. No.
Q. All right. Any other facts that you believe show or suggest that the August 2011 discharge was taken because of your gender?
A. No.
Q. And are you aware of any statements on the part of UPS managers or supervisors that indicate a bias against females?
A. No.
Q. Okay. Ms. Hill obviously is a female, correct? And Ms. Brandon as well?
A. Yes.
Q. And with respect to the January 2012 discharge, tell me every fact you believe shows or suggests that discharge was taken because of your gender?
A. I don't know if anyone else that they have said that they did an audit on and they just flat out told them, you're dismissed. It's always the next day is when we get to see the sheet and show us what was left on the truck.
Q. Okay. So you're not aware of any other driver

that was dismissed as a result of an audit?
A. Correct.
Q. Male or female?
A. Male -- the audit to where as we come back to the building and I gave the supervisors those particular packages.
Q. So as a result of a check-in audit?
A. A check-in audit, yes.
Q. You're not aware of any other males or females discharged as a result of a check-in audit?
A. Right.
Q. Okay. Any other facts?
A. No.
Q. Are you aware of any oral or written statements directly linking -- by a UPS manager or supervisor directly linking your January 2012 discharge to your gender?
A. No.
Q. And have we now discussed all the facts that you believe support your claim of gender discrimination?
A. Yes.
Q. You've also asserted in the case a claim for age discrimination, correct?
A. Yes.

Q. And that claim is based, like the other claims, on your March 2011, August 2011, and January 2012 discharges; is that correct?
A. Yes.
Q. Are there any other actions that you believe were taken against you because of your age? Aside from those three discharges.
A. Nothing more than every time you say the route is cut, you put someone else younger on that route than me, but the route don't be cut, or if you tell me there's not enough up there, you'll place someone younger on the route than me.
Q. Now, how many times would you say the route was cut and you were -- well, let me ask this, when the route was cut, would you work inside the building?
A. Yes. On the 24B, yes.
Q. What about on the 31A?
A. No.
Q. What would happen when the route was cut on 31A?
A. I was just told to go home and come back tomorrow.
Q. But you're a full-time employee with guaranteed hours?
A. Yes.

Q. Did you ever file a grievance that you were denied pay for that day? Or, let me ask it this way, were you paid for that day even though you went home?
A. No, I wasn't paid for that day.
Q. Did you ever file a grievance on that?
A. No.
Q. Even though you're guaranteed hours as a full-time union employee?
A. Yes.
Q. And when a route is cut, there are still stops on that route, correct?
A. Yes.
Q. And those stops get absorbed into a different route?
A. They're supposed to.
Q. And so your contention is --
A. My route was still in but I was told it was cut but my route was still in, it was still running and someone -- they would give someone else my board in the morning before I got there and that would tell me, okay, Denise, we don't have a route for you today.
Q. And how many times do you allege this occurred while you were driving 31A?
A. I'm going to say about five times.
Q. Five times. And do you have any knowledge as

to who would have made the decision to cut a route?
A. Mike Smith.
Q. And for each of those times, who is it that you allege drove 31A in its entirety instead?
A. Tim Pearson and Mohammed.
Q. Do you believe those drivers are younger than you?
A. Yes.
Q. Did you ever file a grievance on having the route cut?
A. No.
Q. Okay. Any other facts that you believe show or suggest that your -- okay, I'm sorry.
Any other actions that UPS took against you that you believe were based on age, other than discharges and the cutting of Route 31A?
A. No.
Q. Did you keep any records of the dates on which Route 31A was cut?
A. No.
Q. So with respect to the March 2011 discharge, what -- tell me every fact that you believe shows or suggests that the discharge was taken on the basis of your age?
A. Without -- refusing to send me help and

telling me that, hey, you're going to have to pick it up, you've got to pick up your work pace, you've got to pick it up, you're moving too slow. That's to tell me, you know, you're moving too slow, you got to pick it up.

Q. Have you ever been told prior to March 2011 that you were working too slow and needed to pick up your pace?

A. Yes.

Q. Were you -- do you recall any time that you were told that when you began your employment with UPS as a part-time employee?

A. No.

Q. What about as a full time, as a combination driver?

A. No.

Q. As a full-time package car driver?

A. Only when Mike Smith became my supervisor was I told that.

Q. Do you know whether Mike Smith has ever told any other drivers in his driver group to pick up their pace?

A. I don't know.

Q. It's not fair to say that pace of work and moving as quickly as you can safely move is a constant

focus at UPS?
A. It is, but if you see that I'm going as fast as I can go and then you're going to cut the route because I can't move faster.
Q. Your testimony is that you were at all times moving as quickly as you could?
A. Oh, yes.
Q. Did you feel that you personally were any slower in performing physically in 2011, 2012 than you were when you first began driving?
A. No.
Q. All right. Any other facts that you believe show or suggest the March 2011 discharge was based on age?
A. No.
Q. Any statements, oral or written, on the part of UPS manager or supervisor that you believe directly links your March 2011 discharge to your age?
A. No.
Q. Any comments on the part of UPS managers or supervisors that you believe indicate a bias against persons based on their age?
A. No.
Q. The August 2011 discharge, can you tell me every fact that you believe shows or suggests that

that discharge was based on age?
A. No one else had been discharged for that and the ones that they want was younger than me, Tim Pearson and Mohammed, all them, they're younger than me.
Q. Okay. So the same folks that we talked about in connection with the gender and race --
A. Yes.
Q. -- that were counseled on left at practices?
A. Yes.
Q. Any other facts?
A. No.
Q. How about your January -- well, are you aware of any oral or written statements directly linking -- oral or written statements by a UPS manager or supervisor that you believe directly links your August 2011 discharge to your age?
A. No.
Q. And with respect to your January 2012 --
MS. POLIN: I'm going to object to the form of that question as well.
BY MR. GARTLAND:
Q. Your January 2012 discharge, tell me every fact that you believe shows or suggests that that action was taken against you because of your age?

A. Well, I don't know what she meant by warm and fuzzy. And, also, I don't know of another driver that they have performed an audit on, did not produce the sheet and plus -- and plus discharged them, terminated them.

Q. Okay. The same fact that we discussed in the context of your gender discrimination claim?

A. Yes.

Q. Any other facts?

A. No.

Q. Are you aware of any oral or written statements that you believe shows -- I'm sorry.

Are you aware of any oral or written statement on the part of a UPS manager or a supervisor that you believe shows a connection between your age and the January 2012 discharge?

A. No.

Q. And with respect to the cutting of Route 31A, which you testified you think occurred about five times during your employment?

A. Yes.

Q. What facts do you have to believe that suggest that that was based on your age?

A. During the times that they were cut, one time Greg told me, Greg said, Greg said, we're not going --

the route wasn't cut that day, Greg said, Greg said, if you take that route today, he said, I'm not going to give you any help and he said, you're going to have to get it off. And that's -- Vince was standing there with me and it all started over a -- so that was it.

Q. Okay. Anything else?

A. No.

Q. Are you aware of any oral or written statements on the part of a UPS manager or supervisor that you believe directly link the cutting of Route 31A to your age?

MS. POLIN: I'm going to object to the form of that question.

THE WITNESS: I don't know.

BY MR. GARTLAND:

Q. All right. You don't know or you're not aware of any?

A. I'm not aware of any.

MR. GARTLAND: All right. There's still more claims to discuss.

MS. POLIN: Can we take a break, please?

MR. GARTLAND: We can take a five-minute break.

(A RECESS WAS TAKEN FROM 3:56 P.M. TO 4:07 P.M.)

MR. GARTLAND: Back on the record.

BY MR. GARTLAND:
Q. Just to close out, have we now discussed prior to the break all the facts that you believe support your claim of age discrimination, Ms. Shipman?
A. Yes.
Q. And feel free to refer to the Complaint, Defendant's Exhibit 29 if you need to. There is also asserted in the Complaint a claim for hostile work environment; is that correct?
A. Yes.
Q. Okay. And on what basis do you believe you experienced a hostile work environment?
A. A --
Q. Maybe it will be easier, I'm sorry to interrupt, if I break it down this way. It does not state in the Complaint whether you believe the hostile work environment was based on race, age, or gender or some combination of all three.
A. Right.
Q. Do you believe you experienced a hostile work environment based on race?
A. To answer the hostile work environment, it -- you go in in the morning and you grab your board and it's -- it was like, you go to your truck and it's -- it's like each day that I was on that route or up

under that management team, I could never do anything right. Even though they would call me and ask me to run routes outside of my route, an evening drop box route, and no matter if I requested help or if I went to help somebody else, each day it was always a yelling at me, you didn't do this, you didn't do that, and even when I was out there, was always texting me, you need to speed up, you got to do this, and it was like, there was -- there was never no happy medium there together.

Q. And who is the person that you allege was raising their voice with you or texting you to speed up?

A. Mike Smith, Lindy. It was mostly Mike Smith and Lindy Blankenship.

Q. When did Ms. Blankenship yell at you?

A. In the morning times a lot. It would be in the morning, you know, like when we're on the belt, she would be yelling down the belt, tell Shipman to get them packages in that truck. I mean, it was just no happy medium there.

Q. So she was yelling at a supervisor to tell you to get the packages on the truck?

A. Yes.

Q. Any other times that you can remember Ms.

Blankenship yelling?
A. She was always yelling in the morning, that was her thing, yelling in the morning.
Q. Well, inside of the package center is a noisy place; is that correct?
A. We can hear though.
Q. Well, if she's -- where's her office?
A. Her office is on up.
Q. It's on the upper level?
A. No, no, sir. It's like -- the cars are -- let's say the cars are these chairs here, right, and her office, let's say on the other side of the office over here. And then she would walk sometimes to the end of the belt and she would yell.
Q. Is the belt in motion at that time in the morning?
A. No.
Q. Is there noise from people working inside the center at that time?
A. Nothing besides the drivers trying to get out.
Q. And the drivers are spaced out in how large an area?
A. Oh, we all over the building.
Q. Are there other folks that she would yell about?

A. Yeah, and it's just...
Q. Did other drivers feel that she was a tough person to work for?
A. Yes.
Q. What about Mr. Smith, do other drivers in your group think he was a tough person to work for?
A. Yeah.
Q. Are you aware of Mr. Smith ever texting any other package car drivers about their pace or being over allowed or anything like that?
A. I don't know their names but I know they have.
Q. So in addition to the -- Ms. Blankenship yelling about things and Mr. Smith texting you messages about your work pace, what are the other actions that you believe created a hostile work environment?
A. Just the texting all day long and then the next morning, just coming up and just, just harassing you for no reason for stuff that just happened, it's just...
Q. Well, were the items that Mr. Smith was discussing with you work related?
A. Yeah, they be work related.
Q. Okay. They're about items reflected on the driver report the following morning?

A.  Yeah.
Q.  And issues that he thought you needed improvement on?
A.  Some I couldn't help.
Q.  Well, whether you could help it or not, they were issues that he thought needed to be improved?
A.  Yes.
Q.  They were statistics or other metrics he was unhappy about as a supervisor?
A.  Yes.
Q.  And did you ever observe him speaking with other drivers in your group about their daily reports?
A.  Yes.
Q.  And would you characterize him as being tough on them as well?
A.  Yes.
Q.  Any other actions that you believe contributed to a hostile work environment?
A.  None I can think of right now.
Q.  Okay.  Is there any other -- is there any documents you want to review in order to refresh your recollection so we can get your full testimony here today?
A.  I don't have any.
Q.  Are you aware of any?

A. No.
Q. Do you believe that hostile work environment was based on your race?
A. No.
Q. Do you believe that hostile work environment was based on your gender?
A. No.
Q. Do you believe that alleged hostile work environment was based on your age?
A. No.
Q. And as far as you know, other than the formal disciplinary action that was taken against you, the -- Ms. Blankenship raising her voice and Mr. Smith texting you, you described it as all day long, did those items affect your compensation?
A. Yeah, to do my job.
Q. No, but I'm saying, did they result in pay being taken away from you?
A. Oh, no.
Q. Okay. Didn't result in any benefits being taken away from you?
A. No. Other than cutting my route probably the next day or taking me off the route and put someone else on there.
Q. So have we discussed all of the actions that

you believe contributed to a hostile work environment?
A. Yes.
Q. If you look with me at the Complaint, page 16, there's also a count asserted for retaliation.
A. Yes.
Q. And in your Complaint, it appears you allege that you were retaliated against for filing written grievances following the March 2011, August 2011, and January 2012 discharges; is that correct?
A. Yes.
Q. And are those the grievances we've looked at here today as exhibits?
A. Yes.
Q. Okay. And I think we've established, based on some of the other documentation, you had been disciplined -- you had received discipline prior to 2011 during your employment with UPS, correct?
A. Yes.
Q. And did you file -- do you recall filing any grievances on discipline you previously received?
A. No.
Q. So to the best of your knowledge, those grievances we looked at today are the only three grievances that you filed during your employment with UPS?

A. I can't be for sure. I can't be for sure.
Q. Aside from the three discharges, from the time that Ms. Blankenship became the business manager to the time that you were taken out of service in January of 2012, did you receive any other warning letters or suspensions other than the ones -- the three discharges we've highlighted?
A. Nothing other than what I was -- I saw today in here. That's it.
Q. Okay. The recertifications and things?
A. Yes.
Q. Okay. Some of those might have been in that time frame, I was just making sure there wasn't a different suspension or something else.
A. No, huh-uh.
Q. Are there any other, aside from the grievances, are there any other written or verbal complaints to management that you believe give rise to your retaliation claim?
A. Nothing that I can remember.
Q. Are there any documents that could refresh your recollection as to any other written or verbal complaints that are part of your retaliation claim?
A. No, I don't have any, no.
Q. And other than your discharges, are there any

other actions you believe were taken against you because you filed grievances?
A. No. No.
Q. And what was it about the grievances that you believe caused UPS to retaliate?
A. Because they -- because I went -- each time when I came back to work, within the short period of time when I would come back to work, I would get better and better at 31A route and knowing -- and they -- it could -- everyone was seeing that, hey, Denise is getting better and better at this route, so we know she can really do this route.
Q. Okay. But I guess my question is more focused on, you've alleged that someone at UPS retaliated against you because you filed one or more of these grievances, so something about the grievances upset them and caused them to retaliate is your contention. I'm trying to figure out, what is it you think about the grievance upset them? Just the fact that an employee was challenging discharge?
A. No, that I was able to keep coming back to work.
Q. Okay. So it was the fact that you were reinstated?
A. Yes, sir. That I was, yes.

Q. So other than what we've previously discussed, are there any additional facts that you believe show or suggest that the March 2011 discharge was retaliation for a grievance?
A. No.
Q. What about the August 2011 discharge, other than the facts we've already discussed, are there any other facts that you believe show or suggest that you were discharged in August 2011 in retaliation for a grievance?
A. No.
Q. And the January 2012 discharge, are there any other facts we haven't discussed that you believe demonstrate you were discharged in January 2012 in retaliation for filing a previous grievance?
A. No.
Q. Are you aware of any oral or written statements by a UPS manager or supervisor indicating that any of those discharges was in retaliation for a grievance?
A. No.
Q. And have we now discussed all the facts that you believe support your claim of retaliation?
A. Yes.
Q. If you'll turn with me on page 17 of your

Complaint, the next claim is under North Carolina State law for breach of contract. If you want, take a moment to look over those allegations and let me know when you're ready. And the contract referenced in the Compliant is the Collective Bargaining Agreement, is that correct?

A. Yes.

Q. Okay. You haven't personally signed an employment contract with UPS other than the CBA?

A. Correct.

Q. And how do you contend that the company breached the contract?

A. First, we did not do progressive discipline. Next, in the contract it states that within 10 days of the decision that I should receive my settlement, I didn't receive it.

Q. That was the payment -- I'm sorry to stop you -- that was the payment in connection with the April 2012 panel decision?

A. Yes.

Q. Okay. And what other actions?

A. Whenever it came time for, especially the last decision to be made at the panel, I don't feel everything was looked at surrounding me being dismissed.

Q. You don't feel the panel looked at everything or you don't feel the union -- or, I don't want to put words in your mouth. Who didn't look at everything?
A. The union, the union.
Q. So you don't feel the union did an adequate job in presenting your case at panel?
A. Yes.
Q. Have you filed any action against the union based on that belief?
A. No.
Q. Do you believe the union discriminated against you based on race or gender or age?
A. No.
Q. And who was it at the union that you believe didn't do their job, so to speak?
A. What I believe is that Rick, Rick Armstrong, he did not prepare his self enough for that -- for the panel. And that's by way of lack of experience because he had just stepped on board.
Q. He was new to the job of union agent?
A. Uh-huh.
Q. Anybody else at the union that you believe didn't do what they should have done?
A. No. No one that I can think of 'cause that's the only one I had contact with.

Q. What about Mr. Bishop?
A. See, Steve had left, Steve got voted out.
Q. I was just trying to clarify whether you were alleging that Mr. Bishop had mishandled the previous --
A. Oh, no, no, no, no. Steve was on it.
Q. Any other actions that you believe constituted a breach of the Collective Bargaining Agreement?
A. Oh, yes, yes, yes, yes, yes. Now, before then the -- yes. I got to go back to that, yes. I do believe that Steve, the 90-some days, I believe that Steve should have looked at that and argued the fact, hey, we're keeping her out more than the time, which is actually in this contract for us to do, once I had a chance to look at the contract.
Q. Okay. So you believe there's somewhere in the CBA that limits the length of a suspension?
A. Yes.
Q. And what is the limit that you believe exists in the CBA?
A. I know it's not 95 days.
Q. It's something less than that?
A. Yes.
Q. Do you know what article that's in?
A. No, it's in that book.

Q. Somewhere in the book but you don't know where?
A. No.
Q. Okay. And have you ever filed a grievance on that or challenged that with the union?
A. No.
Q. Ever filed -- on any of these, ever filed an action or a charge with the National Labor Relations Board?
A. No.
Q. Any other actions that we haven't already discussed that you contend were a breach of the CBA?
A. Nothing that I can recall right now.
Q. Any documents you want to review right now to refresh your recollection to make sure we have your full testimony?
A. No.
Q. And the next claim in the case and the last claim is on page 18, a claim under North Carolina State Law for breach of duty of good faith and fair dealing.
A. Uh-huh.
Q. Allegation 71 says, implied in the employment agreement plaintiff and defendant entered into was an implied duty of good faith and fair dealing.

The agreement referenced in connection with this claim, is that the CBA or some other document?
A. It's both my management team at UPS and plus the union.
Q. Okay. I'm sorry. And those are the folks you may allege breached the CBA or an implied duty but I'm trying get at, there's reference to an agreement. Are we still talking about the CBA or is there a separate agreement that I'm not aware of?
A. No, we're still talking about that.
Q. So that's -- this claim is based on the -- an implied duty of good faith and fair dealing in the Collective Bargaining Agreement?
A. Yes.
Q. And aside from the actions we already discussed in connection with the breach of contract claim, are there any additional actions that you believe were a breach of the duty of good faith and fair dealing?
A. When I didn't receive help, when everyone -- we have many people all over and all the UPSs that are using that left at key and I'm going to get singled out and get discharged or terminated for the left at key. And then the audit.
Q. In connection with the January 2012 discharge?

A. Yes.
Q. Any other actions that you believe were a breach of the Collective Bargaining Agreement implied duty of good faith and fair dealing?
A. No.
Q. And aside from the claims we've already discussed, is it your contention that there are other claims you've asserted in the case?
A. Yes.
Q. Okay. What other claims do you believe you've asserted?
A. No. No.
Q. Okay. If you could, I know we're going a ways back here, so back to the first and second exhibits. Exhibit 1, which is UPS's First Set of Interrogatories to Plaintiff. If you could turn with me to page 6, interrogatory number 10.
A. Okay. I got the wrong one.
Q. No, that's the right one, the one on your left-hand side there. Page 6, please, of Exhibit 1.
A. Page 6?
Q. Yeah. And number 10 begins at the bottom of the page. And if you'll -- it says, identify each and every healthcare professional or entity, including, without limitation, physicians, psychiatrists,

psychologists, therapists, counselors, clinics and hospitals, with whom Plaintiff has consulted or from who Plaintiff has received treatment for any reason since January 1, 2003. And then there's additional language that you're welcome to review.

Exhibit 2, the response on behalf of Plaintiff to that interrogatory is, none at this time. Indicating that you have not sought -- you have not consulted or received treatment for any reason from a healthcare professional or entity from January 1, 2003; is that correct?

A. Yes.

Q. Very healthy?

A. Oh, yes. Yes.

Q. You haven't been to the doctor since January 1, 2003?

A. No.

Q. Are you -- Ms. Shipman, are you contending in this lawsuit that UPS has caused you any physical injuries or illnesses?

A. No.

Q. Are you contending in this lawsuit that UPS has caused you mental or emotional injuries?

A. No.

Q. And if you could look with me just back to

Exhibit 2, again, very first page, is our Plaintiff's Responses to the Interrogatories. It's the first page. So Exhibit 2, the very first page.

A. Oh, okay. This one? No, that's 1.

Q. I think it's that stack that's right in front of you but we have to get back to the very first page. You're holding Exhibit 2 right now.

A. Right.

Q. That's the right document but we just want to get you back to the first page that looks like this.

A. Okay.

Q. Okay. And in response to interrogatory number 1, you've identified a number of folks with whom you communicated regarding the facts and circumstances of the case. And I just want to make sure we've talked about all of the relative communications. So for Rick Armstrong, are there any other oral or written communications that you can recall that we haven't discussed already today that you think are relative to your case?

A. No.

Q. With respect to Mr. Bishop, any other oral or written communications that we haven't discussed that you believe are relevant to your case?

A. No.

Q. Ms. Blankenship, the same question?
A. No.
Q. Mr. Grant?
A. No.
Q. Mr. Simmons?
A. No.
Q. Mr. Smith?
A. No.
Q. Mr. Hawkins?
A. No.
Q. Mr. Mark Ormon, I don't think we've discussed him yet. It indicates, UPS driver, oral communications, has knowledge about the left at practice. Was this one of the other drivers you talked about?
A. Yes, uh-huh.
Q. Could we remember his name at the time or --
A. No, I couldn't remember his name at the time.
Q. And what race is Mr. Ormon?
A. He's a Black male.
Q. And understanding, just based on his appearance, but what you speculate his age to be?
MS. POLIN: I'm going to object.
THE WITNESS: I'm unsure.
BY MR. GARTLAND:

Q. Do you think he's older than you, younger than you?
MS. POLIN: She already answered that question.
MR. GARTLAND: She has not answered. I'm asking follow up.
BY MR. GARTLAND:
Q. Do you think he's older than you or younger than you?
A. I can't be for sure.
Q. Even if you're not sure.
A. It's hard to say.
Q. All right. Mr. Wester, your roommate, you've communicated with him regarding your discharges presumably?
A. Yes.
Q. Are there any communications that you believe are relevant to show discrimination or retaliation or a hostile work environment in this case?
A. No.
Q. I'm looking now and we don't have to --
MR. GARTLAND: What number is it, 30?
THE COURT REPORTER: Yes.
(DEFENDANT'S EXHIBIT 30 MARKED FOR IDENTIFICATION.)
BY MR. GARTLAND:

Q. Ms. Shipman, you've been handed what's been marked for identification as Defendant's Exhibit 30, a copy of the Plaintiff's Initial Disclosures, filed on your behalf in this case by your attorney. Do you recognize this document?
A. Yes.
Q. Okay. If you could turn with me to the page entitled attachment A.
A. Okay.
Q. Plaintiff was --
A. Okay. Uh-huh.
Q. Sorry to interrupt. Plaintiff was requested to list individuals likely to have discoverable information that she may use to support her claims except for impeachment. And I just want to go through the same exercise, make sure if there's other information that you believe these folks have to give us an opportunity to talk about it here today.
Lindy Blankenship is the first name. Is there any information that you believe Ms. Blankenship has that we haven't already discussed today that you believe is relevant to your case?
A. No.
Q. With respect to Mr. Dixon, is there any information Mr. Dixon has that we haven't already

discussed today that you believe is relevant to your case?
A. No.
Q. Same question with respect to Mr. Grant?
A. No.
Q. And Mr. Hawkins?
A. No.
Q. And Mr. Murphy?
A. No.
Q. And Paula Roland?
A. No.
Q. Mike Smith?
A. No.
Q. Okay. Thank you. Ms. Shipman, did you file a tax return for the year 2012?
A. That's this year, right?
Q. Correct. You would have just filed that in April.
A. Yes.
Q. Okay. Do you recall approximately what your total income was for 2012 in connection with that filing?
A. No.
Q. Did you prepare that yourself or do you have a tax assistant?

A. Assistance, a friend of mine helped me.

MR. GARTLAND: We would just ask, subject to the continuing duty to supplement, the return for 2012 be produced.

And the only other documents I have, Sandra, are the tax return documentation produced by Plaintiff from 2008 to 2011, as well as unemployment benefit documentation produced, which is just this single page.

Can we stipulate as to the authenticity? I don't have substantive questions about the documents.

MS. POLIN: (Nods head.)

MR. GARTLAND: Again, these are documents produced by Plaintiff, we're going to stipulate to their authenticity, if it's a document that Ms. Polin has produced to me. Is that fair?

MS. POLIN: Yes.

BY MR. GARTLAND:

Q. Ms. Shipman, have you approached anyone about offering a statement or testimony in this case on your behalf?

A. Oh, no.

Q. Okay. And just a couple wrap-up questions. Have we discussed all of the claims that you have

asserted against UPS in this lawsuit?
A. Yes.
Q. And have you told me all of the facts that you believe support those claims that you've asserted against UPS in this case?
A. Yes.
MR. GARTLAND: Well, subject to redirect, and I do want to make a statement on the record that, to the extent there are additional documents produced that we wish to reopen the deposition on, we're going to reserve that right. But subject to that statement, I appreciate your patience, I'm finished with my questions.
THE WITNESS: Thank you.
MR. GARTLAND: Thank you. Off the record.
(A DISCUSSION WAS HELD OFF THE RECORD.)
(A RECESS WAS TAKEN FROM 4:42 P.M. TO 4:47 P.M.)

EXAMINATION

BY MS. POLIN:
Q. Okay. Ms. Shipman, I'm going to show you what's been previously marked as Defendant's Exhibit 30 and specifically Attachment A. I know that previously you testified that Mohammed Hussein was a package car driver and that you found out from him that he had been counseled, only counseled about using

the left at button as opposed to being discharged as you were. So could Mohammed Hussein be added to this list as someone who is going to provide testimony in your case?

A. Yes.

Q. Okay. You had previously testified that a Mr. Dalton also was warned in regards to using the left at button and that he was not discharged. Would Mr. Dalton also be added to this list as someone who could provide testimony in your case?

A. Yes.

Q. All right. And then Mr. Tim Pearson, you also previously testified that he was warned, only warned as opposed to discharged for using the left at button. Is Mr. Pearson someone that could be added to this list?

A. Yes.

MS. POLIN: So let the record reflect that, although we have in this deposition added these names, I will also be providing you an amended initial disclosure form or document on behalf of Plaintiff that will add those individuals' names to the list.

MR. GARTLAND: Okay.

BY MS. POLIN:

Q. Ms. Shipman, I'm also going to be showing you what has been previously marked as Defendant's Exhibit 2, and Plaintiff's Responses to Defendant's First Set of Interrogatories and Document Request. And you had previously looked over the names of individuals given in response to interrogatory number 1, and, similarly, I want to ask you in regards to adding Mohammed Hussein's name to this list as he could provide testimony in regards to him be warned only when using the left at button?

A. Yes.

Q. Is it also Mr. Tim Pearson being added to this interrogatory response that he would provide information as to his only being warned for using the left at button as opposed to being discharged?

A. Yes.

Q. And then also Mr. Dalton being added to this response that he also can provide information as to how he was just warned as opposed to being discharged for using the left at button?

A. Yes.

MS. POLIN: And then also we will provide supplement to those interrogatories as well.

BY MS. POLIN:

Q. All right. Ms. Shipman, during your tenure at

UPS, was there a change in procedures regarding how UPS instructed package drivers to record lunch?
A. Yes.
Q. Can you explain what was the change in procedure and then what was done before the instruction and the change?
A. Okay. What we would do -- the change first came about, they came down and the supervisors let us know that you have to put your lunch in the board now, you can't come in to the OMS and tell them that you didn't take a lunch or you can't come in and say, well, I took 15 minutes lunch and that's what I put in the board. We had to put our whole hour lunch in the board, even if we broke it up in 15 minutes, we still had to put the whole hour in.
Q. And do you remember when that instruction came down, in terms of what year?
A. I'm going to say about '09. Seems like '09 or something, I believe.
Q. All right. And what were you all doing in terms of package car drivers before that change was announced?
MR. GARTLAND: Object to the form.
BY MS. POLIN:
Q. Go ahead and answer.

A. We was -- we would come in and we would take our -- if we had time, we would take our lunch before we clocked out if we felt like it and then, if not, we would put in, you know, while we was out, we would put in the -- what we took out on the road, if we took 30 minutes, we'd put in 30 minutes. If we didn't take a lunch at all, we would go to the OMS and we would tell them, I didn't take a lunch today, that's the reason my lunch is not in the board, and we would clock out and go home.

Q. So you all were working without taking lunch?

MR. GARTLAND: Object to the form.

BY MS. POLIN:

Q. As a package car driver, would you sometimes work the whole day without taking lunch?

A. Yes.

Q. And then at some point you were instructed to take a lunch and record it?

A. We was instructed to put our lunch in the board. That's how we was instructed, to put your lunch in the board.

Q. Well, were there some days that even though you put your lunch in the board, you didn't take an hour lunch?

A. Yes.

Q. And why was that?
A. Because if you didn't, you're going to know that -- you're going to be -- you're going to be terminated eventually.
Q. You're going to be terminated for what, not taking lunch or -- or not putting -- not recording the lunch?
A. Not recording the lunch.
Q. Okay. But that wasn't my question. My question was, were there days where you did not actually take a lunch in terms of eating lunch during your day?
A. Yes. Yes.
Q. But you're saying, even during those days where you do not physically take a lunch, you were instructed to record that you took a lunch?
A. Yes.
Q. Do you know why the change in the lunch recording procedure came about?
A. No, they just -- they just changed it and they told us we had to do it.
Q. After the change, did you have occurrences where you forgot to record your lunch?
A. Yes.
Q. Were you disciplined for not recording your

lunch?
A. Yes.
Q. Were you terminated because of dishonesty for not recording your lunch?
A. Yes. I guess -- I was -- yeah.
Q. You were discharged for that?
A. Well, I wasn't taken off the truck, I was -- it was wrote up -- I was wrote up as I was discharged.
Q. So was it an Article 50 discharge, meaning that it was considered a cardinal occurrence and you were immediately taken off the truck?
A. I didn't know about it until they came and told me that I was supposed to been in the office for -- for a -- for a dismissal.
Q. So that was the previous testimony when you said that you didn't miss any days during that discharge?
A. Right, I didn't know about it.
Q. So you continued to work through?
A. Yeah, I didn't even know I was on discharge.
Q. Okay. From what you know about the honesty in employment policy, is failing to record lunch a violation of the honesty in employment policy?
A. No.
Q. Why not?

A. Well, what I know now, the way they getting us for recording packages.
Q. Did you finish your response?
A. Yeah.
Q. Okay. What's -- what's your response?
A. No, I don't look at -- no, no, not being dishonest, no.
Q. What's the difference?
A. There is no difference.
Q. Okay. During your tenure at UPS, was there a change in procedures regarding how UPS instructed you as a package car driver regarding the left at policy?
A. Oh, yes. Yes. Yes.
Q. Okay. Can you tell us what you were instructed to do first?
A. I was instructed to just put -- mash left at by the -- by the name and then record them all as left at and then take it to the main dorm where I dropped the packages off.
Q. And that was -- is that what you did when you were discharged?
A. Yes.
Q. And so did you have an opportunity to do that while you were being retrained by Mike Smith?
A. Yes.

Q. Did you do that particular procedure in front of Mike Smith?
A. Yes.
Q. Did he at any time tell you that that was an improper procedure?
A. No.
Q. So at some later point were you instructed that the left at policy had to be modified?
A. No.
Q. At some point later on was the left at key changed on your DIAD?
A. Oh, yes, when I came back from getting discharged, yes, that's when I found out it had been modified and changed.
Q. So during the time that you were discharged, the way you did the left at procedure, was that a violation of UPS policy?
A. Before I left or when I came back?
Q. When you were discharged for the second time.
A. Uh-huh.
Q. At that point of your second discharge --
A. Uh-huh.
Q. -- grounds being that you violated the left at policy --
A. Uh-huh.

Q. -- was that an actual UPS violation at that time?
MR. GARTLAND: Object to the form.
THE WITNESS: No. No.
BY MS. POLIN:
Q. During your tenure at UPS, was there a change in procedure regarding taking packages off the package car at the end of the drivers' route?
A. Oh, yes. Yes.
Q. Okay. So what was the policy initially that you were used to in regards to the packages on the package car at the end of your route in the evening?
MR. GARTLAND: Object to the form.
THE WITNESS: You would take the packages, just your exception packages off and give it to the clerk, explain it to them and then if you needed to scan it or whatever, you do that. The service cross was no -- it was like it was no -- no big deal but --
BY MS. POLIN:
Q. Not putting a service cross on it?
A. Right. Not putting a service cross on it was really not a big deal 'cause that's for the drivers. So you would take it off and give it to them. And then they changed it and what they would say would be

all -- we want everything off the truck, your will calls, even if they didn't call to ask for it to be will call, we want you to bring all your exceptions off the truck.  So then we had to start bringing our exceptions off the truck.

Then they changed it, then they said, okay, we want you all to just leave whatever is the same day will call, 'cause they changed it then to a same day will call and will call.  So if wasn't a same day will call, you don't bring it off the truck.  And if it was an exception three, they tell us to leave that on the truck.  So it was like it depends on whatever they tell us to do within that time, that's what we do.

Q.   Did it ever get to the point where you were supposed to bring all the packages off the truck?

A.   Yes.

Q.   Okay.  So these different changes that you're talking about, what time frame, what year are we talking about there?

A.   I want to say all during the course of my full-time driving different changes would come about.

Q.   So can you tell us the years in regard to that?  Did you previously testify that you started full-time driving in 2005 or 2007?

A.   2005.

Q. So are you talking about the time frame from 2005 to 2012?
A. Yes.
Q. And can you recall the year where the policy was implemented that you had to take all of the packages off the truck?
A. About the middle of two thousand and -- I want to say about in 2011, 'cause when I got back, that's when they was telling me, you know, this is what we're going to start doing.
Q. So you think that after your return from the second termination was when they had implemented the policy as far as taking all the packages off the truck?
A. Yes.
Q. What, if any, comments did Mike Smith make to you while he was supervising you that you believe were discriminatory?
A. As long as I -- as long as he was my supervisor, I wouldn't be driving for him.
Q. And did he ever tell you what he meant by that?
A. He didn't tell me directly, he mentioned it to some of the other drivers.
Q. Do you recall the other drivers that he

mentioned that to?
A. No.
Q. Were they other drivers in your group?
A. Yes.
Q. Any other statements that Mr. Smith made that you felt were discriminatory?
A. No, besides I move too slow.
Q. Did he make any comments or statements about the money that you made or your salary?
A. One morning I came down the belt and he said to the other drivers on the belt that, he said, I hope you all know Denise made more money than you all did last night, and they just laughed it off, we all just started, you know, to proceed putting our packages in the truck.
Q. So did you laugh off the comment that he made about how -- as long as he was supervising you, you weren't going to be driving?
MR. GARTLAND: Object to the form.
THE WITNESS: I just -- I just went on and got on my truck and kept on going.
BY MS. POLIN:
Q. Did you consider that a joke?
A. No.
Q. I'm going to show you what has been previously

marked as Defendant's Exhibit 19, which is titled, South Atlantic District Discrepancy Review Form Certification.  Does that form have your signature on it?

A.   No.

Q.   Is there a place for an employee's signature?

A.   Yes.

Q.   Does it have a manager's signature on it?

A.   No.

Q.   Does it have a place for management's signature?

A.   Yes.

Q.   Does it have date lines on it for dates?

A.   Yes.

Q.   Do you recall this being reviewed with you?

A.   No.

Q.   Okay.  I'm going to hand you what's been marked as Defendant's Exhibit 20, it's entitled, South Atlantic District Discrepancy Review Form.  Does that have an employee signature line on it?

A.   Yes.

Q.   Does it have your signature on it?

A.   No.

Q.   Is it dated?

A.   No.

Q. Does it have a management signature line on it?
A. No. Yes.
Q. Does it have a manager's signature on it?
A. No.
Q. I'm going to hand you -- all right. I'm going to hand you what has been marked as Defendant's Exhibit 7, multi-page packet, and I'm going to be turning to the third page in that packet, which is entitled, Sent Again and Group 2 Exception Procedure Certification. And at the top it's -- in handwriting it says, final warning.
A. Yes.
Q. And it has your signature, Michael Smith as the supervisor, dated September 22nd, '08. What does final warning written on this form mean to you?
A. It means that that's my final warning. If I don't remove the futures -- if I don't remove all the packages off the car, then I'm going to get terminated.
Q. Okay. Do you know if you received from Mr. Smith a separate final warning letter?
A. No.
Q. No, you don't remember or, no, you didn't receive one?

A. I don't -- I don't think I received one. I don't remember receiving one.

Q. Yesterday Mr. Smith testified that he used a template in issuing final warnings. Is this document here a letter that's setting out a warning to you?

A. No. He brings this around every morning. That's for us to look at but we don't know the packages was there or what. He just bring that around to us in the morning time.

Q. Do you know if your Collective Bargaining Agreement requires that warnings are issued in letter form?

A. Yes.

Q. Would this -- based on your knowledge, would this comply with the Collective Bargaining Agreement?

A. No.

Q. This particular document constituting or supposedly constituting a final warning?

A. No.

Q. Did you receive a call from the EEOC representative saying that they had conducted an investigation in your case?

A. I don't remember.

Q. Do you recall ever finding out whether they conducted an investigation in your case?

A. I don't remember.
Q. Okay. I'm showing you what's been marked as Defendant's Exhibit 27. Again, this is a multi-page packet, with the first letter being from Rodney Rosebrough, the business manager, addressed to you, dated November 20th, 2000. If you could look at that and tell me, what is the nature of that document?
A. This right here is an official warning notice for when I was in small sorts for missorts. So this is an official warning letter.
Q. Okay. So this is a written warning, the last paragraph, can you read that last sentence or the last paragraph?
A. Yes. It says, this is an Official Warning Notice per the current labor agreement.
Q. Okay. And the first paragraph, can you read that for me?
A. Okay. It says, on November 16, 2011 (sic), a meeting was held in the Raleigh center, present with you, union representative, that's Susan, I can't pronounce her last name, and Supervisor Kersat. Discussed was your failure to follow your supervisor's instructions, company methods and procedures.
Q. Okay. So Mr. Rosebrough sets out that this warning letter was in regards to a failure to follow

supervisor's instructions, company's methods and procedures?
A. Yes.
Q. All right. Turning to the second page in this same package in this Exhibit 27. This is an August 28, 2002 letter by Chris Smith, the business manager.
A. Uh-huh.
Q. And, again, Mr. Rosebrough was the business manager in the Cary?
A. No, that was when I was in the building doing the combo.
Q. All right. Was Chris Smith the business manager in the Cary facility?
A. Yes.
Q. Okay. And if you can look at this letter and tell me what the -- what this letter is?
A. It is an official warning notice.
Q. Okay. And, again, the paragraph or the sentence right before the signature line, if you could read that.
A. It says that this is an Official Warning Notice per the labor -- current labor agreement.
Q. All right. And then the first paragraph of the letter, can you read that?

A. On August 26th, 2002, you were involved in an auto accident. A review of this accident has been conducted and it has been determined that the accident was avoidable.

Q. Okay. Now, for this letter on August 28th, 2002, is there any doubt in your mind that this is an Official Warning Notice per the current labor agreement?

A. No, there's no doubt.

Q. It's clear?

A. It's clear.

Q. For the November 20th, 2000 letter, is there any doubt in your mind that this is an Official Warning Notice per the current labor agreement?

A. No.

Q. It's clear?

A. It's clear.

Q. For the November 20, 2000 letter, the fact that this warning notice is for your failure to follow your supervisor's instructions, company methods and procedures, is that made clear in this letter?

A. That's clear.

Q. For the August 28, 2002 letter, is it clear that this official warning notice was because you were in an accident and the -- auto accident and the

accident was avoidable? Is that clear?
A. That's clear.
Q. Are these letters, in your experience, are these letters in compliance with the progressive discipline under the Collective Bargaining Agreement?
A. Yes.
Q. Do these Official Warning Notices provide you notice as to why you're being disciplined?
A. Yes.
Q. Do they provide you notice as to what could happen if you have another incident as -- that falls under the category of this incident?
A. Yes.
Q. Okay. Let me have you read the third paragraph in this letter.
A. In the event you have another avoidable accident, you could be subject to many -- no -- more severe disciplinary action up to and including discharge, per the current labor agreement.
Q. All right. Could you read for me, going back to November 20th, 2000 letter by Mr. Rosebrough, the fourth paragraph in this letter.
A. In the future, you should again fail to follow any of your supervisor's instructions, company methods or procedures, you will be subject to future (sic)

discipline action, up to and including discharge.
Q. Okay. So you know what incident will produce further discipline from this letter?
A. Yes.
Q. I'm going to show you the November 15th, 2002 letter, which is the third letter in this packet. This is a letter by Les Abshire, business manager. Was he business manager in the Cary division?
A. Yeah. Les Abshire was -- he was over the -- over the hub. This was when I worked in the hub.
Q. All right. And, again, this is a letter to you?
A. Uh-huh.
Q. Can you look at this letter and determine what kind of letter this is?
A. This is an Official Warning Notice per labor agreement.
Q. Right there in the letter?
A. Yes.
Q. Okay. And can you look at the first paragraph and read to me the first paragraph.
A. On November 13, 2002, a meeting was held in the Raleigh center. Present were you, union representative Johnny Gentry and supervisor Kersat.
Q. Now, it just says, J. Gentry here?

A. Yeah. I say Johnny. Discussed was your failure to follow your supervisor's instructions, company methods and procedures concerning missorts, the most recent occurrence being November 7th, 2002.

Q. Okay. Here, this letter, you know that the notice is being given, the specific action, again, is failure to follow your supervisor's instructions, company methods and procedures, correct?

A. Yes.

Q. And you believe that this is in compliance with progressive discipline policies under the Collective Bargaining Agreement?

A. Yes.

Q. You believe that this provides you notice as to what discipline is being looked at here?

A. Yes.

Q. All right. Chris Smith, Cary center manager, March 6th, 2009, can you tell me from this letter what's the purpose of this letter?

A. It's a warning letter for failing to record my lunch.

Q. Okay. And how do you know this is the warning letter?

A. It says it right here, a warning letter for failure to record lunch.

Q. All right. And if you look at this letter, can you tell me what disciplinary grounds is the basis for this warning letter?
A. It says -- oh, okay, okay. It says that, it's just a warning and avoid the need for more serious discipline action up to and including termination of your employment with UPS. That's telling me, don't -- make sure I put the lunch in there.
Q. Does it use the language that Les Abshire uses or Rodney Rosebrough used in terms of failing to follow your supervisor's instructions, company methods and procedures?
A. No. You failed to record your hour lunch. Oh, yes, it does tell us. You are required to keep adequate records for my lunch.
Q. It says which you're required to keep but does it say what you violated?
A. No. No.
Q. Okay. March 26th, 2009 letter from Chris Smith to you. If you look at that letter, can you tell me what -- what that is?
A. This right here is a letter that, whereas they want you to do so many stops per hour. And to Mike I wasn't up to par with doing up to the plan day that the computer generated out to say that this is how

many stops she should be doing per hour.
Q. Is this a warning letter?
A. No, it don't say it's a warning letter.
Q. Okay. So it does not clearly designate that this is an Official Warning Letter per the labor agreement?
A. huh-uh, it doesn't even say anything about the labor agreement.
Q. All right. Does it say that you're violating any of the company's policies in the first paragraph or anywhere else?
A. No.
Q. All right. The April 15, 2009 letter from Chris Smith to you. If you want to review that. Does this say this is an Official Warning Letter?
A. No.
Q. Does it say what official UPS policy you're violating?
A. No.
Q. All right. This June 30th, 2009 letter from Chris Smith, Cary business manager. What is this in regards to?
A. It says, Notification of Suspension, reference failure to follow instructions concerning my lunch.
Q. And how do you know that it's a suspension

notification regarding failure to follow instructions?
A. 'Cause it's right here.
Q. Okay. It's in the regarding line of this letter. All right. And then do you know what will happen if you get another incident in regards to failure to follow instructions?
A. Yes, 'cause it says right here, as a result of your failure to correct this problem, you're being -- it tells you that you could be suspended, but here it says it was a one-day suspension.
Q. All right. And does the letter tell you what happens if another incident occurs?
A. Oh, yes. Yes, it does, right here. It said that more serious discipline action and up to termination of your employment with UPS.
Q. Okay. So this letter -- does this letter meet the progressive discipline policies under the Collective Bargaining Agreement, in your opinion?
A. Yes.
Q. All right. I'm going to show you the August 13, 2009 letter from Chris Smith, the Cary center manager, to you. And if you can look at that, can you tell me what is the nature of that letter?
A. It's an Article 7 discharge letter concerning failure to record the lunch.

Q. All right. So I had previously asked you about whether you believed you could be discharged under the dishonesty policy for failure to record lunch. This is a discharge for failure to record lunch. Is it under Article 50?
A. No, it's up under Article 7.
Q. All right. So do you know the difference between under the Collective Bargaining Agreement between an Article 7 discharge and an Article 50 discharge?
A. I'm learning now.
Q. Well, what have you learned?
A. I'm learning that the Article 7 is a more of a progressive towards discharge, Article 50, you automatically just get discharged.
Q. A failure to record lunch?
A. Uh-huh.
Q. Do you believe that Chris Smith could have looked at your failure to record lunch and say that you were being dishonest and, therefore, terminate you per Article 50?
A. He could have 'cause he's the boss, he can do whatever he wanted to do.
Q. Okay. The final letter is September 11, 2009, from Chris Smith, Cary center manager. Can you look

at this letter and tell me what kind of disciplinary letter, if any, it is?
A. It just says, Notice of Discharge, failed to follow instruction.
Q. Again, right there in the regarding line?
A. Yeah.
Q. Okay. And does this letter recount the prior incidents of failing to follow your supervisor's instructions or failing to properly record your lunch?
A. Yes.
Q. So the first paragraph refers to a March 6th, 2009 incident where you received a warning letter; is that correct?
A. Yes.
Q. The second paragraph refers to a June 24th, 2009 letter where you, again, failed to follow your supervisor's instructions; is that correct?
A. Yes.
Q. And it says, as a result of your failure to correct this problem, you were notified of a one-day suspension on June 30th -- that should be 2009.
A. Okay.
Q. And then the third paragraph says, on August 7, 2009, once again you failed to record your one hour lunch per supervisor instructions and company

methods. In a local level hearing on July 8, 2009, you were given a final warning concerning this matter. As a result of your continued failure to correct this problem, your employment with UPS was terminated by letter dated August 13th, 2009; is that correct?

A. That's what it says.

Q. On September 1st, 2009, once again you failed to follow your supervisor's instructions, you failed to remove a package qualifying as a Group 2 exception from your package car. Group 2 exceptions must be recorded by the PM clerks in order to provide our customers with the tracking information they expect. Your failure to remove this package from your car resulted in the failure to properly serve our customers. As a result of your continued failure to correct this problem, your employment with UPS is hereby terminated.

Do you have any doubt as to the progressive discipline that was administered to UPS -- from UPS to you here?

A. No.

Q. Is this letter clear in regards to progressive discipline?

A. Yes.

Q. So I'm showing you what has been marked

previously as Defendant's Exhibit 10. This is a March 1, 2011 letter from Lindy Blankenship to you. Can you look at this letter and tell me what the purpose of this letter is?

A. It's Notification of Termination and it says, for work not performed, dishonesty, and overall work record.

Q. So is it your understanding that your first termination was for dishonesty, compensation for work not performed, and overall work records?

A. Yes.

Q. And does this letter indicate that your employment was terminated per Article 50 of the current labor agreement?

A. Yes.

Q. And in that paragraph does it again tell you what the grounds for the termination are?

A. For overall work record, receiving compensation for work not performed, and dishonesty.

Q. Compensation for work not performed?

A. Yes, compensation for work not performed.

Q. All right. I'm going to hand you what's been marked as Defendant's Exhibit 11. Can you look at that and tell me what that is?

A. It's the Teamsters Local Union Agreement from

the local level here.
Q. Well, and the reason that you know it's the agreement, is it because the handwriting in the resolution block says what that situation is?
A. Yes.
Q. Okay. Can you look at the nature of the complaint and indicate what the complaint says were the grounds for your termination?
A. For an alleged compensation for work not performed, dishonesty, and overall work record.
Q. Can you tell from this resolution block if the 95-day suspension included the dishonesty charge?
A. No.
Q. Well, can you read that.
A. Okay.
Q. And you're reading under remedy requested, that's not necessarily the remedy you received, that's what the union was requesting on your behalf?
A. Right.
Q. Okay. What does that say?
A. It says the local union requests that Denise Shipman be reinstated to his or her position, that this discharge be removed from his or her file and record, and that he or she be made whole for all lost wages, benefits, and result from this discharge -- as

a result from this discharge.
Q. Did you receive that?
A. No. This right here is the union, this is what they put in as to what they want, what they expect the remedy should be.
Q. Well, what remedy did you receive?
A. I just went back to work.
Q. Did you receive the discharge being removed from your file and record?
A. No.
Q. Did you receive lost wages and benefits resulting from the discharge?
A. No.
Q. And you were out for how long? Previous testimony says 95 days. Do you agree with that?
A. Yes, 95 days.
Q. So when you went back to work, what happened to your dishonesty discharge?
A. It stayed in my file. It was supposed to have been dropped -- oh, they dropped the dishonesty charge.
Q. Let me show you what's been marked as Defendant's Exhibit 12. This is a letter dated July 27th, 2011, from Lindy Blankenship to you, can you read the first paragraph.

A. It said, on March 1st, 2011 you was terminated in occurrence (sic) with Article 50 in the current labor agreement for just cause, dishonesty, and compensation for work not performed and overall work record.

Q. All right. And then can you read the second paragraph?

A. On June 29th, 2011, a meeting was held with your business agent, Steve Bishop, and labor manager, Lester Grant, based on your firm commitment to correct your unacceptable behavior, it was agreed to reduce your termination to 95 days of suspension for dishonesty, compensation of work not performed, and overall work record. Your return work date was July 5th, 2011.

Q. Okay. So what's the unacceptable behavior here? Does the letter set out what the unacceptable behavior is?

A. No.

Q. Does the letter set out what happened to the dishonesty discharge?

A. No.

Q. In fact, doesn't the letter say it was agreed to reduce your termination to a 95-day suspension for dishonesty, compensation for work not performed, and

overall work record?
A. Yes.
Q. Was the dishonesty charge dropped?
A. Yes.
Q. Well, then why does it still say here, dishonesty? Do you know what happened to the dishonesty charge in regards to the settlement agreement after your first termination?
A. It was supposed to get taken out of my file but it stayed in there.
Q. Do you know how you can be given a 95-day suspension on a dishonesty charge?
A. No.
Q. Don't you have to be terminated on a dishonesty charge?
MR. GARTLAND: Object to the form.
THE WITNESS: That's -- under Article 50, yes.
BY MS. POLIN:
Q. I'm giving you what's been marked as Defendant's Exhibit 14. It's dated August 29th, 2011, by Lindy Blankenship to you. Can you tell me what this document is?
A. It's a Notice of Termination and for dishonesty and compensation for work not performed.
Q. So is this in relation to your second

termination?
A. Yes.
Q. Does this say anything about overall work record? Okay. So it says, overall work record, receiving compensation for work not performed, and dishonesty in the second paragraph of the letter but not in the reference part?
A. Correct.
Q. Does it say anything about failing to follow your supervisor's instructions, company methods and procedures?
A. No.
Q. Does it say anything about falsification of methods and procedures or records resulting in compensation for work not performed?
A. No.
Q. You can find the phrase in there, falsification for methods or records?
A. No, it doesn't say -- no, it doesn't say falsification, no.
Q. Does it say specifically what in your work record is unacceptable? Does this letter in any way refer to your first termination in March of 2011?
A. No.
Q. Does it refer to any other disciplinary

incidents prior to August 19, 2011?
A. No.
Q. I'm going to show you what's been marked as Defendant's Exhibit 15. Can you identify this document for me?
A. Yes. This is what the teamsters submitted the complaint to the panel, to the union.
Q. All right. And can you tell me what the grounds of discharge are listed in the nature of the complaint, which reads, unjust and/or improper discharge?
A. Okay. For dishonesty and compensation for work performed, that's what it was -- that's what I was discharged for.
Q. Does it say failure to follow your supervisor's instructions, company methods and procedures?
A. No.
Q. Does it say falsification for records resulting in compensation for work not performed?
A. No. No.
Q. Does it say overall work record?
A. No.
Q. Handing you what's been marked Defendant's Exhibit 17. Can you look at that and tell me what

that is?
A. This is the panel decision.
Q. All right. And then under the decision can you read for me what that says?
A. It says, the discharge is reduced to time served suspension. The grievant is instructed to properly record all packages. Non-Precedent. No Reference.
Q. What does that mean, non-precedent and no reference?
A. That means --
Q. Has that ever been explained to you either by management or union representatives?
A. No.
Q. Does this say what the time served was?
A. No.
Q. Does this say what the suspension is being served for in terms of what the specific violation is?
A. No.
Q. Does this say whether the dishonesty charge was dropped here?
A. No.
Q. I'm going to hand you what has been marked as Defendant's Exhibit 23. Can you identify for me what that is?

A.   This is the grievance decision in April 2012.
Q.   All right.  And what is -- if you could just turn to the second page of that document and read for me what the decision of the panel hearing was there?
A.   Okay.  Based upon the present (sic), including testimony of the grievant, just cause was shown for the discharge of the grievant for continued failure to follow methods and procedures, including particularly those related to proper recording of the package.
The charge of dishonesty, however, have not been proven.
Q.   All right.  Now, the phrase, continued failure to follow methods and procedures, had you seen that phrase anywhere else in your disciplinary letters? The letters we just went through?
A.   No.
MR. GARTLAND:  Object to the form.
THE WITNESS:  No, I haven't seen it.
BY MS. POLIN:
Q.   Any of the letters from Lindy Blankenship, did they say that your discharge was for failing to follow methods and procedures?
A.   No.
Q.   So then how can this discharge be for continued failure to follow methods and procedures?

A. I don't know. I don't know.
Q. What does the second sentence there say?
A. The charge for dishonesty, however, has not been proven.
Q. So if the charge of dishonesty was not proven, then how could the discharge upon dishonesty be sustained?
A. I don't know.
Q. Do you believe that the way you were disciplined in this matter was discriminatory based on your age?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Do you believe the way you were disciplined throughout your three terminations was discriminatory based as your status as an African-American?
A. Yes.
Q. Do you believe that the manner in which you were discharged over the three terminations was discriminatory based on your status as a female?
A. Yes.
Q. Do you believe that the way you were terminated over the three terminations was a breach of your Collective Bargaining Agreement?

A. Yes.
Q. Do you believe that the manner in which you were disciplined over the three terminations was conducted in bad faith?
A. Yes.
Q. You had previously testified that your Route 31A includes North Carolina State campus; is that correct?
A. Yes.
Q. And on that route, the North Carolina State campus stops included both professors' offices and campus buildings, as well as dormitories, correct?
A. Correct.
Q. Now, you previously testified that you saw, closed, when you were running that route on January 3rd; is that correct?
A. Yes.
Q. The closed sign that you saw, was that in reference to dormitories?
A. Yes.
Q. So that wasn't in reference to office buildings that housed professors' offices?
A. No.
Q. So the closed sign that you saw in regards to the dormitories, is that the closed sign where you

said they were closed for -- until January 6th?
A. Yes.
Q. And what was your knowledge in regard to the reason why the dormitories were closed until January 6th, 2012?
A. 'Cause the students don't come back until January the 6th.
Q. All right. So it is your testimony that some of those packages on that truck that Mr. Hawkins took off your truck, those were packages that were going to go to those closed dormitories?
A. Yes.
Q. Is it your testimony that some of those packages had already been assigned to the future cage?
A. Yes.
Q. Is it your testimony that you didn't know how some of those future packages got back on your truck?
A. Yes.
Q. To your knowledge, were any of those packages that were found on your truck repackaged?
A. No.
Q. Do you have a knowledge as a former UPS worker what it means when a package is repackaged?
A. When the package is repackaged, that means that the package has been damaged in some way and we

had to put it into another container and then ship it out with that container with the same shipping number.

Q. And is it your testimony that you don't recall reviewing documents that said the packages found on your truck were repackaged in order to provide the actual packages found as evidence of this dishonesty of you?

A. No.

Q. Okay. I'll come back to that because I'm going to have to get some copies made.

MR. GARTLAND: Can we go off the record for a second?

(A DISCUSSION WAS HELD OFF THE RECORD.)

BY MS. POLIN:

Q. Would packages ever be repackaged so that new labels could be made and put on the package?

A. Yes.

Q. Why would -- why would that occur?

A. It should only occur if the package has been damaged. That's the reason why it should only occur. Now, if you want to take the contents out of the package and then redo the package and then save the old label, that could be something that could be done but that's not what's supposed to be done.

Q. Well, if I told you that I have a document

that I'm going to be putting in evidence where, from the Atlantic Area Parcel Grievance Committee, the company statement is that from the packages found on your truck, the contents were repackaged in order to provide the actual packages found as evidence of the dishonesty. How would you explain why the packages were repackaged?

A. Only thing I can think of is they took the contents out, put it in a new package and just saved the label. That's all I can think of.

Q. Save the label or reissue the label?

MR. GARTLAND: Object to the form.

THE WITNESS: They reissued a new label for the package that -- for the contents of the new package and then they saved the old label for whatever purpose.

BY MS. POLIN:

Q. Okay. You've heard prior testimony that your manager, your former manager Mike Smith rode on a driver's route when the driver was suspended and actually drove the car -- drove the truck. And do you believe that that was a breach of the Collective Bargaining Agreement?

MR. GARTLAND: Object to the form.

THE WITNESS: Yes.

BY MS. POLIN:
Q. And why do you believe that that was a breach of the Collective Bargaining Agreement?
A. Because if your license is suspended and you're driving, you're supposed to go home or work in the building until you get a current license. And, also, we have cover drivers and a supervisor's not supposed to run a route because we have cover drivers that actually drives the route, they can run that route for them.
Q. So your understanding is that a cover driver was supposed to be used in that case?
A. Yeah.
Q. Now, was that the same day, February 21st, 2011, that Mike Smith was supposed to be riding with you to provide an additional day's training on that Route 31A?
A. Yes.
Q. And how was the agreement made that he was supposed to be riding with you that morning?
A. He had told me Friday, he said, Denise, you get ready and make sure that you got your stuff together because I'm going to be with you all day. So I said, okay.
Q. So when you came in that morning and found out

that Mike Smith was not going to be riding with you that day --
A. Uh-huh.
Q. -- was that one of the reasons why you were hesitant to go out on the route by yourself?
MR. GARTLAND: Object to form. Counsel is testifying.
THE WITNESS: That morning when I went to the truck, I just -- I looked and I actually said, I did tell Lindy when I went through, I said, Lindy, now I'm going to need some help, and then I kept texting all day, I need some help, I need some help.
BY MS. POLIN:
Q. So your testimony is contrary to prior testimony that you -- did you wait till 4:00?
A. No, no, no, no.
Q. When did you start asking management for assistance?
A. As soon as I left the building, as soon as I was driving out of the building and all during the course of the day, all that morning, all during the course of the day.
Q. Give us a time, please.
A. I want to say, I started around about 10:00,

about 10:00, about every hour I was texting them on the board, telling them I needed help.

Q. All right. So when you say, texting them in the board, are you saying you used your -- the DIAD?

A. Yes.

Q. Did you communicate with them any other way to ask for help?

A. No, it was mainly through the board.

Q. And can you estimate how many times you asked for help that day?

A. I'd say about 12, about 12 times.

Q. 12 times.

A. Uh-huh. About 12 times.

Q. Now, you heard prior testimony from Ms. Blankenship Hill on Tuesday that Mr. Smith came in and told her that he was going to go out and help you; is that correct?

A. Uh-huh.

Q. And you heard testimony yesterday from Mr. Smith that Ms. Blankenship Hill told Mr. Smith to go out and help you; is that correct?

A. Uh-huh.

MR. GARTLAND: Object to the form.

BY MS. POLIN:

Q. Do you know if Mr. Smith was monitoring your

progress during that day?
A. I know Lindy was, Ms. Hill was monitoring my progress during the day.
Q. And how do you know that?
A. Because she would send me messages, you need to -- you need to -- you need to pick up your pace, you need to do this, and I be like, I need some help, I need some help, and then, you know, during the daytime she was sending me messages.
Q. Do you know when Mr. Smith was out running the route for the driver whose license was suspended?
A. When was he?
Q. Do you know when during the day that was?
A. Oh, all day, all day.
Q. So if he was out in another package car all day, is there technology where he could also monitor you?
A. No.
Q. Did you hear Mr. Smith testify yesterday that by the time he came out to help you in the field, it was too late?
A. Yes.
Q. Did you hear him testify by the time he came out to help you it was 4:00?
A. Yes.

Q. Did you hear him testify that he concluded that you had a meltdown?
A. Yes.
Q. Was part of the reason for that meltdown the fact that you expected him and you were relying on him to be with you in the car -- in the truck that day?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Did you hear him testify yesterday that since that day, February 21st, and before that day, he had never seen as many service failures as happened that day?
A. Yes.
Q. Did you know at the time that incident angered Mr. Smith?
MR. GARTLAND: Object to the form.
THE WITNESS: I knew when they came out on the truck that they was angry.
BY MS. POLIN:
Q. And how did Ms. Blankenship Hill respond to your performance that day?
A. She was at the building when I came back in with the truck and she was very upset. She said, I don't want to talk to you, I don't want to see you,

you just clock out.
Q. Do you believe Ms. Blankenship Hill purposely failed to provide you assistance an February 21st, 2013 (sic)?
A. Yes.
Q. Do you believe that failure to provide assistance was based on your status as an African-American?
A. Yes.
Q. Do you believe that that failure to provide you help was based on your status as a female?
A. Yes.
Q. Do you believe that that failure to provide you with assistance on February 21st, 2013, was based on your status as someone over 40 years of age?
A. Yes.
Q. You had previously testified that Ms. Blankenship Hill made a statement to others that she was going to, was out to get you; is that correct? Is that your testimony?
A. Yes.
Q. Do you believe that that statement was made because you were African-American?
A. Yes.
Q. Do you believe that statement was made because

you were female?
A. Yes.
Q. Do you believe that statement was made because you've over 40 years of age?
A. Yes.
Q. Do you believe that Mrs. Blankenship Hills' discharge of you the first time, March 2011, and that discharge being classified as dishonesty, was based on your race?
A. Yes.
Q. Do you believe that it was based on your gender as a female?
A. Yes.
Q. Do you believe it was based on the fact that you were over 40 years of age?
A. Yes.
Q. Do you believe that Ms. Blankenship Hill was the one who instructed Michael Smith the morning of February 21st, 2011 not to ride with you but to ride with the driver whose license was suspended?
MR. GARTLAND: Object to form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Do you believe that Ms. Blankenship Hill in a managerial role could have assigned a cover driver to

drive with the driver whose license was suspended?
A. Yes.
Q. Do you believe that Ms. Blankenship Hill instructed Mr. Smith to ride with the driver so as that you would go out on that route by yourself?
MR. GARTLAND: Object to form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Do you believe that her decision to prevent Mr. Smith from riding with you was based on the fact that you are African-American?
MR. GARTLAND: Object to form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Do you believe that that was based on the fact that you were female?
MR. GARTLAND: Object to form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Do you believe that that was based on the fact that you were over 40 years of age?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Your previous testimony was that for the

second termination others had received a warning for using the left at procedure whereas you were terminated; is that correct?

A. Yes.

Q. Do you believe that Ms. Blankenship's discharge under the grounds of dishonesty for you using the left at procedure was discriminatory based on your race?

MR. GARTLAND: Object to the form.

THE WITNESS: Yes.

BY MS. POLIN:

Q. Do you believe that it was discriminatory based on your status as a female?

MR. GARTLAND: Object to the form.

THE WITNESS: Yes.

BY MS. POLIN:

Q. Do you believe that it was based on discrimination of you being over 40 years of age?

MR. GARTLAND: Object to form.

THE WITNESS: Yes.

BY MS. POLIN:

Q. Do you believe that the decision to keep you out of work for 95 days unpaid suspension was discriminatory based on your African-American status?

MR. GARTLAND: Object to form.

THE WITNESS: Yes.
BY MS. POLIN:
Q. Do you believe that your 95-day unpaid suspension was discriminatory based on your status as a female?
MR. GARTLAND: Object to form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Do you believe that your 95-day unpaid suspension was discriminatory based on you being 40 years of age or older?
A. Yes.
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. On the date of January 3rd, 2012, is it your testimony -- well, describe the circumstances where the packages were taken off of your car by Mr. Greg Hawkins.
A. I pulled into the building and I backed the truck up to the table that we take them off, at the exception table, and Greg comes over and I said -- he said, hand me your packages, I said, Greg, I say, I'm going to explain some things to you, I said. He said, no need to explain to me, just hand me the packages.

I can't even go see my daddy 'cause I got to be here to audit you and he in the hospital. I said, don't be mad at me, I'm not the one making you stay here, Lindy is. Just hand me the packages 'cause I need to go and at least check on them a little bit.

So I started handing him the packages to try to tell him about the packages, that they need to go back in the future cage, or the books, we need to find out exactly where they need to go to and where these professors was. So he didn't want to hear nothing I had to say, so I just handed him the packages, he told me, he said, go park your truck and clock out, and that's what I did.

Q. Was it your plan to take the packages -- well, what was your plan before he told you to clock out?

A. Oh, my plan was to come in, go to the exception table and explain all these packages to the clerk. And then I was going to scan them, that way, I told them, make sure this gets back in the future cage and not back on my truck or make sure this get to where it needs to go to or back to the shipper.

Q. So how many packages are we talking about Mr. Hawkins taking from your truck at that point?

A. I don't remember how many it was.

Q. The number of the packages, were you going to

take each one of those to the clerk?
A. Yes, because my truck was right there at the table so all I had to do was just -- because one was over a 70-pounder.
Q. So did Mr. Hawkins, in taking the packages from you, prevent you from completing your duties?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Were you still on the clock when you pulled in to the facility?
A. Yes.
Q. Would you have still been on the clock when you explained the status of each package to the exception clerk?
A. Yes.
Q. Would you have still been on the clock when you scanned each package after talking to the exception clerk?
A. Yes.
Q. Do you believe that Mr. Hawkins' actions regarding taking your packages interrupted your workflow?
A. Yes.
Q. Do you believe that Mr. Hawkins' actions

interrupting your workflow was a breach of the Collective Bargaining Agreement?
A. Yes.
Q. Do you believe that Mr. Hawkins' actions in interrupting your workflow was discriminatory based upon your race?
A. Yes.
Q. Do you believe that Mr. Hawkins' actions interrupting your workflow was discriminatory based upon your age?
A. Yes.
Q. Do you believe that Mr. Hawkins' action in interrupting your workflow was discriminatory based on your gender?
A. Yes.
Q. Do you believe Mr. Hawkins' actions in interrupting your workflow and taking your packages was conducted in bad faith?
A. Yes.
Q. When Mr. Hawkins told you to leave the truck and clock out, what did you do?
A. I went and parked my truck in my spot that I park in, in my space, 'cause we have a space that we all have to park our truck in. I parked my truck in the space and I clocked out. I did all my post trip

and did everything I needed to do and then I clocked out, put my DIAD in the slot and walked on out.

Q. Did you attempt to deliver those packages earlier in the day?

A. Yes.

Q. So when you pulled in to the facility, what needed to be done to the packages?

A. I needed for the dorm packages to go back into the future cage, the ones to where I had already been to the building. I needed for them to get these books to where they need to be at or send them back to the shipper, because they didn't need to keep going back on my truck over and over again.

Q. So do you recall the nature of the packages that you were not able to deliver?

A. Now I can the more I talk about it.

MR. GARTLAND: Object to the form.

THE WITNESS: Yes.

BY MS. POLIN:

Q. What were the nature of the packages?

A. The over 70 one was a soap box, it went to the dormitory there, the other one was mostly of Wiley, with like books that goes to the professors. That's it.

Q. And so what needed to be done to those

packages?
A. To find the proper place that they need to go because the people are saying that these professors, they weren't there anymore or they're saying, this don't go here.
Q. So how would you determine where they needed to go?
A. That was when I was going to take it to the exception and let them know, this been in the system too long, I've been had these packages too long, either we find where they go to or we send it back to the shipper for them to resend them again.
Q. Did the packages have service crosses on them?
A. Before when I had them, yes, but not this last time.
Q. So when were the service crosses going to be administered?
A. When I was going to explain it to the clerk.
Q. Were the packages scanned into the system?
A. I was going to scan it when I was going to tell the clerk about it.
Q. So you were going to complete the work on those packages after you were going to discuss the status with the packages?
A. Yes. 'Cause I wanted them to go directly

where it's supposed to go so I wouldn't keep getting it back again.
Q. Is it your testimony that Mr. Hawkins prevented you from doing that?
A. Yes.
Q. Do you believe that Ms. Blankenship Hill refusing you assistance on February 21st, 2011 created a hostile work environment?
MR. GARTLAND: Object to form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Do you believe discharging -- Ms. Blankenship Hill discharging you for dishonesty in March of 2011 created for you a hostile work environment?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Do you believe being returned to Ms. Blankenship Hill as a manager after your termination, after the first time and after the second time, created for you a hostile work environment?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Do you believe that you being returned to Ms.

Blankenship Hill as a manager after your first termination, your second termination was retaliation after you grieved your terminations?

MR. GARTLAND: Object to the form.

THE WITNESS: Yes.

BY MS. POLIN:

Q. Do you believe that being returned to Ms. Blankenship Hill as your manager after the first termination and second termination violated the progressive discipline policy?

MR. GARTLAND: Object to the form.

THE WITNESS: Yes.

BY MS. POLIN:

Q. Do you believe that they violated -- those actions violated the Collective Bargaining Agreement?

MR. GARTLAND: Object to the form.

THE WITNESS: Yes.

BY MS. POLIN:

Q. Do you believe that -- you previously testified that you were sent home occasionally and someone else ran your route. Do you believe that that particular action was discriminatory based on your race?

A. Yes.

Q. Do you believe that that action was

discriminatory based on your status as a female?
A. Yes.
Q. Do you believe that that action was discriminatory based on you being over 40 years of age?
A. Yes.
MR. GARTLAND: May we take a break so I can change my travel plans?
MS. POLIN: Yes. Yes.
(A RECESS WAS TAKEN FROM 6:17 P.M. TO 6:21 P.M.)
BY MS. POLIN:
Q. Ms. Shipman, both Ms. Blankenship Hill and Mr. Smith answered my questions in regards to the gate key that was used to run the Route 31A and you not having the gate key on January 3rd and January 4th, 2012 to run your route. Can you explain what the gate key is used for and what happened on January 3rd and January 4th in regards to you not having the gate key?
MR. GARTLAND: Object to the form.
THE WITNESS: Okay. The gate key, you use it to get off and on certain sections of N.C. State that's on my route, that's on 31A route. The gate key, it allows you to get to the building to where you can make your deliveries and go to your next section and make that delivery.

And if you don't have the gate key, you would have to wait at the gate or park the vehicle, park the truck in a section to where you don't need a gate key and then you have to walk to that area to deliver the package or you have to load the packages on a handcart and walk all the way there to deliver the package and then walk back.
BY MS. POLIN:
Q. Did not having a gate key on January 3rd and January 4th affect your performance in completing the route?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. How so?
A. It slowed me down, I had to walk, I had to wait, it just slowed you down, you couldn't -- you couldn't get the work performed, you know, at a steady pace. You just couldn't get it done at a steady pace.
Q. On January 3rd, 2012, can you recall whether you completed that route that day?
A. Yes, I completed it.
Q. By the time you had come back to UPS in November of 2011 and working the route from November 2011 through the holidays, had you become

more proficient on that route?
A. Oh, yes. Yes.
Q. Did you inform management that a new gate key was going to be needed to operate the route in 2012?
A. Yes, I told them in December when they put the postings up on N.C. State campus, I let them know.
Q. Who did you let know that you needed a new gate key?
A. I let Greg Hawkins, which was my supervisor, I let him know every single day, when I saw the sign, I let him know, and I let Mike Smith know. And I think I told Fred Fuller too.
Q. Did you tell anybody else in the building?
A. Well, I did, I told OSMs by putting it in the board that I needed a gate key.
Q. Do you remember who -- the name of the OMS that you told?
A. No, I don't remember their names.
Q. Did you get a response from any of those individuals as to when you would get your new gate key?
A. No, but I just told them, we need this gate key by the 1st -- by when we come back to work on January 3rd, we need this gate key.
Q. And so on January 3rd, when you reported to

work, did you talk to anybody about the gate key?
A. Yes, Greg. I said, Greg, I say, you got my gate key, I said, now I'm going to need the gate key to get in and out of the campus to deliver my work. And at that point, that evening when I called back again and I believe I used my phone and I called back again.
Q. Your cell phone?
A. Yes. And I said, Greg, did you get my key and then he said, well, I'll check on it. So then I kept texting it in the board, I need my key you all, I need my key. So then that's when it was said that Lindy said, tell her to walk the route or wait for somebody to come or just go around the gate.
Q. So based on your communications from the facility, at some point you knew that Ms. Blankenship Hill knew that you didn't have a gate key?
A. Yes.
Q. Do you believe that the failure to provide you a gate key on January 3rd and January 4th, 2012 to operate your route was a breach of the Collective Bargaining Agreement?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:

Q. Do you believe that the failure to give you a gate key on January 3rd and January 4th, 2012 to operate your route was discriminatory based upon your race?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Do you believe that the failure to give you a gate key on January 3rd and January 4th, 2012 to operate your route was discriminatory based on the fact that you were female?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Do you believe that failure to give you a gate key on January 3rd and January 4th, 2012 to operate your route was based on the fact -- was discriminatory based on the fact that you were 40 years old or older?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Do you believe the failure to give you a gate key on January 3rd, January 4th, 2012 to operate your route was conducted in bad faith?
MR. GARTLAND: Object to the form.

THE WITNESS: Yes.
BY MS. POLIN:
Q. Do you believe that the hostile work environment that you've previously testified was created by the actions of UPS was based on your status as a Black female over the age of 40?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Did you lose benefits when you were terminated the first, second, and third time by UPS?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Did you lose compensation?
A. Yes.
Q. Each time that you were terminated did you lose compensation?
A. Yes.
Q. I'm going to show you what's been marked Defendant's Exhibit 29, which is your Complaint. Direct your attention to page 15, Count II, which is the hostile work environment. Paragraph 55, fourth line in, starting with Blankenship, can you read that for me, please?

A. Blankenship hostile -- Plaintiff -- Blankenship --
Q. Is that harassed?
A. Blankenship harassed Plaintiff from the beginning of her management of Plaintiff, resorting (sic) in terminating Plaintiff three times during the period of January '11 to January '12. Continue on?
Q. Uh-huh.
A. Blankenship failed to follow Defendant's progressive discipline policy and terminate plaintiff based on defendant's dishonesty policy which allows for immediate termination. Blankenship never issued Plaintiff any oral or written warning prior to the termination. Blankenship --
Q. Abused?
A. Blankenship abused the dishonesty policy and used it as a pretext for discrimination.
Q. Paragraph 57?
A. Plaintiff suffered unwelcome hostility (sic) from Blankenship.
Q. All right. Do you believe this Complaint accurately summarizes the claims against UPS?
A. Yes.
Q. The paragraphs that you read, were they accurate?

A. Yes.
Q. Do you believe that the panel hearing came to the correct conclusion at the -- regarding the decision for your third termination?
A. Ask me that again?
Q. The panel hearing heard your grievance for your third termination.
A. Uh-huh.
Q. And they decided not to return you to work and they sustained the termination but dropped the dishonesty charge.
A. Okay.
Q. Do you believe they were correct in making that determination?
MR. GARTLAND: Object to the form.
THE WITNESS: No.
BY MS. POLIN:
Q. To your knowledge, does the panel consist of -- well, who does the panel consist of?
A. UPS side and the union.
Q. So in making this decision, it's more than just the union?
A. Yes.
Q. In your review of these documents, have you ever seen a check-in audit form that Mr. Hawkins used

to do the check-in audit of your package car?
A. No.
Q. Did you hear prior testimony by Mr. Mike Smith that when he did check-in audits, he used the check-in audit form?
A. Yes.
Q. Have you been presented during your deposition with a check-in audit form that was used on January 3rd for the check-in audit?
A. No.
Q. You testified earlier that Ms. Blankenship Hill during your termination meeting for your third termination prevented you from explaining the status of the packages after Jim Freeman, Union Steward, asked her to let you explain; is that correct?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. And what was the response that Ms. Blankenship Hill gave when she cut you off from explaining the statuses of the packages?
MR. GARTLAND: Object to the form.
THE WITNESS: Save it for the panel 'cause I don't want to hear it.
BY MS. POLIN:

Q. What is your understanding of a termination meeting? What is your understanding of the purpose of a termination hearing?
MR. GARTLAND: Object to the form.
THE WITNESS: That you're terminated, you're dismissed.
BY MS. POLIN:
Q. To your understanding, is management supposed to investigate the charges?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Does management interview the person disciplined to find out what happened?
A. Yes.
Q. Did Ms. Blankenship Hill ever interview you to find out what happened?
A. No.
Q. Do you believe the fact that she did not provide you an opportunity to explain to her what happened a breach of the Collective Bargaining Agreement?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:

Q. Do you believe that her failure to find out from you what happened was discriminatory based on your race?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
BY MS. POLIN:
Q. Do you believe that her failure to find out what happened was discriminatory based on your age?
A. Yes.
MR. GARTLAND: Object to the form.
BY MS. POLIN:
Q. Do you believe that it was discriminatory based on your gender?
MR. GARTLAND: Object to the form.
THE WITNESS: Yes.
MS. POLIN: I don't have any other questions.
MR. GARTLAND: Ms. Shipman, I have a few follow ups, do you want to take a break before we proceed?
THE WITNESS: No, sir.

RE-EXAMINATION

BY MR. GARTLAND:
Q. There was some testimony earlier during Ms. Polin's examination about a change that you contend was made in the procedure for recording lunch,

correct?
A. Yes.
Q. And that sometimes, I think your estimate was approximately 2009, there was an emphasis on the part of UPS management about taking and recording your lunch hour?
A. Yes.
Q. I couldn't tell with some of the back and forth but is it your testimony that there was an occasion after 2009 where you reported to a supervisor that you didn't take lunch that day and the supervisor instructed you not -- the supervisor instructed you to record an hour for lunch in your DIAD anyway?
A. No. What it was, that's -- that's what they instructed us to do. If you -- if you don't take -- if you take your lunch, you're supposed to put your hour lunch in the board. If you come back, let's say at 8:00 and they want you to clock out by 8:15, okay. They expect to now by a certain time to look into the computer and see that your lunch is already in that board.
Q. Right. And so part of the emphasis is making sure the DIAD and the print out of the activity matches what the driver did minute for minute?
A. Correct.

Q. So instead of coming in at the end of the day and saying, hey, just take an hour for my lunch to an OMS --
A. Right.
Q. -- you would have to record it when you went on break at 12:03 and come back at 1:03?
A. Correct.
Q. Okay. Now, there was some testimony about, we can find it we need to, about a specific exception certification that Mr. Smith reviewed with you, across the top of which was written final warning?
A. Yes.
Q. And part of the progressive disciplinary process, the certification would just be a review with the employee, not a formal warning letter, correct?
A. No, it's a formal warning that --
Q. Just having you sign the certification is a formal warning letter?
A. No, the official letter is the formal -- is the official warning letter.
Q. Correct. And let me clarify. So when Mr. Smith, presumably it's in his handwriting that wrote final warning, is it possible that he meant, if there's another incident of this, it will result in a warning letter, meaning this is the last time I'm

verbally counseling you on this?
A. As thorough as Mike is with paperwork, it's doubtful because Mike love paperwork.
Q. I'm sorry. Why is it doubtful?
A. Because if he put final up there, that meant that's your final warning concerning this right here.
Q. But you only get one warning under progressive discipline, correct? One written warning. So the term, final warning, wouldn't make sense, right?
A. I don't know.
Q. Is it possible that he had reviewed multiple certifications with you and in writing, final warning, what he meant was, if there's another incident like this, it will result in a formal written warning?
A. No, I can't say that with Mike 'cause Mike thorough with his paperwork.
Q. Okay. Well, if he's thorough with his paperwork, would you expect him to issue a warning notice that didn't look like a formal official notice of warning?
A. I can't say.
Q. Okay. So it's not even possible what I'm describing?
A. No, huh-uh.
Q. Did you file a grievance on the fact that

there was a final warning notation on this certification?
A. No, sir.
Q. Okay. Did that final warning notification or final warning handwriting on the certification, was that counted as part of progressive discipline toward termination that you can recall?
A. I can't recall.
Q. There was some discussion about the April 17th panel hearing?
A. Uh-huh.
Q. And the decision that was issued by the panel, to sustain the discharge but find that the allegation of dishonesty was not proven. Do you recall that?
A. Yes.
Q. Do you have any understanding of whether the panel can uphold a discharge on grounds different from the ones cited in the discharge letter?
A. No.
Q. You don't know or you don't believe they can?
A. I don't know.
Q. Have you ever talked about that issue with the union?
A. No.
Q. There was some discussion about your belief

that Mr. Smith driving the package car of a driver whose license was suspended was a violation of the CBA?
A. Uh-huh.
Q. What article or section would that violate?
A. I don't know what article it is but I know that the management team is not supposed to do hourly work, whenever we have a -- we have employees that can do it because we have cover drivers for that.
Q. Got it. Did you ever file a grievance on that?
A. No.
Q. To the best of your knowledge, did anyone file a grievance on that?
A. I don't know.
Q. Did you raise that issue with the union?
A. No.
Q. Why not?
A. So much was going on, I didn't think about that.
Q. But if you believed that it was a violation of the Collective Bargaining Agreement and you believe that it played some role in your discharge, why wouldn't you raise it?
A. I don't know.

Q. Is it fair to say that you believe you're a very capable package car driver?
A. Yes. Oh, yeah.
Q. As capable as anyone else in the building?
A. Yes.
Q. And is it your testimony that without a sixth day of training from Michael Smith on February 21st, 2012, you were incapable of performing the route correctly?
A. Yes, because the route entails so much.
Q. Are other -- have other drivers been able to correctly drive that route after less than six days training?
MS. POLIN: I'm going to object to that.
BY MR. GARTLAND:
Q. Go ahead and answer.
A. We have had several people go on that route and just give up so...
Q. Who are the persons who have given up?
A. It was -- they named some of the names that some of the people just said, I can't do it. I don't remember their names.
Q. Did you ever hear them say they can't do it?
A. I heard management say it when we was in that second, when we was in the hearing, one of the people

had mentioned somebody that had went out there on that route and that happened to them, they had a meltdown.
Q. And are there other people who have successfully delivered that route on one day or another without discipline?
A. Without training?
Q. Without discipline? In other words, do you know the other drivers who performed that route, 31A, at any time during your tenure with UPS, do you know whether they received more than five days' training?
A. No. No, I don't know.
Q. Okay. So if they had only received five days' training and they were able to perform the route, does that make them a better package car driver than you?
A. Wait a minute now. You said -- I'm sorry.
Q. I'm saying, are you aware of any other package car driver who drove Route 31A --
A. Uh-huh.
Q. -- with less than six days' training?
A. No.
Q. Okay. So do you know of any specific package car driver who received six or more days of training on Route 31A?
A. No.
Q. So other drivers performed Route 31A?

A. Yes.
Q. And presumably they received five days training or less, correct?
A. Yes.
Q. And how --
MS. POLIN: I'm going to object that.
MR. GARTLAND: Okay. Your objection is noted.
BY MR. GARTLAND:
Q. How is it that those drivers were able to perform the route one day after their training was completed and you were not?
A. They had prior knowledge of the route.
Q. They never had a first day on the route?
A. No, these drivers had prior knowledge of that route.
Q. What do you mean, prior knowledge?
A. Meaning they were cover drivers and at one time or another they done covered that route before.
Q. What's the basis for that statement?
A. They were cover drivers.
Q. And they were cover drivers, do you know for a fact testifying here today that each of them had performed Route 31A before their first day on it?
A. Yes.
Q. And who are those drivers?

A. Tim Pearson and Mohammed.
Q. Do you know how much training they received? I'm sorry. Do you know how many times they had to run that route as a cover driver?
A. No.
Q. And as a cover driver when they ran the route, would they have a supervisor with them?
A. A lot of times they may have split the route up or put them in there blind, I don't know, but I know they was cover drivers and they ran that route.
Q. Okay. And it's possible that they were given the entire route to run as a cover driver?
A. Yes.
Q. Without any training?
A. No, they had to get some form of training at one time or another on that route particular.
Q. Why do you say that?
A. Because the route entails so much, you got to get some sort of training on there to know where everything go to.
Q. But that's an assumption on your part, correct?
A. Okay.
Q. Is it possible they drove it as a cover route without any previous training?

A. No, it's not possible, no. No.
Q. Why is that not possible? Do you know for a fact they received training before they ran it as a cover driver?
MS. POLIN: I think she's asked and answered the question. You're becoming argumentative now.
MR. GARTLAND: I'm not becoming argumentative. I just asked a different question.
BY MR. GARTLAND:
Q. Do you know for a fact that they drove that route as a cover route -- I'm sorry, I'll rephrase.
Do you know for a fact that they did not drive it as a cover route without previous training?
A. Yes.
Q. Okay. Do you know for a fact that they were trained before driving it as a cover route?
A. Yes.
Q. You personally observed this?
A. I didn't personally observe it but I know -- I know they did.
Q. Why? Who told you that they received training? Let me rephrase.
A. I didn't ask anyone.
Q. Did anyone tell you that they received training?

A. No, I didn't ask. I haven't asked anyone.
Q. So what's the basis for your statement that you know and can testify under oath that they received training?
A. I don't know. So let me -- I don't know if they have received it or not, I don't know.
Q. Okay. There was also testimony about the evening of January 3rd when you returned to the Cary package center, correct?
A. Uh-huh.
Q. And you testified that you intended to scan or process those packages that were found on the package car but that Mr. Hawkins prevented you from doing so. Isn't it true that, according to methods and procedures, those packages are to be scanned at the time that delivery is attempted?
A. Yes.
Q. And so if that had been done, if you had scanned those packages at the time with the service cross and appropriate code and just handed them to Mr. Hawkins, he could have processed them with the clerk, correct?
A. Yes, but I still needed to explain to them about the particular packages, where they needed to be at.

Q. Well, let's take, for instance, the professors' packages, you said that professors that change locations?

A. Yes.

Q. And is there a specific code you can use for no longer lives there or address is incorrect?

A. No, sir. For at least two days I have placed that on the package and I kept getting back the same packages, that's what I was trying to explain to the clerk.

Q. So you think that was a misload on the part of someone?

A. Yes, and that's what I was trying to let them know.

Q. Okay. What about -- what about the future cage, is that the right term?

A. Yes.

Q. Is there a way to code in the system that this should go back to the future cage?

A. Yes. And the future packages during the holidays, they really don't like for you to rescan because they'll tell you, don't keep scanning these future packages, just wait till they're there. So I was just going to tell them, place these back on future again, place them back on future. Don't keep

taking these out of the future cage until it's time for us -- till after January the 6th.

Q. Okay. And your testimony, just to be clear, with respect to each of the packages for which the address was incorrect. You testified that certain of these packages you tried to deliver and the address was incorrect?

A. Right.

Q. And your testimony is that each time you tried to deliver it and someone at that location told you that the professor was no longer a resident there and that they needed to be sent elsewhere?

A. Right.

Q. Again, on the days of January 3rd and 4th -- when did you receive the gate key?

A. I want to say it was on the 5th.

Q. Okay.

A. It was on that Friday when I received it.

Q. Okay. So if you didn't have the valid gate key on the 3rd or 4th, you said it extended your day on the route?

A. Yes.

Q. Having to walk or park and walk longer distances made your day last longer. Do you recall receiving any discipline for being over allowed on

those days?
A. They did come to me and let me know that I went over my plan day.
Q. Okay. You went over your plan day but you were compensated for that time, correct?
A. I got paid for working.
Q. You got paid overtime for going in excess of nine five?
A. I believe I was back by nine five.
Q. But over your plan day?
A. Yes, but over my plan day.
Q. Okay. And they indicated you were over your plan day as part of a daily review the next morning?
A. Yes.
Q. Did you receive any discipline for being over allowed or over your plan day?
A. Other than just coming to me and letting me know that I was over my plan day, no.
Q. Okay. But is that formal discipline, just letting you know that you were over your plan day?
A. No.
Q. Is that a warning letter?
A. No, sir.
Q. It's not a suspension, it's not a discharge?
A. huh-uh. huh-uh.

MR. GARTLAND: That's all I have.
MS. POLIN: I just have one question.
RE-EXAMINATION
BY MS. POLIN:
Q. Regarding the January 3rd and January 4th, 2012 day that you did not have the gate key, your testimony was that you got paid for those days, correct?
A. Yes.
Q. But isn't the January 3rd day also the date that served as the basis for your termination?
A. No, I got -- yes, I got terminated on January 3rd, yes. I forgot about it. Yeah, I got terminated on January 3rd -- no, huh-uh. I got terminated on January the 12th. The gate key, they audited me on January the 3rd and I didn't officially get terminated until January the 12th.
Q. But the grounds of dishonesty --
A. Was on January 3rd.
Q. So the fact that you were terminated on January 3rd, terminated, does it really matter that you got paid for the entire day?
MR. GARTLAND: Object to the form.
THE WITNESS: No.
RE-EXAMINATION

BY MR. GARTLAND:

Q. I'm sorry, just to clarify for the record. You were taken out of service January 12th is what you testified?

A. Yes.

Q. And that you worked January 3rd, 4th, 5th and through the 12th?

A. Yes.

(DEPOSITION CONCLUDED AT 6:57 P.M.)

(SIGNATURE RESERVED)

DEPOSITION ERRATA SHEET

Our Assignment No. 3365AS
Case Caption:  Shipman v. UPS, Inc.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my examination under oath taken in the captioned matter or the same has been read to me, and. the same is true and accurate, save and except for changes and/or corrections, if any, as. indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer. these changes as if still under oath.

Signed on the ______ day of
___________________, 20__.
Denise Shipman

DEPOSITION ERRATA SHEET

Page____ Line____ Change to:____________________________

______________________________________________________________

Reason for change:_________________________________________

Page____ Line____ Change to:____________________________

Reason for change:_________________________________________

Page____ Line____ Change to:____________________________

Reason for change:_________________________________________

Page____ Line____ Change to:____________________________

Reason for change:_________________________________________

Page____ Line____ Change to:____________________________

Reason for change:_________________________________________

Page____ Line____ Change to: ___________________________

Reason for change:_________________________________________

Page____ Line____ Change to:____________________________

Reason for change:_________________________________________

Page____ Line____ Change to:____________________________

Reason for change:_________________________________________

Page____ Line____ Change to:____________________________

Reason for change:_________________________________________

Page____ Line____ Change to:____________________________

Reason for change:_________________________________________

SIGNATURE:_____________________________DATE:______________

DENISE SHIPMAN:

DEPOSITION ERRATA SHEET

Page____ Line____ Change to:____________________________

________________________________________________________________

Reason for change:______________________________________

Page____ Line____ Change to:____________________________

Reason for change:______________________________________

Page____ Line____ Change to:____________________________

Reason for change:______________________________________

Page____ Line____ Change to:____________________________

Reason for change:______________________________________

Page____ Line____ Change to:____________________________

Reason for change:______________________________________

Page____ Line____ Change to: ___________________________

Reason for change:______________________________________

Page____ Line____ Change to:____________________________

Reason for change:______________________________________

Page____ Line____ Change to:____________________________

Reason for change:______________________________________

Page____ Line____ Change to:____________________________

Reason for change:______________________________________

Page____ Line____ Change to:____________________________

Reason for change:______________________________________

SIGNATURE:_____________________________DATE:______________

DENISE SHIPMAN

STATE OF NORTH CAROLINA:

COUNTY OF WAKE:

REPORTER'S CERTIFICATE

I, Suzanne G. Patterson, RPR, a Notary Public, do hereby certify that there came before me on May 9, 2013, the hereinbefore named who was by me duly sworn to testify to the truth and nothing but the truth of his or her knowledge concerning the matters in controversy in this cause; that the witness was thereupon examined under oath, the examination reduced to typewriting under my direction, and the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to, or employed by any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereto set my hand this 21st day of May, 2013.

_______________________________

Suzanne G. Patterson, RPR

Notary Public #200525000025