# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
#### No. 5:12-CV-589-F

| | |
|---|---|
| DENISE SHIPMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     ORDER |
| | ) |
| UNITED PARCEL SERVICE, INC., | ) |
| | ) |
| Defendant. | ) |

This matter is before the court on the Defendant United Parcel Service, Inc.'s Motion for Summary Judgment [DE-23] and Consent Motion for Leave to File Excess Pages [DE-33]. Also pending before the court is Plaintiff's Motion for Leave to File a Corrected Copy of the Memorandum in Response to Defendant's Motion for Summary Judgment [DE-35]. All of these motions are ripe for ruling. For the reasons stated below, all of the motions are ALLOWED.

## I. PROCEDURAL BACKGROUND

Plaintiff Denise Shipman ("Shipman" or "Plaintiff") initiated this action by filing a Complaint [DE-2] in this court, asserting various claims of employment discrimination, retaliation, and harassment against Defendant United States Parcel Service, Inc. ("UPS" or "Defendant") pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Plaintiff also asserted state law claims for breach of contract and breach of the duty of good faith and fair dealing.

UPS filed the Motion for Summary Judgment [DE-23] on July 2, 2013. Shipman timely filed her Response [DE-29], and UPS timely filed a Consent Motion for Leave to file Excess Pages [DE-33] and its Reply [DE-34]. Ten days after UPS filed its Reply, Shipman filed the Motion for Leave

to File Corrected Copy of Memorandum in Response to Defendant's Motion for Summary Judgment [DE-35]. UPS has timely filed its response to Shipman's motion.

## II. MOTIONS FOR LEAVE

Because their resolution determines what materials the court will review when ruling on the Motion for Summary Judgment, the court first considers the parties' motions for leave to file their various memoranda.

UPS, with Shipman's consent, seeks leave to file a reply brief that exceeds the 10-page limit allowed by the Local Civil Rules. For good cause shown, the Consent Motion for Leave to File Excess Pages [DE-33] is ALLOWED, and the court deems the Reply [DE-34] to be properly filed.

Shipman, in turn, seeks leave to file a corrected copy of her response in opposition to the motion for summary judgment. She asserts that the corrected copy addresses typographical errors in her original response, and makes no substantive changes. UPS consents to the motion to the extent that Shipman seeks to correct "purely typographical errors." UPS Resp. [DE-36] p. 1. UPS opposes the motion, however, to the extent that Shipman seeks to make substantive changes. Specifically, UPS contends that Shipman's attempts to make the following alterations constitute substantive changes: (1) changing the pages in a citation; (2) changing the record source of a citation; and (3) adding an entirely new record citation. UPS argues that such proposed changes are in direct response to its Reply brief, wherein UPS noted specific examples where the record materials cited by Shipman allegedly failed to support her factual allegations. UPS contends that Shipman's request to now file a corrected copy constitutes an attempted end-run around the Local Rules, which mandate that response to motions be filed within 21 days. *See* Local Civil Rule 7.1(e)(1).

The court is sympathetic to UPS's concern, and is generally not inclined to give litigants

2

multiple bites at the apple to perfect the substantive nature of their filings. Nevertheless, in light of the record before the court, and the absence of any indication of other dilatory behavior on the part of Shipman or her counsel, the court ALLOWS the Motion for Leave to file Corrected Copy [DE-35]. Accordingly, the corrected copy of the Response [DE-35-2] is what the court will consider when ruling on UPS's Motion for Summary Judgment.

## III. SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-movant. *Liberty Lobby*, 477 U.S. at 255. Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish any one of the essential elements of the party's claim on which he will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322-23.

## IV. FACTS

The following facts are accepted as true for purposes of the motion for summary judgment.

### A.    UPS Operations

UPS is in the business of small-package delivery throughout the world. In the United States, UPS is divided into three geographic "regions," and each of these regions is divided into a number

3

of "districts." Each district includes a number of "package centers," which are responsible for the pickup and delivery of packages from customers in an assigned area. Packages are delivered to and picked up from UPS's customers in brown delivery trucks, which UPS refers to as "package cars." UPS refers to the employees who operate these package cars as "package car drivers."

The facts underlying this case took place at the Cary Package Center in Raleigh, North Carolina. At all times relevant to this case, the Business Manager for the Cary Center was Lindy Hill ("Hill"), a Caucasian female, who served in this role from approximately January 2011 until January 2013. Hill in turn reported to University Division Manager Nicole Brandon ("Brandon"), an African-American female.

## 1. Policies applicable to package car drivers

UPS contends that package car drivers are required to follow specific work rules and methods to ensure that UPS's customers can accurately track the status of their packages at any time. To that end, UPS requires all package car drivers to use an electronic, hand-held device known as a Diagnostic Information Acquisition Device or "DIAD," which tracks drivers' activities throughout the work day. The DIAD is used to scan and track a package car driver's package deliveries and pickups. The information that package car drivers enter into their DIAD is uploaded to a package tracking system so that UPS's customers and employees can monitor the status of packages via the internet or a customer call center. UPS maintains that its ability to track packages minute by minute in an accurate manner is one of the primary services that it provides to customers, and that the accuracy of the package tracking system is dependent upon the data put into the DIAD by package car drivers. UPS states that, when picking up a package, a package car driver is required to enter the address of the pickup location into the DIAD and scan the shipping label on the package to record

4

the precise time of pickup. UPS further states that a similar procedure is followed when package car drivers deliver packages to customers so that an accurate delivery record can be generated.

UPS states that every morning, each package car is loaded with the packages to be delivered along its route. According to UPS, once the packages are on the car, the package car driver must at least attempt to deliver every package. In addition, every package must have a DIAD entry contemporaneous with the delivery or attempted delivery to ensure that UPS and customers can accurately track their packages. UPS asserts that there are a variety of codes a driver can input into the DIAD if she is not able to deliver a package, and, in addition, if a package is not deliverable, UPS requires drivers to write a "service cross" on the package. A service cross is a marking on the package that includes the driver's initials, the time and date of attempted delivery, and the delivery code indicating why the package was not deliverable. The service cross communicates the relevant information to the next driver attempting to deliver the package without requiring the driver to look up the package on the DIAD. If no information is entered into the DIAD for a particular package, UPS assumes that no attempt to deliver that package was made. UPS considers the failure to scan packages into the DIAD to be an act of dishonesty, because it believes the only reason to fail to scan the package would be to cover up something.

UPS monitors many aspects of a package car driver's performance, including the number of individual stops she makes on her route and speed in which the stops were made. UPS states that package car drivers receive "stop credit" for each individual stop made during the day. With respect to locations with multiple deliveries, UPS explains that it distinguishes between when a driver makes multiple stops to deliver multiple packages and where she delivers multiple packages to a single location only requiring one stop. When a package car driver delivers multiple packages to different

5

individuals at a single location (such as delivering packages to the office of an apartment building for several residents) and does not attempt to deliver each package separately to each recipient (by, for example, going to each apartment and trying to obtain the signature of each recipient), UPS explains that the packages must all be recorded into the DIAD as one stop. If the packages are recorded as individual stops, the package car driver receives stop credit for each package when she actually only stopped once. UPS refers to this as "padding stops," and considers it to constitute dishonesty.

UPS explains that one code used to indicate an individual stop is the "left at" code. A driver may properly record a package as "left at" when: (1) she attempts delivery on a package to its intended recipient, (2) if she is unable to obtain a signature from the intended recipient, she leaves the package at an alternate location and obtains another's person's signature, and (3) she leaves an "Info Notice" on the door of the intended recipient indicating where the package was left. UPS maintains that it only allows the "left at" designation to be used when delivery of the package to its intended recipient was attempted. A package car driver is not to use this code when delivering multiple packages to a single location without attempting delivery on every package or leaving "Info Notices." UPS considers the use of the "left at" code in this manner to be "padding stops."

UPS also places value on the honesty of its employees. It has a Policy Book, wherein, at the time Shipman began her employment, its honesty and integrity section provided as follows:

WE INSIST UPON INTEGRITY IN OUR PEOPLE. We present our company honestly to employees and, in turn, expect them to be honest with us.

We expect honesty from our people in their handling of money, merchandise, and property with which they are entrusted. We insist on integrity in the preparation and approval of all reports.

6

\*\*\*

The great majority of our people are of high moral character. However, when we do discover a dishonest person in our organization, we deal with that individual quickly and firmly. For our company to be known for its integrity, each one of us must meet high standards.

Dep. of Shipman pp. 68-69, Ex. 4 [DE-25-5] UPS maintains that the trust of its customers is vital to its success, and that its commitment to honesty and integrity is integral to its business.

## 2. The Collective Bargaining Agreement

The terms and conditions of package car drivers' employment with UPS are governed by the Collective Bargaining Agreement ("CBA") between UPS and the International Brotherhood of Teamsters (the "Union"). Disputes between UPS and the Union regarding disciplinary action for employees covered by the CBA are resolved by the grievance procedure set forth in the CBA. Once a grievance is filed, the first step is a local-level hearing where UPS representatives meet with the grievant and her Union representatives to discuss the grievance. If a grievance cannot be resolved at the local-level hearing, then the grievance proceeds to a regional-level panel where the grievance is heard by a panel of six (6) representatives — three Company representatives (usually UPS personnel from other districts) and three Union representatives who are not employees of UPS. This hearing is typically referred to as "the panel hearing," and the result obtained at this level is final and binding on both UPS and the Union.

The CBA also governs how employees covered by the CBA are disciplined. The CBA provides for two levels of infractions, routine violations and serious violations, which UPS refers to as "cardinal sins." For routine violations, the Article 50 of the CBA requires progressive discipline, which includes a warning letter prior to any suspension or discharge. For a discharge for

7

a routine violation, the employee continues working pending the resolution of any grievance filed regarding the discharge, called a "working discharge." Cardinal sins, on the other hand, may result in immediate discharge without progressive discipline or a working discharge. Under Article 50 of the CBA, dishonesty is listed as an offense which may result in immediate discharge.

**B.    Shipman's employment at UPS**

Shipman, a 49 year-old African American female, worked for UPS from 1997 to 2012. She began her employment as a part-time employee, and eventually worked her up to a full-time package car driver position in 2000. Shipman contends that at the time of incidents giving rise to this suit, out of 82 package car drivers at the Cary Center, seven were female. She asserts she was the lone African-American female; the rest were Caucasian.

As Union members, package car drivers, including Shipman, complete a yearly bid in order to determine which route they drive. A route is then awarded to the most senior of the drivers who selected that route. In January 2011, a more senior driver bid on the route Shipman was then-servicing, so she bid on Route 31A, which includes the campus of North Carolina State University. In February 2011, prior to beginning to drive Route 31A, Shipman received five days of training on the route from her immediate supervisor, On-Road Supervisor Mike Smith, an African-American male, who rode in the package car with her and showed her where the stops were and how to deliver them. UPS asserts that typically a supervisor trains a package car driver on a new route for one to three days, but Smith rode with Shipman for five days on Route 31A.

**1.    March 2011 Termination**

Smith and Shipman had planned for Smith to ride with her for an additional sixth day of training on Route 31A on February 21, 2011. Instead, when Shipman arrived at work she learned that

8

Smith would not be assisting her, because he instead had to drive a package car for a driver whose license had been suspended. Shipman contends the decision to have Smith drive a package car violated the CBA; however, she has not provided any evidence showing which portion of the CBA was violated.

Shipman contends that before she left the facility, she told Smith that she would need help on the route, and that Smith replied that she would get some. Shipman further contends that beginning around 10:00 AM, she repeatedly began contacting Hill via the DIAD requesting assistance, but no help arrived until after 4:30 PM, when Smith and some package car drivers arrived. Smith testified that he was attempting to do damage control, and deliver what packages he could given the late hour. Despite having the assistance of Smith and four additional package car drivers, Shipman still had a large number of packages on her car at the end of the day. In fact, Smith testified that Shipman's performance was the worst he has seen before or since that time, and that he has never had another package car driver fail to deliver as many packages. Dep. of Mike Smith [DE-30-3] pp. 48-49. Shipman contends this was because her requests for help were ignored until it was too late in the day to deliver packages.

During the course of what both parties agree was an abysmal day for Shipman, she realized that she was delivering some Next Day Air ("NDA") packages on her route late. Normally, NDA packages must be delivered by 10:30 AM and NDA "saver" packages must be delivered by 3:00 PM. If an NDA package is delivered after those specified times, it is considered late unless the customer contacted UPS and requested that the package be delivered at a later time, in which case, it is recorded as "customer-requested late." Smith performed an audit on Shipman's delivery records and found that, on February 21, 2011, she recorded a series of NDA as "customer requested late." UPS

9

contends that it had no record of any of the customers requesting that the packages be delivered late and did not authorize Shipman to deliver any of the packages late. In UPS's view, Shipman's recording the deliveries as "customer-requested late" could not have been unintentional, and constituted dishonesty under its policy. UPS accordingly discharged Shipman's employment on March 1, 2011.[1]

Shipman filed a grievance regarding her March 1, 2011, discharge. A local level hearing was held, but the since the grievance was not resolved at that point, it was scheduled to proceed to the panel. On June 29, 2011, prior to the panel hearing the case, UPS and the Union met again and reached an agreement that Shipman would return to work, with her time off since her discharge to be considered an unpaid suspension. Upon her return to work, UPS provided Shipman with additional training on a package car driver's responsibilities, and Smith also trained Shipman on Route 31A by riding the route with her for an additional five days.

## 2. August 2011 Discharge

On August 19, 2011, UPS performed an audit of Shipman's delivery records. The audit revealed that Shipman coded almost 50 packages as "left at" when it appeared that she had not attempted individual delivery on each package as required by the "left at" procedure. For example, the audit showed that Shipman recorded 24 packages as "left at" in 12 minutes, which UPS contends is a physical impossibility if she was attempting to individually deliver each package. UPS notes that

---

[1] Shipman contends she recorded some deliveries as "customer requested late" because she was attempting to remedy the situation where UPS would have to have refund the next day air fees for the packages. She asserts that she asked the signee for "the packages" if she minded if the packages were late. Because the signee indicated she did not mind, Shipman coded the delivery as "customer-requested late." Shipman's citation to her deposition, however, does not support this assertion of fact. *See* Corrected Response [DE-35-2] p. 8 (citing Shipman Dep. [DE-31-1] pp. 113-117).

Case 5:12-cv-00589-F   Document 41   Filed 10/03/13   Page 10 of 25

all the packages were signed by the same person, which it considered evidence that Shipman simply delivered all the packages to one location. According to UPS, this violates its policies and procedures. UPS further considered this to constitute dishonesty for compensation for work not performed, since Shipman took credit for multiple stops that she did not actually make. UPS discharged Shipman for dishonesty and compensation for work not performed on August 29, 2011.

Shipman concedes that she used the "left at" key on her DIAD when she left packages addressed to multiple dormitories at a single dormitory, but contends that she also did this during her training with Smith. She further contends that at least three other drivers, Duane Tipton, Tim Pearson and Mohammed Hussein, used the "left at" key in a similar manner, and those drivers received warnings instead of immediate discharge.

On September 2, 2011, Shipman filed a grievance claiming that she was improperly discharged. Again, no resolution was reached at the local level hearing, so the grievance proceed to the panel, which reduced Shipman's discharge to a time-served, unpaid suspension, and instructed her to properly record packages. When Shipman returned to work on or about November 21, 2011, she again received training on proper methods and procedures for recording the delivery of packages.

## 3. January 2012 Discharge

On January 3, 2012, at the end of the holiday peak season, Shipman returned to work from a three-day New Year's holiday. Shipman contends that she normally used a "gate key," which allowed her easier access to portions of the North Carolina State University campus to deliver packages. Shipman, however, was not provided a gate key on either January 3, 2012, or January 4, 2012. She asserts that without a gate key, she had to find parking on campus far from her delivery locations and then walk to the delivery locations. Shipman contends that having to work the route

11

without a gate key added a significant amount of time to her work.

Shipman admits that she had undelivered packages remaining on her package car when she returned to the Cary Center on the evening of January 3, 2012, but she contends that she intended to take the packages to the exception clerk to discuss how they should be handled. Shipman asserts that some of the packages had been placed on her car despite being previously marked as undeliverable until January 6, 2013, when the North Carolina State University campus officially reopened after a winter break. She also contends that certain packages were addressed to professors who had moved, and she intended to talk to the exception clerk about how those packages should be handled. Upon her return to the Cary Center, however, she was met by her new direct supervisor, Gregory Hawkins, who told her he was going to perform a check-in audit on her package car. UPS asserts that the purpose of a check-in audit is to ensure that all packages left on a package car are in the correct location, have been properly recorded in the DIAD, and have service crosses on them. According to Shipman, Hawkins directed Shipman to clock out and did not let her explain the status of the packages remaining on the package car.

In the check-in audit, Hawkins found six packages that did not have service crosses, correct labels for the date, nor were the packages scanned into the DIAD to indicate that delivery was attempted. According to UPS, these packages also did not bear the required service cross. Hawkins reported the findings of the audit of Shipman's package car to Hill. UPS asserts that a subsequent review of Shipman's delivery records for January 3, 2012, also revealed that a number of packages were recorded incorrectly. Specifically, UPS asserts that Shipman recorded several undelivered packages to indicate that the recipient businesses were closed; however, she had delivered other packages to the same locations on the same day.

12

On the morning of January 12, 2012, Shipman was told to report to Hill's office, where she met with Hill and a Union steward. Hill detailed the problems with the packages left on Shipman's package car on January 3, 2012. Shipman contends that she told Hill about the packages that were released from the "future" cage prematurely and that some of professors had moved. She also told Hill that for some of the packages, she had driven up to the customer site, but found that the business was closed. Shipman asserts that she put those packages aside and forgot about them. Hill told Shipman that she had failed to say anything that made Hill feel "warm and fuzzy" and so she was fired. UPS contends that prior to Hill's meeting with Shipman, she conferred with Labor Manager Lester Grant and Division Manager Nicole Brandon, and they all three agreed that Shipman should be discharged. Shipman was provided a letter explaining the reason for her termination, which stated the following:

> On January 3, 2012, it was discovered through an audit of your package card that you did not complete your delivery work and customer packages were left on the car, having no valid delivery attempt, resulting in service failures. On January 4, 2012, it was discovered through an audit of your delivery records that you were dishonest in your recording of your delivery records. Your overall work record is unacceptable.
>
> This letter shall serve as your official notification that your employment with UPS is, hereby, terminated in accordance with Article 50 of the current labor agreement, for just cause; falsification of company records and documents, dishonesty, and overall work record.

January 12, 2012, Letter [DE-25-6] p. 10.

Shipman again grieved her discharge. After no resolution was reached at the local level hearing, Shipman's grievance proceed to the panel. Ultimately, the panel decided to uphold Shipman's discharge based on her continued failure to follow methods and procedures, including in particular those relating to proper recording of the packages. The panel determined, however, that

13

the charge of dishonesty against Shipman was not proven. Because failure to follow proper methods and procedures is not a "cardinal sin" and would have afforded Shipman the right to a working discharge, the panel required UPS to pay her for the time period between her discharged and the panel's decision.

## C. Shipman's filing of the EEOC Charge

Shipman filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on or about May 29, 2012, alleging that her January 2012 discharge was motivated by race, sex, and age discrimination. *See* Charge [DE-25-6], p. 20. The Charge lists January 17, 2012, as the first and last date on which any alleged discrimination occurred, and specifically states the following:

I. I have worked for U.P.S. since May 15, 1997, most recently as a Driver. On January 11, 2012, I was discharged from that position. U.P.S. employs more than 20 persons.

II. Ms. Linda [sic] Blankenship, Caucasian, female, under 40, told me that I was fired because I failed an audit. However, management did not produce any audit documentation. Additionally, I have not had any disciplinary actions during my tenure.

III. I believe I have been discriminated against, based on race Black, my sex, female and my age, 48, which is in violation of Title VII of the Civil Rights Act of 1964, as amended and the Age Discrimination in Employment Act of 1967, as amended.

*Id.* On June 11, 2012, the EEOC issued a "no cause" determination and a Dismissal and Notice of Rights to Shipman, who timely filed the instant action on September 7, 2012.

## V. ANALYSIS

In the Complaint, Shipman asserts a claim for disparate treatment race, gender, and age discrimination under Title VII and the ADEA, *see* Compl. [DE-2] ¶¶ 51-53; a claim for hostile work environment based on her race, gender and sex under Title VII and the ADEA, *see id.* ¶¶ 54-60; a

14

claim for retaliation under Title VII and the ADEA, *see id.* ¶¶ 61-64; and claims for breach of contract and breach of the duty of good faith and fair dealing under North Carolina, *see id.* ¶¶ 65-76. All of Shipman's claims are based on her March 2011, August 2011, and January 2012 discharges.

UPS argues it is entitled to summary judgment because (1) Shipman's Title VII and ADEA claims, other than her disparate treatment discrimination claim based on the January 2012 discharge, are untimely and barred for failure to exhaust administrative remedies; (2) Shipman cannot establish a prima facie case of disparate treatment race, gender or age discrimination with respect to her January 2012 discharge, nor is there any evidence that UPS's legitimate, non-discriminatory reason for her discharge were a pretext for unlawful discrimination, and (3) Shipman's state-law claims for breach of contract and breach of the duty of good faith and fair dealing are preempted by federal law. In response, Shipman states that she "voluntarily withdraws her Breach of Contract and Breach of Duty of Good Faith and Fair Dealing claims." *See* Corrected Response [DE-35-2] unnumbered p. 33. The court construes this to be a motion for voluntarily dismissal pursuant to Rule 41(a)(2). The motion is ALLOWED, and Shipman's claims for breach of contract and breach of the duty of good faith and fair dealing are DISMISSED. Accordingly, the court only will address UPS's first two arguments.

## A. Failure to timely exhaust administrative remedies

Title VII makes it an "unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex . . . ." 42 U.S.C. § 2000e-2(a)(1). The ADEA makes it "unlawful . . . to discharge any individual or otherwise discriminate against any individual with respect to his . . . privileges of employment,

15

because of such individual's age." 29 U.S.C. § 623(a)(1).

"Before a plaintiff may file suit under Title VII or the ADEA, he is required to file a charge of discrimination with the EEOC," thereby exhausting his administrative remedies. *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009)(citing 42 U.S.C. § 2000e-5(f)(1); 29 U.S.C. § 626(d)). The exhaustion of administrative remedies is a statutory prerequisite to properly invoke the jurisdiction of the federal court. *Id.* ("[A] failure by the plaintiff to exhaust administrative remedies concerning a Title VII [or ADEA] claim deprives the federal courts of subject matter jurisdiction over the claim."). To be timely, a charge of discrimination must be filed within 180 days after the alleged discrimination occurred. *See* 42 U.S.C. § 2000e–5(e)(1) and 29 U.S.C. § 626(d); *see also E.E.O.C. v. Commercial Office Prods. Co.*, 486 U.S. 107, 110 (1988).

The allegations contained in the EEOC charge "generally operate to limit the scope of any subsequent judicial complaint." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996) (citation omitted). "If the claims raised under Title VII [or the ADEA] exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005) (quotation omitted). Consequently, the Fourth Circuit has held that "if the factual foundation in the administrative charge is too vague to support a claim that is later presented in subsequent litigation, that claim will also be procedurally barred." *Id.* (citation omitted).

Additionally, discrete discriminatory and retaliatory acts are not actionable if they are time-barred, even when they relate to acts alleged in other timely filed charges. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002); *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 220 (4th Cir. 2007). The Fourth Circuit has "declined to extend the limitations period for discrete acts

16

of discrimination merely because the plaintiff asserts that such discrete acts occurred as a part of a policy of discrimination." *Williams v. Giant Food, Inc.*, 370 F.3d 423, 429 (4th Cir. 2004).

Under these principles, Shipman's claims alleging a hostile work environment and retaliation are barred for failure to exhaust administrative remedies. With regard to her claim for hostile work environment, the Fourth Circuit has "held that the allegation of a discrete act or acts in an administrative charge is insufficient when the plaintiff subsequently alleges a broader pattern of misconduct." *Chacko*, 429 F.3d at 509. Here, the Charge–and the questionnaire submitted by Shipman which was used to draft the Charge–concern only the discrete discriminatory act of the January 2012 termination of her employment. *See* Charge [DE-25-6] p. 20; Intake Questionnaire [DE-25-6] pp. 18-19. This allegation in the Charge concerning one termination does not provide "notice of the sort of repeated, severe and pervasive conduct required for establishing a hostile work environment claim." *Guion v. Mabus*, No. 4:11-CV-159-F, 2012 WL 1340117, at \*7 (E.D.N.C. April 17, 2012) (citing *Morgan*, U.S. at 115; *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993)). Nor can the court find that a hostile work environment claim would have been developed by a reasonable investigation of Shipman's Charge. *Id.*, *see also Bannister v. Wal-Mart Stores East, L.P.*, 843 F. Supp. 2d 610, 617 (E.D.N.C. 2012) (determining that EEOC charge detailing two discrete episodes of discipline would not provide notice of a claim of harassment or hostile work environment, "[n]or would such claims be developed by a reasonable investigation by the EEOC").

Neither can the court find that Shipman's retaliation claim is reasonable related to the Charge such that it would have reasonably been expected to follow from an administrative investigation of that charge. *See Miles v. Dell, Inc.*, 429 F.3d 480, 492 (4th Cir. 2005). Shipman did not check the retaliation box on the Charge, nor did she include any facts in the Charge narrative which suggest

17

her termination was the result of retaliation. She thus provided no notice to UPS that she would be bringing a retaliation claim, and a reasonable investigation by the EEOC would not have developed such a claim. Under these circumstances, the court must conclude that Shipman has failed to exhaust her administrative remedies as to her retaliation claim. *Id.*; *see also Kerney v. Mountain States Health Aliance*, 894 F. Supp. 2d 776, 780-81 (W.D.Va. 2012) (concluding that the plaintiff failed to exhaust her administrative remedies for her retaliation claim where the EEOC charge claimed only discrimination on the basis of age and disability and did not mention retaliation at all).

The court also concludes that Shipman's disparate treatment claim, to the extent it is based on the March 2011 and August 2011 discharges, must be dismissed. As the court already has stated, discrete discriminatory and retaliatory acts are not actionable if they are time-barred, even when they relate to acts alleged in other timely filed charges. *See Morgan*, 536 U.S. at 114; *Holland*, 487 F.3d at 220. Accordingly, even if this court assumes that the March 2011 and August 2011 discharges are reasonably related Shipman's Charge–even though the Charge makes no mention of the prior terminations, states that the date of the discriminatory conduct as January 2012, and affirmatively states that Shipman had not been subject to any disciplinary action to prior to January 2012–any claim based on those discharges is nonetheless untimely. Shipman filed the Charge on May 29, 2012, well after 180 days had passed after either the March 2011 or August 2011 discharges.

Shipman attempts to salvage her disparate treatment claim, to the extent that it is based on the 2011 discharges, by arguing that the alleged misconduct was part of a "continuing violation" or a "pattern or practice" claim. Both arguments fail. First, a discharge is a discrete act of discrimination under *Morgan*, and therefore "the continuing violation doctrine does not apply . . . and cannot save [Shipman's] untimely claims." *Williams*, 370 F.3d at 429 (citing *Morgan*, 536 U.S.

18

at 114). Second, Shipman's "pattern or practice" theory has been rejected by the Fourth Circuit. In *Williams*, the Fourth Circuit held that each failure to promote remains a discrete act of discrimination, even if it is part of a broader discriminatory practice. *Id.* at 429 (agreeing with "other courts [that] have declined to extend the limitations period for discrete acts of discrimination merely because the plaintiff asserts that such discrete acts occurred as part of a policy of discrimination"); *id.* at 430 ("We see no reason why the general rule set out in *Morgan* should not apply to such separate incidents [of discrete acts] just because [the plaintiff] alleges, in a general sense, that there was a 'pattern or practice' of discrimination."). The reasoning in *Williams* is equally applicable here to Shipman's allegations regarding the March 2011 and August 2011 discharges.[2]

Consequently, the court finds that Shipman's claims for retaliation and hostile work environment are barred for failure to exhaust administrative remedies, and that her disparate treatment claim, to the extent it is based on the March 2011 and August 2011 discharges, is untimely. UPS's Motion for Summary Judgment [DE-23] is therefore ALLOWED as to those claims.

## B. Shipman lacks sufficient evidence to show that her discharge was based on sex, race, or age

As this court has recounted, Title VII makes it illegal for an employer to discharge an employee on the basis of the employee's sex or race. 42 U.S.C. § 2000e-2(a)(1). The ADEA, in turn, is violated if an employer "discharge[s] any individual . . . . because of such individual's age." 29

---

[2] Additionally, as UPS observes, the words "pattern or practice" appear nowhere in the Charge or the Complaint, and even if Shipman had attempted to allege such a claim, the Fourth Circuit has held that "individuals do not have a private, non-class cause of action for pattern or practice discrimination under . . . Title VII." *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 759 (4th Cir. 1998); *see also Williams*, 370 F.3d at 403 n.3 ("*Lowery* . . . held that an individual plaintiff (as opposed to a class action plaintiff) cannot pursue a cause of action based on a pattern or practice of discrimination or invoke the proof scheme described in *International Brotherhood of Teamsters v. United States* . . . ."(internal citation omitted)).

U.S.C. § 623(a)(1). Unlike Title VII, which allows a plaintiff to proceed under a theory that sex or age was *a* motivating factor for the adverse employment action, under the ADEA, "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009).

In the absence of direct evidence of discrimination, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) for claims pursuant to Title VII and the ADEA. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc).[3] First, a plaintiff bears the burden of establishing a prima facie case of discrimination, which requires a plaintiff to show "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd.,* ___ U.S. ___, 132 S. Ct. 1327 (2012). "In the employee discipline context, a prima facie case of discrimination is established if the plaintiff shows that he 'engaged in prohibited conduct similar to that of a person [outside the protected class] . . . and . . that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person." *Kelley v. United Parcel Service, Inc.*, No. 12-2343, ___ F. App'x ___, 2013 WL 2480211, at \*1 (4th Cir. June 11, 2013) (per curiam) (quoting *Moore v. City of Charlotte*, 754 F.2d 1100,

---

[3] The Supreme Court has assumed, without deciding, that the *McDonnell Douglas* framework is applicable to ADEA claims. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 141-42 (2000); *see also Gross*, 557 U.S. at 175 n.2 ("[T]he court has not definitively decided whether the evidentiary framework of *McDonnell Douglas* . . . is appropriate in the ADEA context."). Since *Gross*, the Fourth Circuit has continued to permit the application of the *McDonnell Douglas* framework to ADEA claims, *see, e.g., Duffy v. Belk*, 477 F. App'x 91, 93 (4th Cir. 2012) (unpublished opinion), and accordingly, this court will do the same.

1105-06 (4th Cir. 1985)).

If a plaintiff sets out a prima facie case of discrimination, the burden shifts to the employer to establish a legitimate, nondiscriminatory reason for the adverse action. *Hill*, 354 F.3d at 285. If the employer sets forth a legitimate, nondiscriminatory reason for the action, the plaintiff then bears the burden of showing, by a preponderance of the evidence, that the employer's proffered neutral reasons were not its true reasons, but were instead a pretext for discrimination. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010). "[T]he burden to demonstrate pretext has merged with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." *Holland*, 487 F.3d at 214 (4th Cir. 2007) (quotation omitted).

In this case the parties dispute whether Shipman can establish a *prima facie* case of sex, race, or age discrimination. Notably, the Fourth Circuit has cautioned courts "to resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget the scheme exists solely to facilitate the determination of the 'ultimate question of discrimination *vel non*.'" *Merritt*, 601 F.3d at 295 (quotation and citations omitted, alteration in original). Accordingly, in cases where the employer has proffered a legitimate reason for the adverse employment action in its motion for summary judgment, the Fourth Circuit commonly assumes, without deciding, that the plaintiff has established a prima facie case and goes on to consider whether a plaintiff has adduced evidence, which if believed, would allow a jury to conclude the actual basis for the adverse action was unlawful discrimination. *See, e.g., Holland*, 487 F.3d at 218; *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 301, 319 (4th Cir. 2005); *Mereish v. Walker*, 359 F.3d 330, 334 (4th Cir. 2004). Here, UPS has articulated a legitimate, non-discriminatory reason for Shipman's January 2012 discharge: she was terminated for "falsification of company records and documents, dishonesty, and

21

overall work record." January 2012 Letter [DE-25-6] p. 10. Because the parties' arguments regarding the prima facie case and Shipman's ultimate burden of showing intentional discrimination largely overlap, the court will assume, for purposes of this motion, that Shipman has established a prima facie case.

Thus, the issue before the court is whether Shipman has adduced sufficient evidence that, if believed, would allow the finding that UPS's purported reasons for her January 2012 discharge were pretexts, and the actual basis for her discharge was unlawful discrimination.

Shipman offers two principal arguments as to why she has shown that UPS's reasons for her January 2012 discharge were pretext for unlawful sex, race or age discrimination. First, she contends that three other male employees, some of whom were under the age 40 or not African American, engaged in similar conduct and were not discharged. Second, she contends the panel's determination that the charge of dishonesty was not proven is sufficient evidence of pretext to allow her case to reach the jury.

With regard to Shipman's first argument, she has not proffered admissible evidence showing that the three other male employees are valid comparators. To be similarly situated, "an employee must have engaged in the same conduct without mitigating circumstances that would distinguish [his] conduct or the employer's treatment of [him] for it." *Elzey v. Wal-Mart Assocs., Inc.*, No. RDB-11-2151, 2012 WL 3715321, at \*6 (D. Md. Aug. 28, 2012) (quotation and alterations omitted). The comparison need not involve *exactly* the same set of work-related circumstances, but "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008) (citation omitted). "Such a showing would include evidence that the employees dealt with the

22

same supervisor, were subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (quotation and alterations omitted).

Here, Shipman has proffered her testimony that Mohammed Hussein (38-year old, Middle Eastern male), Duane Tipton (46-year old, Caucasian male), and Tim Pearson (31-year old, African American male) all told her that they were counseled–and not discharged–for using the "left at" button improperly. *See* Shipman Dep. [DE-31-1] pp. 207-212, 224-25, 261. Even assuming that this evidence is not inadmissible hearsay, the court does not perceive that the improper use of the "left at" button to be substantially the same as the failure to attempt to deliver packages. Nor is it comparable to representing that recipient businesses were closed when other packages had been delivered to the same address on the same date.[4] Even if the court considers the alleged misconduct broadly, as constituting "dishonesty," Shipman fails to address her disciplinary record leading up to her January 2012 discharge, and whether these three comparators had a similar record. With this lack of information, it cannot be said that these three male package car drivers engaged in the same conduct without differentiating or mitigating circumstance that would distinguish their use of the "left at" key or UPS's treatment of them for it. *See Street v. United Parcel Service, Inc.*, 822 F. Supp. 2d 1357, 1368 (M.D. Ga. 2011) (determining that a co-worker was not a comparator because, *inter alia*, "no evidence exists that [the co-worker's] record shows the history of disciplinary actions, including reprimands and termination, that Plaintiff's employment history reflects").

---

[4] The court recognizes that Shipman disputes that she failed to attempt delivery or made false representations about whether a recipient was open or closed. There is no suggestion, however, that UPS did not perceive this to be the misconduct she engaged in.

23

With regard to Shipman's second argument, the fact that the panel determined that the dishonesty charge was not proven–but still upheld Shipman's discharge for her continued failure to follow proper methods and procedures–does not establish that her discharge was the result of unlawful discrimination. At issue in this claim is not whether UPS's reasons for terminating her employment were ultimately correct or fair, but rather, whether Shipman's race, sex, or age were the real reasons for her discharge. The fact the panel found one of the reasons for her discharge not to be proven does not mean that (1) the UPS decision-makers did not believe she had engaged in dishonest conduct and (2) her discharge was because of her race, age, or sex. *See Golter v. Square D Co.*, No. 4:06CV3287, 2007 WL 4225273, at *10 (D. Neb. Nov. 27, 2007) (where plaintiff offered affidavit from union official in an attempt to show her termination was improper because it was not for just cause, the court stated that "even if I assume that [the plaintiff] has established that her termination was not for just cause, this does not establish that termination for violation of the last chance agreement was pretext for sex discrimination"). As is oft-repeated in this Circuit:

[T]his court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination. . . . . Our sole concern is whether the reason for which the defendant discharged the plaintiff was discriminatory. Thus, when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not out province to decide whether the reason was wise, fair or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.

*DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quotation and citations omitted); *see also Robinson v. BGM America, Inc.*, ___ F. Supp. 2d ___, 4:11-3459-MGL, at *14 (D. S.C. Aug. 8, 2013); *Croft v. City of Roanoke*, 862 F. Supp. 2d 487, 498 (W.D. Va. 2012); *James v. Verizon*, 792 F. Supp. 2d 861, 869 (D. Md. 2011). In light of the record before the court, the panel's determination that the dishonesty charge was not proven does not give rise to the inference that

24

Shipman's discharge was caused by unlawful discrimination.

Accordingly, UPS's Motion for Summary Judgment [DE-23] is ALLOWED.

## VI. CONCLUSION

For the above stated reasons, it is hereby ORDERED that Plaintiff's Motion for Leave to File a Corrected Copy of the Memorandum [DE-35], Defendant United Parcel Service, Inc.'s Motion for Summary Judgment [DE-23] and its Consent Motion for Leave to File Excess Pages [DE-33] are all ALLOWED. Plaintiff's claims are DISMISSED, and the Clerk of Court is DIRECTED to close this case and remove it from the undersigned's trial calendar.

SO ORDERED

This the _3_ day of October, 2013.

James C. Fox

JAMES C. FOX
Senior United States District Judge